# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **FW-CO, INC.,** | ) | |
| d/b/a Fortis Warranty | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. _____** |
| vs. | ) | |
| | ) | |
| **CHARLES SCHULZ,** | ) | |
| **DAVID SCHUPPMAN,** | ) | |
| and | ) | |
| **TRIDENT SOLUTIONS** | ) | |
| **OF SUGAR GROVE, LLC,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED COMPLAINT

Plaintiff FW-CO, Inc., d/b/a Fortis Warranty ("**Fortis**" or the "**Company**"), by and through its undersigned counsel, files the following Verified Complaint against Defendants Charles Schulz ("**Schulz**"), David Schupmann ("**Schupmann**") and Trident Solutions of Sugar Grove, LLC ("**Trident**") (collectively, "**Defendants**").

## INTRODUCTION

**"I have never been asked to do this in my other 28 years in the business" – Scott Reynolds**

1.      This case involves two former employees who, apparently unsatisfied with the significant compensation Fortis provided them, engaged in a massive scheme to enrich themselves at their employer's expense by both demanding kickbacks from contractors and diverting business to an entity that they created and operated.

2.      Schulz and Schupmann's actions were in clear violation of their respective duties of loyalty to Fortis, and in breach of the Employment Agreement ("**Agreement**") Schupmann executed as a condition of his employment with Fortis.

3.      Schulz and Schupmann's wrongdoing was aided and abetted by Trident, which intentionally interfered with Fortis's employment contracts and business relations with the intent of damaging Fortis for the benefit of Defendants.

4.      Fortis hired Schupmann on February 27, 2018 as part of its effort to build out the sales and marketing wing of its business.

5.      Schupmann's first hire was Schulz, who joined Fortis in June 2018.

6.      Fortis eventually promoted Schupmann to COO of Fortis in October 2021.

7.      As a member of Fortis's sales and marketing division, Schulz was primarily tasked with identifying and soliciting potential clients for Fortis's Roof Performance Program (the "**Program**"). The Program offers an initial roof reconditioning service, followed by the issuance of a roof warranty, which saves Fortis's customers significant amounts of money compared to a complete roof replacement. Fortis works with outside contractors to provide the labor and materials to complete these projects. In addition to a base salary, Schulz was awarded a 10% commission on his gross sales volume—two to three times more than that of any other Fortis salesperson.

8.      Schulz's supervisor was Schupmann, who developed a close relationship with Schulz. Like Schulz, Schupmann earned a large base salary and was eligible to earn significant bonuses based on his performance.

9.      Given that Schulz and Schupmann had the ability to accrue substantial bonuses and commissions through their compensation plans, an ordinary employee in their shoes would have worked hard on Fortis's behalf to maximize their compensation, benefitting themselves and the Company concurrently. If Schulz and Schupmann were concerned that their pay was less than they deserved, they could have resigned and sought other employment or negotiated new terms with

2

Fortis. Schulz and Schupmann instead chose a third path: to "double dip" from Fortis through demanding kickbacks from Fortis's contractors and, in other instances, diverting whole projects from Fortis to abscond with all of the revenue generated from that work without Fortis ever knowing of their scheme.

10. To further this plot, Schulz and Schupmann created Trident, which they used both as a receptacle for their kickback payments and as a de facto competitor of Fortis's that diverted potential Fortis business secretly.

11. Schulz and Schupmann successfully ran this illicit campaign for years, earning untold amounts before it was uncovered by Fortis in late 2024.

12. Nothing about Defendants' actions was legal. Schulz and Schupmann usurped business opportunities from Fortis and artificially inflated Fortis's costs and liabilities in obvious violation of the duty of loyalty and in breach of Schupmann's contractual obligations to Fortis. These actions were assisted by and greatly benefitted Trident, which at all times had knowledge of Fortis's contracts and prospective business relations.

13. Defendants' acts have significantly damaged and jeopardized Fortis's business by unfair methods. Defendants have caused Fortis to lose significant revenue and clients due to Schulz and Schupmann's unlawful kickback scheme and diversion of work away from Fortis, which Trident has knowingly and willingly participated in for its own profit. Accordingly, Fortis seeks money damages for its lost profits, Defendants' unjust enrichment resulting from Defendants' wrongful acts, and disgorgement of all compensation that Fortis paid to Schulz and Schupmann during their periods of disloyalty. Fortis also seeks injunctive relief enjoining Defendants from continuing to unfairly compete with Fortis and ordering Schupmann to comply with the restrictive covenants contained within the Agreement.

3

## PARTIES AND JURISDICTION

14.     Plaintiff Fortis is a privately held Colorado corporation with its principal place of business in Colorado. Fortis is registered to do business in the state of Colorado.

15.     Defendant David Schupmann is an individual who, upon information and belief, currently resides at S440 Crego Place, Geneva, IL, 60134.

16.     The Court has personal jurisdiction over Schupmann because his Agreement contains a Colorado forum selection clause. The Court also has personal jurisdiction over Schupmann because he was employed by Fortis, a Colorado employer, because he repeatedly came to Colorado for work, because he repeatedly made false or misleading statements to Fortis personnel located in Colorado, and because some or all of the wrongdoing committed by Schupmann was specifically targeted to harm Fortis in the state of Colorado.

17.     Defendant Charles Schulz is an individual who, upon information and belief, currently resides at S31W37307 School Section Lake Rd, Dousman, WI, 53118.

18.     The Court has personal jurisdiction over Schulz because he was employed by Fortis, a Colorado employer, because he repeatedly came to Colorado for work, because he repeatedly made false or misleading statements to Fortis personnel located in Colorado, and because some or all of the wrongdoing committed by Schulz was specifically targeted to harm Fortis in the state of Colorado.  Moreover, Schulz has threatened Fortis with claims pursuant to the Colorado Wage Act, which further illustrates his understanding that he is subject to Colorado law and the jurisdiction of Colorado courts.

19.     Defendant Trident Solutions of Sugar Grove, LLC is a limited liability company owned by Defendants Schulz and Schupmann. For purposes of diversity jurisdiction, Trident is a citizen of Wisconsin and Illinois.

20.     The Court has specific personal jurisdiction over Trident because Trident intentionally and tortiously interfered with Fortis's employment contracts and prospective business relations in Colorado such that Trident's conduct was specifically aimed at this state.  Additionally, the various wrongful acts performed by Schupmann and Schultz in or directed to persons in Colorado were done as they were officers and owners of Trident.

21.     The Court has subject matter jurisdiction over the action under 28 U.S.C. § 1332 because the parties are diverse in citizenship and the matter in controversy exceeds $75,000.

22.     Venue is proper in the Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the district.

**FACTUAL ALLEGATIONS**

**I.      Fortis and Its Business.**

23.     Founded in 2003, Fortis is a leader in the roof performance business. Fortis's primary revenue stream is the Program. The Program consists of three phases: (1) a proprietary Fortis Roof Risk Assessment, during which Fortis's Quality Control personnel assess the quality of a roof and relevant building conditions to determine the exact number of years Fortis can guarantee performance, (2) a roof reconditioning, performed by Fortis's contractor network, to bring each roof up to Fortis's standards, and (3) the issuance of a comprehensive warranty backed by Lloyd's of London. If a customer experiences a roofing issue while covered by a Fortis warranty, Fortis sends its Operations team to assess the issue and promptly schedule repairs through its nationwide network of contractor partners.

24.     The benefit of the Program to Fortis's customers is clear: rather than potentially spending millions on a roof replacement, customers can instead spend a fraction of the cost on the Program, which guarantees roof performance for a set amount of time.

25.      The Program has been highly successful and leads the market as the most reliable, financially advantageous way to extend roof life, avoid the risk of roof performance issues, eliminate unexpected roof maintenance costs, and secure unmatched savings.

26.      Due to the success of the Program, Fortis has developed strong relationships with its customers and roofing contractors alike based on confidence in the quality of Fortis's services and Fortis's commitment to providing such services at competitive prices.

27.      However, not all roofs are eligible for the Program. If Fortis's initial assessment determines that reconditioning work would be insufficient to bring a roof up to Program standards, then Fortis will advise its client that the roof requires an immediate replacement. Often, clients will request that Fortis manage the roof replacement process due to their trust in Fortis as a reliable partner in the roofing industry. In these instances, Fortis receives a general management fee and works with its contractor network to replace the roof. While Fortis's primary revenue stream comes from the Program, Fortis has received over $500,000 in revenue for roof replacement management projects between 2022-2024 and, as it has learned in recent weeks, would have earned substantially more if not for Defendants' acts in diverting roof replacement projects for themselves.

28.      Fortis's decision to engage in such reroofing management projects is subject to the discretion of its executive team working out of its Denver, Colorado headquarters.

29.      While Fortis's headquarters are located in Colorado, Fortis's success has allowed it to expand its services to cover buildings in six countries. Fortis's Program protects more than 140 million square feet of property and has helped customers defer over $500 million in costs. Fortis's efforts have allowed it to develop significant goodwill in the roofing industry.

**II.    Schupmann and Schulz Are Hired by Fortis.**

30.    Schupmann joined Fortis in 2018 as a Senior Vice President of Sales and Marketing. In that role, Schupmann was tasked with building Fortis's sales and marketing operations. From the start of his employment, Schupmann operated in an executive role and managed Fortis's marketing and operations staff.

31.    Schupmann's initial base salary was $250,000 and included an options grant of 5% of Fortis's stock that would vest over time. Schupmann was ultimately compensated well in excess of this base salary, as he earned approximately $2.1 million in total compensation from the Company between 2022-2024.

32.    In exchange for this executive position with significant access to Fortis's customer relationships, confidential information, and trade secrets, Fortis required that Schupmann sign the Agreement (attached hereto as Exhibit A) on February 27, 2018.

33.    The Agreement contains several lawful restrictive covenants in order to protect Fortis and the significant investment it made in Schupmann. For starters, Schupmann agreed that he would "devote substantially all of his business time, attention and skill to the performance of his duties as an employee of the Company."  (Ex. A, § 1.1.2.)

34.    Schupmann's Agreement includes several confidentiality provisions that provide as follows:

> 5.1.1 Executive acknowledges that, during employment with the Company, Executive will have access to confidential information of and pertaining to the Company and its clients, all of which is hereby agreed to constitute confidential information and trade secrets (as described in 5.1.3 hereof) of the Company. To ensure the continued secrecy and confidentiality of such information and trade secrets, Executive hereby covenants and agrees that Executive shall keep secret and shall not divulge any of the names of, or any other information relative to, the clients and business operations of Company, and any information concerning Company's clients, employees, employment practices, policies, techniques, methods, and any all business associations or activities of Company and its clients

and any information or knowledge that Executive acquires during Executive's employment with the Company. Executive also further covenants and agrees that Executive will not keep, <u>or use for his personal advantage</u>, either directly or indirectly, any information documentation (regardless of the manner or form in which such documentation exists) relative to the business of the Company or its clients and, furthermore, will not furnish or make available any such information to any third party.

5.1.2 Upon leaving employment with the Company, Executive will return and not take with him any confidential information or trade secrets, including without limitation, manuals, programs, documents, computer programs, compilations of technical data, client and prospective client lists, specifications and other records of any nature relating to the Company, its clients or others, or any reproductions thereof. <u>Further, Executive will take no other action inconsistent with his obligations as an employee of the Company</u>.

Executive acknowledges that the Company has certain trade secrets including, but not limited to, certain processes, formulae, data, know-how, software programs, improvements, inventions (whether patentable or not), techniques, marketing plans, business plans, strategies, forecasts, computer programs, and other copyrightable material, the compensation and terms of employment of other employees, customers and customer lists, and other information relating to the Company's business which is secret and of value (Information"), which trade secrets the parties agree are and shall remain under the full control of the Company and shall remain of limited availability. In consideration for entering into this Agreement, Executive hereby covenants and agrees that Executive shall not divulge to any third party at any time any information regarding such trade secrets or the substance thereof without the prior written consent of the Company and, furthermore, with respect to such trade secrets, shall comply with all of the provisions of Section 5 hereof. Employee agrees that Company is the only firm offering its type of services in the United States and certain other countries, and further agrees (i) that the Company takes precautions above and beyond normal business precautions to guard secrecy of the Information; having knowledge of the Information is of great value to the holder as against competitors; the Company has expended considerable effort and money in obtaining and developing the Information; and (iv) the amount of time and expense it would take for others to acquire and duplicate the Information is also considerable. Employee acknowledges the confidentiality of the Information and that the Information is protected by this Agreement and by C.R.S. §§ 7-74-101 *et seq.*, the Colorado Uniform Trade Secrets Act, from unauthorized disclosure or use for any competitive purpose.

(Ex. A, § 5.1) (emphasis added).

35.    The Agreement also contains an employee and customer non-solicitation clause:

During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not, either directly or

indirectly, on the Executive's own behalf or on behalf of others, approach, solicit, induce, divert or hire, or attempt to approach, solicit, induce, divert or hire, any employee or customer or prospective customer of the Company, whether or not the employment or relationship of any such person or entity is pursuant to a written agreement or for a determined period or at will, to terminate such employment or relationship with the Company. Executive's agreement to not solicit customers shall be limited to the Area defined below in subparagraph 5.3.1.

(Ex. A, § 5.2.)

36.     Schupmann also agreed to a limited non-compete covenant:

During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not (except on behalf of or with the prior written consent of the Company), within the Area, either directly or indirectly, on his own behalf or in the service or on behalf of others, as a manager or consultant, or in any other capacity which involves duties and responsibilities similar to those the Executive has undertaken for the Company, engage in any Competing Business.

(Ex. A, § 5.3.)

37.     The Agreement defines the restricted Area for purposes of the non-compete and non-solicitation covenants as "any state or country where the Company engages in business during Executive's employment with the Company." (Ex. A, § 5.3.1.)

38.     "Competing Business" is defined as any business organization directly engaged in any business which is the same as, or substantially the same as, the business of Fortis. (*See id.*)

39.     Upon executing the Agreement, Schupmann agreed that Fortis would be irreparably harmed should Schupmann breach any of the Agreement's restricted covenants, and that Fortis would be entitled to injunctive relief as a remedy and to its reasonable attorneys' fees if it were to prevail in any action to enforce the Agreement's covenants. (Ex. A, § 5.5.)

40.     Finally, the Agreement provides that it will be governed by Colorado law, and that sole and exclusive jurisdiction for any action to enforce the Agreement would be in the United States District Court for the District of Colorado or Denver District Court. (Ex. A, § 10.)

41.    Fortis included these restrictive covenants to protect Fortis's significant investment in Schupmann, its client relationships, and its trade secrets and confidential information.

42.    Schupmann's initial hire for Fortis's sales team was Schulz, who joined Fortis in June 2018. Schulz was hired at a base salary of $150,000 a year and was awarded 10% commission on Fortis's gross sales volume for Schulz's customers. This commission rate was between two to three times more than any other Fortis salesperson. Like Schupmann, Schulz's base salary represented only a fraction of his total compensation, which totaled approximately $1 million between 2022-2024. While Schulz resides in Wisconsin, he attended Fortis's board meetings in Colorado and traveled to Colorado multiple times a year for internal meetings.

43.    Like Schupmann, Schulz's primary duty at Fortis was to identify and solicit potential customers for the Program or Fortis's other services. Schulz was also responsible for developing and maintaining Fortis's goodwill and relationships with its customers on Fortis's behalf. In this role, Fortis exposed Schulz to customers and prospects throughout the country. To perform these functions, Fortis provided Schulz with access to confidential and proprietary information and assisted Schulz with client development. In other words, Fortis paid Schulz to develop and maintain relationships with Fortis's current and prospective customers and to service those customers at a top level.

44.    In exchange for this exposure, as well as significant compensation, Fortis intended for Schulz to sign an employment agreement containing restrictive covenants like Schupmann to protect the Company's confidential information and customer goodwill. While Fortis prepared an agreement for Schulz's execution and provided this agreement to Schupmann to have Schulz sign, the agreement was never executed. Upon information and belief, Schupmann intentionally refused to require that Schulz execute his employment agreement in order to avoid subjecting Schulz to

10

the restrictive covenants and other obligations therein. As such, Schupmann was acting in his own interests and to the detriment of Fortis.

### III.    Schupmann and Schulz Begin to Operate Their Illicit Scheme.

45.    Fortis promoted Schupmann to become its COO in October 2021. The Company intended for Schupmann to eventually take over the role of Company President. However, Fortis ultimately demoted Schupmann rather than promoting him because of poor job performance.

46.    Schulz also displayed job performance issues. Soon after his hiring in June 2018, Fortis discovered that Schulz had abused his Company expense account by booking personal travel and entertainment on his Fortis account. In light of these findings, Fortis temporarily reduced Schulz's commission percentage, though it later returned to 10%.

47.    Despite these issues, Schulz and Schupmann formed a close relationship. To avoid suspicion, the two often denied that they interacted outside of work, but on multiple occasions, other Fortis personnel would overhear that the two had made extracurricular plans together.

a.    <u>Schulz and Schupmann Receive Improper Kickbacks for Fortis Work.</u>

48.    Upon information and belief, Schulz and Schupmann's motivation to hide their close relationship from other Fortis employees and executives was because they were engaged in a massive kickback scheme through which they profited directly at Fortis's expense.

49.    Schulz and Schupmann's strategy was simple: they would offer contractors guaranteed work on Fortis projects if those contractors would promise to inflate their bids by 5-7.5%. Then, after the contractor was paid for its work by Fortis, the contractor would pay that 5-7.5% directly to Schulz and Schupmann.

50.    For example, if a contractor's initial estimate for a project was $100,000, Schulz and/or Schupmann would instruct the contractor to submit an inflated bid of $105,000-$107,500.

11

Schulz and Schupmann would then receive between $5,000-$7,500 in kickbacks for ensuring the contractor was awarded the job. In Schulz's own words to a contractor, "we understand we'll be paid after you are paid." (Ex. B, Emails Provided by Scott Reynolds, p. 5.)

51.    This plot injured Fortis in multiple ways. First, and most obviously, the kickbacks would result in Schulz and Schupmann being compensated significantly more than they were contractually owed (or that Fortis was aware). As previously stated herein, Schulz already received a commission two to three times higher than his peers for this work, and Schupmann earned an average of $700,000 in annual compensation across his three years at the Company. These amounts were meant to compensate Schulz and Schupmann for the entirety of their work for Fortis.

52.    Second, these inflated contractor fees directly cut into the profit Fortis earned on each project. This also dramatically increased Fortis's business risk. Fortis generates profits when the maintenance that it is required to perform during the warranty period it issues through the Program costs less than the customer pays for that warranty. By artificially increasing Fortis's front-end reconditioning and subsequent maintenance costs, Schulz and Schupmann decreased the likelihood that Fortis would profit on each warranty the Company issued through the Program.

53.    On information and belief, Schulz and Schupmann improperly profited through kickbacks from numerous contractors. Fortis's investigation remains ongoing. However, the most significant kickback relationship Fortis has uncovered to date was between Schulz and Schupmann and TopKey Construction, f/k/a Installation Services ("**TopKey**"), a general contractor based in Laurel, Maryland.

54.    Schulz and Schupmann's primary contact at TopKey was Project Manager Scott Reynolds ("**Reynolds**"). Reynolds worked for TopKey from August 2022 to approximately August 2024. Soon after Reynolds commenced work for TopKey, he was contacted by Schulz and

12

Schupmann, who proposed their kickback scheme. Schulz and Schupmann promised Reynolds that they would ensure TopKey was awarded Fortis projects if TopKey would pay Schulz and Schupmann a kickback, or "TPI," in exchange. This acronym became well-known throughout TopKey. (*See* Ex. B, p. 6.)

55.    Although Reynolds had never experienced this kickback scheme in his nearly three decades in the industry, he accepted Schulz and Schupmann's demand because it came with guaranteed work for TopKey. During the length of his employment with TopKey, Reynolds worked with Schulz and Schupmann to execute the kickback scheme. While the initial kickback amount was 5% of TopKey's initial cost estimate, the percentage eventually rose all the way to 7.5% because Reynolds knew that Schulz and Schupmann would make sure that TopKey was still awarded the project even if TopKey had not made the most competitive bid.

56.    Although Fortis maintains a nationwide network of contractors and typically engages local contractors for its projects, TopKey was assigned projects across the country thanks to Schulz and Schupmann's interference. Reynolds was willing to take on any job Schulz and Schupmann offered because he knew it was guaranteed work for himself and his team.

57.    Schupmann instructed Reynolds to begin paying the kickbacks to Trident, which Schupmann created on September 9, 2022. (*See* Ex. C.) Trident's Operating Agreement lists Schulz and Schupmann as its two managers, and the two each hold a 50% stake in the company. (*See* Ex. D, § 7.2, Ex. A.) Reynolds and TopKey complied with this request and began to send the "TPI" payments directly to Trident. (*See* Ex. E.)

58.    Reynolds participated in Defendants' kickback scheme with the approval of TopKey's leadership, including TopKey President Dan Schardt. At times, Schardt directly confirmed the kickback percentage and total amount Schulz and Schupmann would receive for a

given project. On one instance in June 2024, Schardt requested that Schulz provide TopKey with the correct fees for a certain project. (*See* Ex. B, p. 7.) Schulz confirmed that he would provide a proposal and noted that "the basics" involved a 7.5% kickback in addition to a flat fee of $7,000 per roof section replaced for the project at issue. Schardt then sought confirmation a total amount of $109,977.33 was correct. (*See id*, p. 8.)

59.     All told, TopKey performed an estimated 130 jobs on behalf of Fortis during Reynolds' employment, most or all of which were subject to kickbacks for Schulz and Schupmann. Reynolds estimates that Schulz and Schupmann ultimately received between $350,000-$400,000 in kickback payments from TopKey.

60.     At no time was Fortis aware of this illicit relationship until Reynolds informed Fortis CEO Richard Lewis ("**Lewis**") of its existence after his employment at TopKey ended. Schulz and Schupmann displayed a disdain for their own employer to Reynolds and questioned why the Company should be allowed to profit off their efforts as employees.

  b.   Schulz and Schupmann Divert Work from Fortis to Trident.

61.     Schulz and Schupmann's request for the kickback payments described above was not their only method of lining their own pockets at Fortis's expense.

62.     In addition to their kickback arrangement, Schulz and Schupmann also diverted work from Fortis altogether in order to instead profit themselves and Trident. Defendants primarily employed this tactic in instances where customers were in need of a roof replacement as opposed to participating in Fortis's Program. When Fortis determines that a roof cannot be reconditioned and instead must be replaced entirely, Fortis often manages the replacement process for a consulting fee. Fortis's customers can trust Fortis to coordinate with contractors and ensure the job is performed properly through the trust and goodwill Fortis has earned in the roofing industry.

63.     In violation of the duties they owed to Fortis, Schulz and Schupmann usurped these opportunities on numerous occasions to compete with Fortis directly and unfairly. In this context, Defendants also frequently collaborated with Reynolds and TopKey to divert roof replacement projects from Fortis. The first project Reynolds worked on with Schulz and Schupmann was SouthPoint Village Apartments (the "**SouthPoint Project**") in Durham, North Carolina. The SouthPoint Project involved a complete roof replacement, which Fortis could have managed. Notably, Schulz emailed the SouthPoint Project's job specifications from his Fortis email to his Trident email, yet Schulz and Schupmann never entered the SouthPoint Project as a potential lead in the Company's database. (*See* Ex. F.) This meant that Fortis never had the opportunity to evaluate the SouthPoint Project to determine if it was worth attempting to undertake. Upon information and belief, Defendants made roughly $100,000 in kickbacks for the SouthPoint Project while concealing the project from Fortis.

64.     Schulz and Schupmann's improper relationship with TopKey spanned for multiple years. In May 2024, Reynolds contacted Schulz at Schulz's Trident email address to provide Defendants with a roof replacement proposal for a building located at 1011 Marsh Avenue, Fort Myers, Florida, 33905. (*See* Ex. G.) This was yet another project that Schupmann and Schulz did not present to Fortis and that the Company could have performed if not for Schulz and Schupmann's disloyalty.

65.     Defendants' diversion of potential Fortis business expanded far beyond their relationship with TopKey, however. On one instance, on September 24, 2019, Schulz received the following email from a Fortis client at his Fortis email address:

Afternoon Charlie,

We have some roof issues at our Oklahoma City location and was wondering if you're interested in taking a look. I don't believe this is in the spectrum of a

warranty project but more like what Fortis did with our Santa Rosa location and a patch job. I've copied our manager Mr. Shore and if you're interested would you reach out to him and see about an evaluation and quote? Let me know, thank you!

(Ex. H.)

66.     Despite the fact that the email specifically provided that Fortis had previously completed the exact type of work the client was seeking, Schulz immediately forwarded the email to Schupmann and stated, "Should be a Trident job. What would you like to do here?" (*Id.*)

67.     An hour later, Schulz messaged Schupmann's Fortis email address again to suggest that Defendants ". . . should just send Kyle Crawford and **have him include a bump for us**." (*Id.*) (Emphasis added).

68.     Kyle Crawford works for Exterior Solutions Group, a contractor that is part of Fortis's strategic partner network.

69.     Schulz advised Schupmann that Crawford ". . . can just be vague and send me the invoice" and promised "10% for us." (*Id.*) Schupmann responded "10/4" to confirm his approval of the arrangement. (*Id.*)

70.     Schupmann and Schulz did not enter the project discussed in Exhibit H into Fortis's database as a potential opportunity nor did Fortis ultimately perform work on that project. Upon information and belief, Schupmann and Schulz diverted the project away from Fortis and was instead performed by Schulz and Schupmann through Trident.

71.     One specific area of Fortis's business from which Schulz and Schupmann were especially aggressive for diverting was Fortis's work relating to the solar energy business. Solar energy clients comprise a significant portion of Fortis's customer base because roofs often need to be reconditioned, repaired, or replaced to be fit for solar panel installation. At times, Fortis and solar energy companies combine to offer their services jointly to a building owner. In other instances, solar energy companies lease roofs from building owners and then engage Fortis for

roof reconditioning themselves as Fortis's end-client. In other words, Fortis works extensively with solar companies and generates significant revenue from these relationships.

72.    Undeterred by the fact that work with solar companies is directly within Fortis's scope of operations, Schulz and Schupmann continued with their operation to compete with Fortis from within.

73.    For instance, on January 30, 2023, Schulz sent a document titled "Aspen-Trident Channel Partnership Agmt [Aspen].docx from his Fortis email address to Schupmann's Trident email address. (Ex. H.) The document contemplates a "channel partnership" between Trident and Aspen Power Partners LLC ("**Aspen**"), through which Trident would identify prospective customers of Aspen's and refer them to Aspen in exchange for $0.01 per watt of electricity generated by Aspen's solar panels on projects identified by Trident. (*See* Ex. I, §§ 2, 4.) The term "channel partnership" was previously used by Schupmann to suggest that Fortis undertake similar agreements.

74.    Aspen is a Fortis client, but Fortis's work for Aspen declined in 2023 and 2024. Upon information and belief, this was due to Defendants' usurpation of Fortis's business despite their status as Fortis executives.

75.    In February 2023, Schulz emailed an attachment titled "Trident Solar opps 2023.xlsx" that includes eight buildings, each with a "Y" (short for "yes") under the column "RPP Candidate." (Ex. J.) "RPP" refers to the Program, which is a Fortis-specific term and is not industry standard. In other words, Defendants were open about the fact that these were opportunities for Fortis's core service yet failed to present them to Fortis in favor of diverting them to Trident. The buildings in the spreadsheet total over 2.3 million square feet in area; Fortis would generally expect

17

to receive between $5-6 million in revenue from a project of this size. (*See id.*)  Instead, Fortis got none of it.

76.    Subsequent emails identify one of the prospective clients Defendants attempted to solicit. On March 14, 2023, Schulz emailed a spreadsheet titled "Trident IL_Lease Summary_3.13.2023.xlsx" with the following message:

Tom

I've broken out the sf area of the systems here.  You could put a valuation on this either on the area the solar system covers itself or the entirety of the footprint.

I'm not sure which way would work for Hiffman the best.

Charlie

(Ex. K.)

77.    "Tom" refers to Tom Murphy, Fortis's point of contact at Hiffman National, a major property management company. Even though Fortis had already established relations with Hiffman National, Schulz did not report this project to Fortis. The attached spreadsheet includes many of the same building addresses as those found in Exhibit J.

78.    In another instance, Defendants worked with TopKey to present a proposal to a different solar company—Citrine Power, LLC—for work on a building located at 210-230 West Parkway, Pompton Plains, New Jersey, 07444 in May 2024. (*See* Ex. L.) Schulz had previously entered Citrine Power, LLC in Fortis's systems as a potential opportunity but designated the opportunity "closed—lost" and "disqualified." Upon information and belief, this was done in order to perform work for Citrine Power, LLC on behalf of Trident rather than Fortis.

79.    The work described herein would have resulted in millions of dollars in revenue for Fortis had Schulz and Schupmann loyally performed their job duties on behalf of the Company.

18

At no time did Schulz and Schupmann act to present these job opportunities to Fortis, nor did they inform Fortis of their competing business.

80.    In fact, Schulz and Schupmann went even farther to cover their tracks. Schupmann explicitly instructed his direct reports that they were not allowed to communicate with Lewis about many subjects. Upon information and belief, Schupmann did this to prevent Lewis from becoming aware of Schulz and Schupmann's wrongdoing, which Lewis only discovered in 2024.

c.    Schulz's Disloyalty is Uncovered by Fortis.

81.    Schulz and Schupmann successfully continued their disloyalty undetected for several years. Fortis first learned that Schulz had been engaged in wrongdoing because of a project that occurred in July 2024.

82.    One of Fortis's largest clients is the Coca-Cola Company ("**Coca-Cola**"). Schulz was entrusted with maintaining this client relationship on behalf of Fortis. In July 2024, Schulz advised Fortis personnel that he was travelling to a Coca-Cola facility in Lexington, Kentucky (the "**Lexington Plant**") to meet one of Fortis's client contacts at Coca-Cola. At the time, the Lexington Plant had an active Fortis warranty for its roof that was not set to expire for several years.

83.    On July 30, 2024, Schulz began to call Fortis Director of Growth and Development Dan Kimball ("**Kimball**"), Schupmann's direct supervisor at Fortis after he was demoted from the COO position. Schulz claimed that the Lexington Plant's roof was in dire need of work and reported catastrophic roof damage. Schulz further informed Kimball that one of Fortis's contractors, FPS Roofing ("**FPS**"), happened to be working nearby and that Schulz had already coordinated with FPS President of Sales Michael Fusco ("**Fusco**") to begin immediate work on the Lexington Plant.

19

84.     This was unusual for two reasons: (1) FPS is based near Youngstown, Ohio, nearly six hours from Lexington, while a recognized Fortis service provider is located less than two miles from the Lexington Plant and (2) Fortis salespeople such as Schulz are not responsible for scheduling maintenance work on roofs under warranty because Fortis's Operations team conducts prompt in-person inspections of roofs whenever a claim is filed, determines the proper repairs, and then engages a contractor.

85.     Schulz represented to Kimball that the Lexington Plant's roof was in such poor condition that it could not wait for the Operations team to travel to Lexington to inspect it. Schulz attributed the amount of damage to poor contracting work or improper reconditioning when Fortis first issued the warranty. While Schulz claimed that a roof replacement was necessary, FPS ultimately conducted repairs and did not need to replace the roof.

86.     In order to investigate these claims, Kimball contacted Jonathan Lewis ("**Lewis**"), Fortis's head of Operations and Quality Control. Lewis informed Kimball that it was highly unusual that the Lexington Plant's roof would display such damage because (1) Coca-Cola had not filed any warranty claims for the roof and (2) Fortis had spent $50,000 to recondition the roof one year prior. Lewis also informed Kimball that Schulz's assertions that the roof reconditioning had been improperly performed were incorrect because Lewis had personally supervised the work. Tellingly, Schulz refused to speak with Lewis even though these issues fell directly within Lewis's job duties.

87.     As a result of the events on July 29, 2024, Lewis traveled to the Lexington Plant to investigate the situation. Upon arrival, Lewis was informed by Coca-Coca facility manager Courtney Hundley that they had been directed by Schulz to not submit any claims to Fortis on the

20

Lexington Plant. Lewis also reached out to Fusco to inquire about the nature of the damage and subsequent repairs conducted by FPS.

88.    On August 2, 2024, Fusco contacted Kimball (his former coworker at a previous employer) and expressed concern based on his conversation with Lewis. After his conversation with Lewis, Fusco feared that he had been misled by Schulz regarding the situation at the Lexington Plant. Fusco revealed to Kimball that Schulz had directed FPS to be present at the Lexington Plant on July 29 several days in advance for a roof replacement. This directly contradicted Schulz's representations to Fortis that he had only discovered the damage to the Lexington Plant on the 29th and that FPS's presence in the area was coincidental.

89.    In addition, Fusco informed Kimball that Schulz had requested that FPS "pad" its costs for its work at the Lexington Plant by a total of $40,000 and instructed that this amount be paid to Schulz directly after FPS was paid by Fortis. Fusco also detailed that Schulz had requested a "finder's fee" of $10,000 to be added to work FPS had previously conducted for Fortis in Toledo, Ohio. At the time, Fusco was under the impression that this was standard practice, but his suspicions were raised by Schulz asking for a significantly higher amount of money with regard to the Lexington Plant. As a longtime partner of Fortis's who had performed a significant amount of work for Fortis, Fusco did not want Schulz's wrongdoing to affect the relationship between Fortis and FPS.

90.    Schulz refused to admit any wrongdoing when confronted with this information. Additionally, when Schulz was asked why he had requested FPS perform a roof replacement rather than roof repairs even though the Lexington Plant's roof was under warranty (and thus Fortis would be required to pay for the replacement), Schulz replied that Coca-Cola was not aware that

21

the Lexington Plant was under warranty. Fortis then terminated Schulz's employment for this behavior (among other reasons) on August 9, 2024.

91.     Upon information and belief, Schulz misled Coca-Cola to believe they did not have a warranty on the Lexington Plant so that no repairs would be performed on the roof and the roof would need to be replaced. Schulz also created the "emergency" situation to ensure that FPS would perform work on the Lexington Plant's roof without Fortis supervision so that Fortis would not learn of the roof's exact condition. Upon information and belief, Schulz engaged in these various subterfuges so that he could charge $40,000 in kickbacks from FPS after the repairs were completed. In short, Schulz spun this complex web of lies to multiple parties in order to enrich himself at the expense of Fortis, Coca-Cola, and FPS.

d.  Schupmann, a Repeat Offender, is Also Terminated.

92.     After Schulz's termination, Fortis began to investigate Schupmann's level of involvement in Schulz's disloyal activities. Schupmann initially claimed that Schulz had acted alone. However, as Fortis's investigation continued, Schupmann's lies became apparent. During the investigation, Schupmann offered contradictory explanations of his level of involvement with Schulz and Trident: (1) admitting that he was aware of Trident's formation but that Schulz had not used it prior to his termination, (2) stating that Trident had only been used to perform a roof replacement project that Fortis had declined two years prior, and finally (3) that he had not performed work for Trident in the last 12 months.

93.     In addition to Schupmann's dishonesty, Reynolds revealed the nature of the relationship between TopKey and Defendants in December 2024. Lewis offered Schupmann the opportunity to travel to Fortis's Denver headquarters to discuss what had happened, but Schupmann refused. Fortis then terminated Schupmann's employment on December 24, 2024.

22

94. Fortis has since learned that this is not the first time Schupmann has violated the fiduciary duties and contractual obligations that he has owed to an employer in the industry. In 2017, Schupmann was sued by his former employer, Tecta America Corporation ("**Tecta**"), where Schupmann had previously served as Vice President of National Accounts. Tecta discovered that Schupmann had been plotting with one of Tecta's subcontractors ("**Saratoga**") to orchestrate a mass raid in which the entire business unit that Schupmann supervised would join Saratoga, all in violation of Schupmann's restrictive covenants with Tecta. Tecta also learned that Schupmann had been providing Saratoga with confidential information regarding Tecta's customers and pricing. A copy of Tecta's Complaint is attached hereto as Exhibit M.

95. All told, Defendants' actions have caused Fortis massive amounts of damage. Fortis has experienced significant lost profits and business opportunities because of Schulz and Schupmann's disloyal acts. Additionally, Fortis has been irreparably harmed through the loss of its customer goodwill.

96. Further, by signing the Agreement, Schupmann expressly agreed not to compete with Fortis for a limited period after the end of his employment. Upon information and belief, Defendants continue to operate in the roofing industry in unfair competition with Fortis and in violation of Schupmann's Agreement. Recently, Fortis has received multiple inquiries from Coca-Cola regarding warranty forms and contractual language. Upon information and belief, Coca-Cola has taken such action because Schulz, who serviced Coca-Cola during his employment at Fortis, has continued to contact Coca-Cola in an effort to interfere with Fortis's contractual relationships and solicit Coca-Cola's business away from Fortis in favor of himself and in active concert with Schupmann and Trident.

97.    At all times, Trident was aware of Schupmann's Agreement as well as Fortis's customer relationships and prospects. Trident knowingly and intentionally interfered with the Agreement, as well as these relationships, with the specific intent to damage Fortis. Trident's actions were improper and illegal because Trident's agents, Schulz and Schupmann, violated the fiduciary duties they owed to Fortis as Fortis employees.

98.    Defendants' actions were done intentionally and willfully, were calculated to cause damage to Fortis's lawful business, were maliciously done with the unlawful purpose to cause such damage and loss, with actual damage and loss resulting, and was accomplished by wrongful conduct through the violation of the duty of loyalty.

99.    The harm suffered by Fortis as a result of Defendants' conduct and their continuing intent to violate the terms of the Agreement is and will be irreparable in nature, and incapable of being measured solely in terms of monetary damages, thereby leaving no adequate remedy at law for said harm to Fortis.

<u>COUNT I</u>
**BREACH OF THE FIDUCIARY DUTY OF LOYALTY**
**(Defendants Schulz and Schupmann)**

100.    Fortis incorporates all preceding paragraphs as if fully stated herein.

101.    At all times relevant, Schulz and Schupmann were employed by Fortis in positions of trust and responsibility as employees of the Company wherein they acted as the face of Fortis to its customers, prospects, and partners. In this capacity, Schulz and Schupmann owed Fortis a duty of loyalty to act in Fortis's best interests at all times and not to engage in activities harmful or detrimental to Fortis.

102.    While still employed with Fortis, Schulz and Schupmann willfully and maliciously sought kickback payments and diverted business away from Fortis to Trident in order to benefit Trident at the expense of Fortis.

103.    Additionally, Schupmann acted in his own interests and against those of Fortis when he disregarded a direct request to have Schulz execute an agreement similar to the one signed by Schupmann.

104.    Schulz and Schupmann's breach of their duty of loyalty has caused Fortis to suffer irreparable harm and economic damages in an amount to be determined at trial.

105.    Fortis is entitled to disgorgement of the compensation paid to Schulz and Schupmann during their period of disloyalty, as well as any lost profits and/or unjust enrichment resulting from their breaches of their fiduciary duties.

106.    Fortis is also entitled to punitive damages against Schulz and Schupmann because they have acted with malice in usurping Fortis's business opportunities with the attempt to injure Fortis.

**COUNT II**
**<u>BREACH OF CONTRACT</u>**
**(Defendant Schupmann)**

107.    Fortis incorporates all preceding paragraphs as if fully stated herein.

108.    Schupmann entered into valid confidentiality and non-compete covenants in the Agreement for good and valuable consideration, whereby he agreed not to use for his personal advantage Fortis's confidential information (including information regarding its customers) during or after the end of his employment with Fortis or to provide the same or similar services he provided to Fortis on behalf of a competitor during his employment and for two years following the end of his employment in a limited territory.

109.    Upon information and belief, Schupmann's acts in using Fortis's confidential information for his personal gain and on behalf of Trident constitutes a breach of the confidentiality provision of Schupmann's Agreement.

25

110.    The Agreement's confidentiality provision is reasonable under the circumstances to protect Fortis's legitimate interests in its confidential information, client/employee relationships, and goodwill.

111.    Upon information and belief, Schupmann is continuing to offer the same or similar services he provided for Fortis on behalf of a competitor, Trident, within the area Fortis engaged in business during Schupmann's employment with Fortis. These actions constitute a breach of the non-competition provision of Schupmann's Agreement.

112.    The Agreement's non-competition provision is reasonable under the circumstance to protect Fortis's legitimate interests in its confidential information and customer goodwill.

113.    Additionally, Schupmann's work on behalf of himself, Schulz, and Trident violated Paragraph 1.1.2 of the Agreement, wherein he promised to devote substantially all of his business time, attention and skill to the performance of his duties as an employee of the Company.

114.    Fortis has complied with the material terms of the Agreement at all times relevant.

115.    As a result of Schupmann's actions and breach of the Agreement, Fortis has suffered and/or will suffer irreparable harm, and should be awarded money damages, together with attorneys' fees, costs, and such other relief as the Court may deem just and proper.

**COUNT III**
**TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTION**
**(All Defendants)**

116.    Fortis incorporates all preceding paragraphs as if fully stated herein.

117.    As a condition of his employment with Fortis, and in exchange for valuable consideration, Schupmann agreed not to provide the same or similar services he provided for Fortis on behalf of a competitor within the area Fortis engaged in business during Schupmann's employment with Fortis.

26

118.    Trident and Schulz have induced, aided, and abetted Schupmann's violations of the Agreement in order to unfairly compete with Fortis by placing Schupmann in a position to unfairly compete with Fortis in violation of the Agreement and through the exploitation of Fortis's confidential information. Trident and Schulz have refused to stop this course of action and will continue to employ and abet Schupmann in a manner that violates Fortis's contractual rights.

119.    In the absence of injunctive relief, Fortis will suffer irreparable harm, including, but not limited to, loss of customers and disclosure of customer information to a competitor.

120.    Fortis has no adequate remedy at law.

121.    The potential harm to Fortis if Defendants are not enjoined is far greater than any harm that Defendants will suffer if injunctive relief is granted.

122.    Fortis is likely to succeed on the merits of its causes of action against Defendants.

123.    The public interest weighs in favor of granting injunctive relief.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Defendant Trident)

124.    Fortis incorporates all preceding paragraphs as if fully stated herein.

125.    At all relevant times, Fortis had a valid and enforceable employment agreement with Schupmann.

126.    Trident knew or should have known of the restrictive covenants in Schupmann's Agreement, including the Agreement's non-competition and confidentiality provisions.

127.    Upon information and belief, Trident wrongly and without justification solicited and induced Schupmann to breach the Agreement and compete with Fortis on behalf of Trident in violation of the Agreement's non-competition provision. Schupmann has conducted such activities while using Fortis's confidential information in violation of the Agreement's confidentiality provision.

27

128. Upon information and belief, Trident continues to interfere with Fortis's contractual rights by directing Schupmann to violate the non-competition clause of the Agreement and/or inducing his violations of the Agreement by creating economic incentives to improperly compete with Fortis.

129. At all relevant times, Trident was a stranger to the Agreement with which Trident improperly interfered because Trident: (a) was not a signatory to the Agreement; (b) was not an intended or unintended beneficiary of the Agreement; and (c) had no direct economic interest in the Agreement.

130. Trident's conduct was intentional and for the improper and wrongful purposes of (a) interfering with Fortis's contractual employee relationships; (b) unlawfully and unfairly competing with Fortis; and (c) harming Fortis's business.

131. Fortis has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships.

132. Trident's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that Fortis is entitled to punitive damages in an amount to be determined at trial.

## COUNT V
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
**(Defendant Trident)**

133. Fortis incorporates all preceding paragraphs as if fully stated herein.

134. Upon information and belief, Schulz and Schupmann breached their fiduciary duties of loyalty owed to Fortis in order to unfairly compete with Fortis by usurping Fortis's business opportunities for the benefit of themselves and Trident.

135. At all times relevant, Schulz and Schupmann committed these wrongful actions as managers and agents of Trident.

136. Upon information and belief, through inducing Schulz and Schupmann's violation of the duty of loyalty to interfere with Fortis's business prospects, Trident has tortiously interfered with Fortis's prospective business advantage through improper or wrongful means.

137. Trident's interference with Fortis's business advantage was done intentionally and willfully, was calculated to cause damage to Fortis's lawful business, and was maliciously done without right or justifiable cause on part of Trident.

138. Trident's actions have resulted in actual damage and loss to Fortis through the loss of Fortis's actual and potential customers, profits, and customer goodwill.

139. The violation of the duty of loyalty for the purpose of wrongfully diverting business opportunities is independently wrongful and unlawful apart from its effect on Fortis's business relationships.

140. Fortis has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships.

141. Trident's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that Fortis is entitled to punitive damages in an amount to be determined at trial.

## COUNT VI
## CIVIL THEFT
### (All Defendants)

142. Fortis incorporates all preceding paragraphs as if fully stated herein.

29

143.    During their respective employments with Fortis, Schulz and Schupmann demanded that Fortis's contractors increase their bids for the work they performed on behalf of Fortis. After Fortis compensated these contractors, the contractors would pay the excess money directly to Schulz, Schupmann, and/or Trident.

144.    The funds Fortis expended on the kickback payments are valuable to Fortis because they contributed to the revenue and overall profit of the business.

145.    In violation of C.R.S. § 18-4-405, Schulz and Schupmann knowingly, intentionally, and without authorization deceived Fortis with the intent to permanently deprive Fortis of the monies Defendants received as a result of the kickback payments.

146.    Defendants obtained, retained, and/or exercised control over these funds and permanently deprived Fortis of the benefits of these funds.

147.    Upon information and belief, Trident is now or may become in possession of these stolen funds, to the extent the funds are no longer in possession of Schulz and/or Schupmann.

148.    As a direct and proximate result of Defendants' civil theft, Fortis has suffered damages in an amount to be proven at trial.

149.    As a direct and proximate result of Defendants' civil theft, and pursuant to C.R.S. § 18-4-4-5, Fortis is also entitled to treble damages equal to three times the amount of actual damages, as well as an award of costs and attorneys' fees.

**COUNT VII**
**CONVERSION**
**(All Defendants)**

150.    Fortis incorporates all preceding paragraphs as if fully stated herein.

151.    Fortis had an ownership interest and absolute, unconditional right to the revenues, profits, and funds it has earned, obtained, and maintained as a business.

152.    Through their kickback scheme, Defendants, wrongfully and without authorization, have assumed control, dominion, or ownership of Fortis's property.

153.    As a direct and proximate result of Defendants' civil conversion of Fortis's property, Fortis has suffered damages in an amount to be proven at trial equal to at least the fair market value of the converted property.

## COUNT VIII
## CIVIL CONSPIRACY
### (All Defendants)

154.    Fortis incorporates all preceding paragraphs as if fully stated herein.

155.    Defendants agreed, by words or conduct, to engage in unlawful conduct to personally enrich themselves, including so that they could unlawfully compete with Fortis and/or cause Fortis other economic harm.

156.    To accomplish this goal, Defendants, acting in concert with each other, engaged in an improper kickback scheme to convert and steal Fortis monies, stole business opportunities that rightfully belonged to Fortis, interfered with Fortis's contracts and prospective business advantage, breached their common law duties of loyalty, and otherwise unjustly enriched themselves at Fortis's expense.

157.    Defendants formed and operated a malicious combination with a common purpose and object to injure Fortis by performing unlawful acts in violation of Fortis's employment practices, Defendants' duties and obligations, and applicable law.

158.    Defendants' conduct was without justification or privilege and was taken for their respective personal and economic advantage.

159.    As a direct and proximate result of Defendants' civil conspiracy, Fortis has suffered damages in an amount to be proven at trial.

31

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Fortis respectfully requests the Court grant the following relief:

A.      A temporary restraining order, followed by the issuance of a preliminary injunction against Schupmann and all others acting in active concert (including Schulz and Trident) with him prohibiting Schupmann from breaching the terms of the Agreement, including any violations of its confidentiality and non-competition covenants;

B.      The entry of a judgment for monetary damages for Defendants' wrongful acts alleged herein, including, but not limited to actual damages (including all damages incurred by Fortis as a result of lost customers and profits), pre-litigation attorneys' fees and costs, and Defendants' unjust enrichment as a result of their unlawful acts;

C.      Disgorgement of all compensation received by Defendants Schulz and Schupmann during their period of disloyalty;

D.      An award of punitive damages for Defendant Schulz and Schupmann's violations of the fiduciary duty of loyalty;

E.      An award of punitive damages for Defendant Trident's malicious tortious interference with the Agreement;

F.      An award of punitive damages for Defendant Trident's malicious tortious interference with Fortis's prospective business advantage;

G.      Treble damages for Defendants' civil theft, as authorized by C.R.S. § 18-4-4-5;

H.      The fair market value of the property Defendants have converted;

I.      Damages resulting from Defendants' civil conspiracy;

J.      An award of costs and attorneys' fees; and

32

K.    An award of such other relief that the honorable Court may deem just and proper.

Respectfully submitted the 24th day of January, 2025,

s/ *Michael P. Elkon*
Michael P. Elkon
Georgia Bar No. 243355
Matthew T. Sharon
(motion for admission *pro hac vice* forthcoming)
Georgia Bar No. 723611
FISHER & PHILLIPS LLP
1230 Peachtree Street, NE
Suite 3300
Atlanta, Georgia 30309
Phone (404) 231-1400
Facsimile (404) 240-4249
melkon@fisherphillips.com
msharon@fisherphillips.com

Francis A. Wilson
Colorado Bar No. 57427
FISHER & PHILLIPS LLP
1125 17th Street
Suite 2400
Denver, Colorado 80202
Phone (303) 218-3650
Facsimile (303) 218-3651
fwilson@fisherphillips.com

***Counsel for Plaintiff FW-CO, Inc.***

# VERIFICATION

I, Richard (Rick) Lewis, Founder and CEO of Montis Tenura, Inc., d/b/a Fortis Warranty, do hereby certify under penalty of perjury that the facts contained in the foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief.

By: _____
Richard Lewis

Dated:  January 24, 2025.

FP 53594100.1