# EXHIBIT I

**From:** Charlie Schulz
**Sent:** Monday, January 30, 2023 6:28 PM
**To:** David Schupmann <dave@tridentsolutionscorp.com>
**Subject:** Aspen Energy agreement

Haven't reviewed it yet. Give it a look and we can talk.


Best,

Charlie

**Charlie Schulz**
**Fortis**
**262-269-2749**

Aspen Draft 1/30/23

# CHANNEL PARTNERSHIP AGREEMENT

This Channel Partnership Agreement (this "<u>Agreement</u>") is entered into as of February __, 2023 (the "<u>Effective Date</u>"), by and between Aspen Power Partners LLC, a Delaware limited liability company ("<u>Aspen</u>"), and Trident Solutions of Sugar Grove LLC d/b/a Trident Solutions Corp, an Illinois limited liability company ("<u>Channel Partner</u>"). Each of Aspen and Channel Partner may be referred to herein as a "<u>Party</u>," and collectively as the "<u>Parties</u>."

## RECITALS

A.   Aspen is in the business of developing, constructing, operating, and owning solar photovoltaic energy systems (each, a "<u>System</u>"), to be installed on commercial and industrial property rooftops located throughout the United States (each, a "<u>Property</u>"). As used in this Agreement, the term "<u>Project</u>" shall mean any System installed, or expected to be installed, at a on a Property by Aspen.

B.   Channel Partner now has, and will continue to develop, relationships with developers, owners, and managers of Properties (each, a "<u>Prospective Customer</u>").

C.   Channel Partner desires to identify, and if requested, connect, Prospective Customers to Aspen, and Aspen desires to compensate Channel Partner therefor.

## AGREEMENT

1.   **Term and Termination**. Subject to <u>Section 6(b)</u> below, the term of this Agreement shall commence on the Effective Date and shall terminate on the date that is three (3) years after the Effective Date (such period, the "<u>Term</u>"). Aspen may terminate this Agreement for convenience at any time during the Term by delivering at least thirty (30) days' prior written notice to Channel Partner.

2.   **Channel Partner Obligations**. During the Term, Channel Partner agrees to use commercially reasonable efforts to (a) identify Prospective Customers to Aspen; (b) upon request by Aspen, make introductions and/or coordinate meetings, whether virtual or in person, between such Prospective Customers and Aspen; and (c) to the extent reasonably requested by Aspen, assist in facilitating the execution by Aspen and such Prospective Customers of (i) one or more site control agreements allowing for development, installation, and ownership of a Project on the applicable Property by Aspen or one of its affiliates (each, a "<u>Site Control Agreement</u>"), (ii) offtake agreements for the sale by Aspen or one of its affiliates of the electricity produced by the applicable Project to such Prospective Customer or the tenants of such Prospective Customer's applicable Property, and/or (iii) any other documentation between Aspen or one of its affiliates and such Prospective Customers to the extent reasonably necessary in Aspen's sole discretion to provide for the installation of such System and/or the sale of such electricity (collectively, the "<u>Definitive Agreements</u>").

Aspen Draft 1/30/23

**3.     Prospective Customers; Exclusivity.**

a.     Following the identification by Channel Partner of a Prospective Customer to Aspen, Aspen may at any time decline to meet, discuss, negotiate, or execute agreements with such Prospective Customer for any reason or for no reason in Aspen's sole discretion.

b.     Except as expressly set forth in Sections 3(c) below, with respect to a Prospective Customer, during the applicable Introduction Period and following the applicable Initial Meeting, if any, Channel Partner shall not (i) directly or indirectly introduce, or disclose the identity of, any Prospective Customer to any third party who is in the business of developing, or who desires to develop, any facilities similar to the Systems (each, a "Competitor"), or (ii) otherwise engage in any activities related to developing, owning, or operating Systems, or facilitating any of the foregoing, for itself or on behalf of any Competitor.

c.     If, after ninety (90) days following Channel Partner's initial identification of a Prospective Customer to Aspen ("Introduction Period"), Aspen has not scheduled, directly or through Channel Partner, a meeting between Aspen and a Prospective Customer (each, an "Initial Meeting"), Channel Partner may introduce such Prospective Customer to any third party, including any Competitor, for any purpose.

**4.     Compensation; Costs and Expenses; Taxes.**

a.     Following the Initial Meeting, in the event that Aspen executes Definitive Agreements with a Prospective Customer, and a Project on a Property developed, owned, or managed by such Prospective Customer achieves the Payment Conditions set forth below, then Channel Partner shall be entitled to a Channel Partner Payment.

b.     As used in this Agreement, the term "Payment Conditions" shall mean:

i.     Channel Partner's identification of a Prospective Customer to Aspen in writing, including sufficient detail to allow Aspen to evaluate such Prospective Customer as a potential counterparty with respect to a Project;

ii.     The occurrence of an Initial Meeting between Aspen and a Prospective Customer, including, if requested by Aspen, a "warm" introduction by Channel Partner and facilitation by Channel Partner of such Initial Meeting;

iii.     All Definitive Agreements for the applicable Project having been duly executed by Aspen and the applicable Prospective Customer, and/or each such party's designees, following an Initial Meeting described in Section 4(b)(ii) but prior to the expiration of the Term; and

iv.     The applicable Project having achieved "commercial operation," as defined in the Definitive Agreements for such Project; *provided* that if "commercial operation" is not defined in the Definitive Agreements, it shall mean that the applicable System is mechanically complete and capable of delivering electricity to the Prospective Customer, its tenants, or the electrical grid, as applicable.

Aspen Draft 1/30/23

   c. No later than ten (10) Business Days after all Payment Conditions are satisfied with respect to a Project, Aspen shall pay to Channel Partner an amount equal to $0.01 per Watt (direct current) of installed nameplate capacity of the applicable System.

   d. In the event that Aspen executes Definitive Agreements for a Project with a Prospective Customer after the expiration or earlier termination of the Term of this Agreement, and such Project achieves commercial operation as defined in such Definitive Agreements, Aspen shall have no obligation to make any payments to Channel Partner for such Project.

   e. Each Party shall be solely responsible for all its costs and expenses incurred in the negotiation and preparation of this Agreement. Channel Partner shall be solely responsible for all taxes incurred by Channel Partner in connection with its performance hereunder, including, but not limited to, (i) all withholding, social security and other taxes of Channel Partner's employees, and (ii) all taxes with respect to any Channel Partner Payments.

  **5.** **Qualifications**. Channel Partner hereby represents and warrants to Aspen that Channel Partner is capable of performing, and is qualified to perform, its obligations in this Agreement, including, to the extent applicable, having any licenses or other approvals required under applicable law for Channel Partner to perform its obligations under this Agreement.

  **6.** **Events of Default and Remedies; Remedies; Survival**.

   a. It shall be an event of default hereunder (an "<u>Event of Default</u>") if any Party breaches a material term of this Agreement and has failed to cure such breach within thirty (30) days of notice thereof by the non-breaching Party ("<u>Cure Period</u>"); *provided* that if the breaching Party begins to cure such breach during the Cure Period and is unable, despite such Party's commercially reasonable efforts, to complete the cure within the Cure Period, the Cure Period shall be extended by the time reasonably necessary to cure the same, up to a maximum of thirty (30) additional days.

   b. Following the occurrence and continuation of an Event of Default, the non-breaching Party may terminate this Agreement and pursue any remedies available at law or equity. Notwithstanding the foregoing, neither Party be liable to the other Party, whether in contract, tort or otherwise, for loss of profits, loss of revenues, loss of savings, loss of business, or any indirect, incidental, special, exemplary, punitive or other consequential damages, whether under tort, contract, or other theories of recovery, other than in cases of gross negligence or willful misconduct.

   c. <u>Sections 4</u>, <u>5</u>, <u>6</u>, <u>7</u>, <u>9</u>, and <u>10</u>, and any other provision of this Agreement that by its nature is intended to survive termination or expiration of this Agreement, shall so survive.

  **7.** **Choice of Law; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of laws. Any litigation between the parties shall be conducted in the state or federal courts of the State of New York.

  **8.** **Waiver of Trial by Jury**. Each of the Parties hereby knowingly, voluntarily and intentionally waives the right to a trial by jury with respect to any litigation based hereon or arising

Aspen Draft 1/30/23

out of, under or in connection with this Agreement. This provision is a material inducement to each Party's execution of this Agreement.

9.  **Notice**. All notices required under this Agreement shall be deemed given when sent by overnight courier or registered or certified mail, or when sent by telecopy, telegraph or other graphic, electronic means and confirmed by overnight courier or registered or certified mail addressed as follows:

If to Aspen:

Aspen Power Partners LLC
100 Crescent Ct., Suite 700
Dallas, TX 75201
Attn: General Counsel
Email: notices@aspenpower.com

If to Channel Partner:

Trident Solutions of Sugar Grove LLC d/b/a Trident Solutions Corp
[Address]
[Address]]
Attn: [_____]
Email: [_____]

10.  **Relationship of Parties**. This Agreement does not constitute a joint venture, association, or partnership between the Parties.  No express or implied term, provision, or condition of this Agreement shall create, or shall be deemed to create, an employment, agency, joint venture, partnership, or any fiduciary relationship between the Parties.  For the avoidance of doubt, Channel Partner is not granted any right, authority, or responsibility expressed, implied, or apparent on behalf of or in the name of Aspen to bind or act on behalf of Aspen.

11.  **Confidentiality**. The terms, provisions, and conditions of this Agreement and any materials, information, files, and documentation provided by one Party to the other Party in connection herewith are strictly confidential and proprietary, and shall be treated and maintained as such, and neither the terms, provisions, and conditions hereof or any materials, information, and documents received from the other Party in connection herewith shall be disclosed by a Party to any third party without the prior written consent of the other Party, except that either Party may disclose such confidential information (a) to its members, officers, directors, employees, affiliates, agents, advisors, and/or financing parties on a need-to-know basis, (ii) to the extent necessary for a Party to perform its obligations hereunder, or (iii) as required by applicable law.

12.  **Entire Agreement; Modification**. This Agreement contains the entire understanding between the Parties with respect to the subject matter covered by this Agreement. This Agreement can only be changed, modified, or discharged by a writing signed by both Parties.

13.  **Non-Waiver**. No waiver of any provision of this Agreement shall be deemed to be nor shall constitute a waiver of any other provision whether or not similar, nor shall any waiver

Aspen Draft 1/30/23

constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

        14.    **Benefit; No Assignment; Delegation**. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns; *provided* that neither Party shall assign its rights or duties under this Agreement without the prior written consent of the other and any such attempted assignment without consent shall be null and void.

        15.    **Authority**.  Aspen and Channel Partner each represents and warrants it has the authority to enter into this Agreement and it is bound hereto and that its performance hereunder shall not cause a default or breach of any other agreement to which it is a party.

        16.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which together shall constitute a single instrument. Execution and delivery of signature pages hereof by electronic means shall constitute effective and binding execution and delivery hereof.

*Signature Page Follows*

Aspen Draft 1/30/23

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**ASPEN:**

Aspen Power Partners LLC


By:_____
Name:
Title:


**CHANNEL PARTNER:**

Trident Solutions of Sugar Grove LLC d/b/a Trident Solutions Corp


By:_____
Name:
Title:

*[Signature page to Channel Partnership Agreement – Trident Solutions]*