# EXHIBIT A

Case No. 1:25-cv-00254-NYW-TPO   Document 106-1   filed 08/13/25   USDC Colorado   pg 1 of 11

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement") is made as of January __, 2018, between Fortis Warranty, its parents, subsidiaries, and affiliates (the "Company"), and David Schupmann (the "Executive").

WHEREAS, the Company and the Executive desire to set forth the terms and conditions of Executive's employment with the Company.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

## 1. EMPLOYMENT OF THE EXECUTIVE

1.1 <u>Duties and Status</u>.

1.1.1 <u>Employment Duties</u>. The Company hereby engages the Executive for the period specified in Section 3.1 hereof (the "Employment Period") its Senior Vice-President of Sales and Marketing. The Executive accepts such employment on the terms and conditions set forth in this Agreement. During the Employment Period, the Executive shall exercise such authority and perform such duties as are normally associated with the office of Vice-President of Sales and Marketing, and such other reasonable duties related to the operation of the Company as may be assigned to him from time to time by the President and Chief Executive Officer ("CEO") of the Company.

1.1.2 <u>Time</u>. The Executive agrees to devote substantially all of his business time, attention and skill to the performance of his duties as an employee of the Company, unless otherwise authorized in writing by the CEO; provided, however, that neither this provision nor Paragraph 5 hereof shall be construed to prohibit or prevent the Executive from engaging in the following activities while this Agreement is in effect:

(a) Investment of the Executive's assets in any enterprise not in direct competition with the Company at the time of such investment, provided that such investment is in such form or manner as will not require the rendering of any substantial services by the Executive;

(b) Ownership of not more than twenty percent (20%) of the outstanding securities of any class of an entity which has at least five hundred (500) holders of record;

(c) Engaging in charitable, religious or civic activities such as serving on a school board, a church board or community fund committee.

1

## 2. COMPENSATION AND BENEFITS

2.1 <u>Cash Compensation</u>. As cash compensation for his services under this Agreement, the Executive shall be compensated solely as follows:

2.1.1 <u>Base Salary</u>. The Company shall pay the Executive an annual salary (the "Base Salary") in periodic equal installments in accordance with the normal payroll practices of the Company. The initial Base Salary shall be Two Hundred Fifty Thousand Dollars ($250,000.00) and shall be subject to periodic review at least annually.

2.1.2 <u>Annual Bonus</u>. During the Employment Period, the Executive shall be eligible for an annual bonus. For the first year of employment only, Executive shall receive an initial bonus of Two Hundred Fifty Thousand Dollars ($250,000.00), payable when the following conditions are met: One Hundred Twenty Five Thousand Dollars ($125,000.00) on or before June 30, 2018; and the remaining One Hundred Twenty Five Thousand Dollars ($125,000.00) on or before March 15, 2019, so long as Executive has reached the cumulative objectives of five million dollars in proposals, one million dollars in bookings, and two regional or national hires. Provided, however, that Executive must be employed on the above dates in this subparagraph 2.1.2 to receive the above bonus amounts. Should Executive be terminated or resign for any reason on or before the above dates, he shall not be entitled to such bonuses or any portions thereof. Following the initial bonus period above, Executive will be eligible for up to Seven Hundred Fifty Thousand Dollars ($750,000.00) in annual bonus, subject to satisfactory performance and meeting all key business initiatives and/or performance indicators to be established for him by the CEO on or before March 31, 2018. Such initiatives and/or performance indicators will be provided for in the Compensation Plan and shall be revised by the CEO in his sole discretion each year on or before March 31st of each successive year.

2.1.3 <u>Exclusion of Any Other Bonus</u>. Except as provided above, Executive shall not be eligible for any other Company bonus program.

2.2 <u>Additional Benefits</u>. In addition to all compensation due or payable hereunder, the Company will provide the Executive with additional benefits as follows:

2.2.1 <u>Expenses</u>. The Company will reimburse the Executive for such reasonable out-of-pocket expenses as the Executive may incur in the rendition of the services contemplated hereby upon presentation of written evidence that the expense has been paid by the Executive, if reimbursement of such expenditures conforms to the Company's expense reimbursement policy at the time the expenditures are incurred or if the Executive had prior written authorization for said expenditures.

2.2.2 <u>Participation in Employee Benefit Plans</u>.

(a) The Executive is entitled to participate in any health, medical, disability, medical reimbursement and hospitalization insurance plan, group life insurance plan, pension or profit-sharing plan, and each other qualified or nonqualified employee benefit plan covering employees of the Company, if the Executive is eligible according to the terms and conditions of the particular plan.

FPDOCS 33554758.1

(b) Without limiting or being limited by the foregoing, in the event of a Disability Termination (as hereinafter defined) the Executive shall be paid the amounts available under any disability insurance plan maintained by the Company in which Executive participates or, if the Company does not have a disability insurance plan, the Company shall pay the Executive the amounts described in Section 4.3 hereof.

2.2.3 **Vacation**. In addition to Company holidays, the Executive shall have the right to take a vacation of three (3) weeks in his first year of employment. On Executive's third anniversary of employment and thereafter, he shall have the right to take a vacation of four (4) weeks each anniversary year during the Employment Period, subject to all of the terms and conditions of the vacation policy contained in the Company's Employee Handbook.

2.2.4 **Vehicle Allowance**. Executive shall also receive in his pay each month a vehicle allowance of Eight Hundred Dollars ($800.00) per month.

3. **EMPLOYMENT PERIOD**

3.1 **Employment at Will**. Notwithstanding the provisions of paragraph 3.2 of this Agreement, which are intended solely for the purpose of setting forth any entitlement to severance pay and benefits, Executive's employment with the Company shall be at will, meaning that Executive or employee may terminate the employment relationship at any time without notice, cause, or any specific procedures.

3.2 **Termination of Employment**.

3.2.1 **Termination by Company**. The Executive's employment under this Agreement may be terminated:

(a) By the Company upon the death or permanent disability of the Executive (a "Disability Termination"). Permanent disability for purpose of this Subsection means the inability of the Executive to perform his normal required services or essential functions under this Agreement for a period of six (6) consecutive months by reason of his mental or physical disability as determined by the Company, consistent with federal and state law; or

(b) Immediately by the Company for cause ("For Cause Termination"). For purposes of this Agreement, "Cause" shall mean conduct by the Executive amounting to: (i) fraud or dishonesty against the Company, or other acts or omissions which adversely impact the business or image of the Company or cause the Company to fall into disrepute; (ii) willful misconduct or knowing violation of law in the course of employment with the Company; (iii) a conviction or plea of guilty or nolo contendere to a felony or other crime involving dishonesty or moral turpitude; or (iv) failure to perform any of Executive's duties as an employee of the Company; or

(c) By the Company for any reason other than a For Cause Termination or a Disability Termination after giving the Executive thirty (30) days' written notice of such election ("No Cause Termination").

3

FPDOCS 33554758.1

3.2.2 <u>Termination by the Executive</u>. The Executive's employment under this Agreement may be terminated:

(a) By the Executive voluntarily for any reason other than an Employee Termination for Cause, as defined in Paragraph 3.2.2(b) hereof, after giving ninety (90) days' prior written notice to the Company ("Employee Voluntary Termination"); or

(b) By the Executive for cause ("Employee Termination for Cause"). For purposes of this Agreement, "Employee Termination for Cause" exists upon the occurrence of any of the following: (i) the Company fails to make any payment of Cash Compensation under Section 2.1 hereof within thirty (90) days of when due hereunder; or (ii) the Company breaches any term of this Agreement not involving a payment of Cash Compensation pursuant to Section 2.1 hereof in any material respect and fails to cure such breach in full within thirty (30) days of the Company's receipt of written notice of such breach from the Executive.

## 4. SEVERANCE PROVISIONS

4.1 <u>Executive's Voluntary Termination or Company Termination for Cause</u>. If the Executive's employment under this Agreement is terminated as a result of Executive's voluntary termination, or a Company Termination for Cause, on the date of termination the Executive shall be entitled to receive, and the Company shall pay to the Executive:

(a) Base Salary for the period ending on such termination, plus any annual bonus, provided that Executive is employed through the last day of the period on which such compensation is based and, provided further, that such compensation is payable pursuant to the terms of any written annual bonus program in effect at the time of termination;

(b) Reimbursements pursuant to Subsection 2.2.1 hereof for expenses incurred prior to the date of termination; and

(c) Benefits, if any, payable to or on behalf of the Executive upon his termination of employment under any employee benefit plans and arrangements which are not specifically provided for in this Section 4.1, under the terms and conditions for benefit payments set forth in such plans and arrangements.

(d) Should Executive provide notice pursuant to Paragraph 3.2.2(a), the Company, at its election, may permit Executive to work for the Company for the term of such notice. However, the Company may elect to accept Executive's voluntary termination immediately or at a time that is less than the notice provided under Paragraph 3.2.2(a). Should the Company accelerate the Executive's voluntary termination for any reason other than conduct amounting to Cause as defined in Paragraph 3.2.1(b), Company shall pay Executive the Base Salary that would be owed for the remainder of the notice period specified in Paragraph 3.2.2(a).

(e) Except as expressly provided for in this Paragraph 4.1, Executive shall not be entitled to any separation benefits or pay or any other amounts.

4

4.2   **Company No Cause Termination or Employee Termination for Cause.**

    4.2.1   **Separation Benefits.** If the Executive's employment under this Agreement is terminated as a result of a Company No Cause Termination, or an Employee Termination for Cause, the Executive shall be entitled to receive, and the Company shall pay to the Executive:

        (a)   The amounts provided in Paragraphs 4.1(a) and (b) and any benefits payable under Paragraph 4.1(c) on the date of termination, or on the date on which such amounts are earned and determinable, and

        (b)   An amount equal to twenty-four (24) months of the Executive's Annual Base Salary in effect at the time of such termination.

    4.2.2   **Payment Method.** Severance payments shall be paid in accordance with normal payroll practices of the Company following termination and the expiration of any revocation period, contemporaneously with delivery by the Executive of a waiver and release of the Company (in a form reasonably satisfactory to the Company) from all claims by the Executive relating to his employment and the termination of his employment, except for the obligations of the Company under this Agreement. If any amount to be paid under this Section 4 (i.e., annual bonus) cannot be immediately determined or is not immediately payable under any written annual bonus program, such portion of the severance payment shall be calculated as soon as possible consistent with the terms and conditions of such program.

    4.2.3   **Continuation of Benefits.** Executive shall be entitled to the continuation of benefits including, but not limited to, continuation of group health benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), consistent with the terms and conditions of any benefit programs in effect at the time employment is terminated.

4.3   **Death or Disability Termination.** If the Executive's employment under this Agreement is terminated as a result of his death or disability which constitutes a Disability Termination, the Executive shall be entitled to receive any Base Salary that may be owed to the Executive, but is unpaid as of the date on which the Executive's employment is terminated and any annual bonus earned pursuant to any written annual bonus program as of the date of death or Disability Termination payable as specified in Subsection 2.1.2.

5.   **CONFIDENTIAL INFORMATION, RESTRICTIVE COVENANTS AND MATERIALS/INVENTIONS**

    5.1   **Confidentiality and Nondisclosure.**

        5.1.1   Executive acknowledges that, during employment with the Company, Executive will have access to confidential information of and pertaining to the Company and its clients, all of which is hereby agreed to constitute confidential information and trade secrets (as described in 5.1.3 hereof) of the Company. To ensure the continued secrecy and confidentiality of such information and trade secrets, Executive hereby covenants and

5

agrees that Executive shall keep secret and shall not divulge any of the names of, or any other information relative to, the clients and business operations of Company, and any information concerning Company's clients, employees, employment practices, policies, techniques, methods, and any all business associations or activities of Company and its clients and any information or knowledge that Executive acquires during Executive's employment with the Company. Executive also further covenants and agrees that Executive will not keep, or use for his personal advantage, either directly or indirectly, any information, documentation (regardless of the manner or form in which such documentation exists) relative to the business of the Company or its clients and, furthermore, will not furnish or make available any such information to any third party.

    5.1.2   Upon leaving employment with the Company, Executive will return and not take with him any confidential information or trade secrets, including without limitation, manuals, programs, documents, computer programs, compilations of technical data, client and prospective client lists, specifications and other records of any nature relating to the Company, its clients or others, or any reproductions thereof. Further, Executive will take no other action inconsistent with his obligations as an employee of the Company.

    5.1.3   Executive acknowledges that the Company has certain trade secrets including, but not limited to, certain processes, formulae, data, know-how, software programs, improvements, inventions (whether patentable or not), techniques, marketing plans, business plans, strategies, forecasts, computer programs and other copyrightable material, the compensation and terms of employment of other employees, customers and customer lists, and other information relating to the Company's business which is secret and of value ("Information"), which trade secrets the parties agree are and shall remain under the full control of the Company and shall remain of limited availability. In consideration for entering into this Agreement, Executive hereby covenants and agrees that Executive shall not divulge to any third party at any time any information regarding such trade secrets or the substance thereof without the prior written consent of the Company and, furthermore, with respect to such trade secrets, shall comply with all of the provisions of Section 5 hereof. Employee agrees that Company is the only firm offering its type of services in the United States and certain other countries, and further agrees (i) that the Company takes precautions above and beyond normal business precautions to guard secrecy of the Information; having knowledge of the Information is of great value to the holder as against competitors; the Company has expended considerable effort and money in obtaining and developing the Information; and (iv) the amount of time and expense it would take for others to acquire and duplicate the Information is also considerable. Employee acknowledges the confidentiality of the Information and that the Information is protected by this Agreement and by C.R.S. §§ 7-74-101 *et seq.*, the Colorado Uniform Trade Secrets Act, from unauthorized disclosure or use for any competitive purpose.

    5.2   **Agreement Not to Solicit Employees or Customers.**  During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not, either directly or indirectly, on the Executive's own behalf or on behalf of others, approach, solicit, induce, divert or hire, or attempt to approach, solicit, induce, divert or hire, any employee or customer or prospective customer of the Company, whether or not the employment or relationship of any such person or entity is pursuant to a written agreement or for

a determined period or at will, to terminate such employment or relationship with the Company. Executive's agreement to not solicit customers shall be limited to the Area defined below in subparagraph 5.3.1.

5.3   Agreement Not to Compete. During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not (except on behalf of or with the prior written consent of the Company), within the Area, either directly or indirectly, on his own behalf or in the service or on behalf of others, as a manager or consultant, or in any other capacity which involves duties and responsibilities similar to those the Executive has undertaken for the Company, engage in any Competing Business.

5.3.1   As used in this Agreement, "Area" means any state or country where the Company engages in any business during Executive's employment with the Company. As used in this Agreement, "Competing Business" means any business organization of whatever form directly engaged in any business or enterprise which is the same as, or substantially the same as, the business of the Company. Investments and services which are consistent with the terms of Subsection 1.1.2 hereof shall not be considered Competing Businesses and shall not be prohibited.

5.4   Materials and Inventions. All work performed, and all materials, products, deliverables, improvements, discoveries, inventions and other subject matter conceived, developed or prepared by Executive alone or with others during the period of Executive's employment with the Company (collectively the "Materials"), are the property of the Company and all title and interest therein shall vest in the Company and all Materials shall be deemed to be works made for hire and made in the course of Executive's employment with the Company. This Paragraph 5.4 does not include those materials which, in the judgment of the Company, do not relate to the business efforts or research and development efforts in which, during the period of Executive's employment, the Company actually is engaged or reasonably would be expected to become engaged. To the extent that title to any Materials may not, by operation of law, vest in the Company or such Materials may not be considered works for hire, Executive hereby irrevocably assigns all right, title and interest therein to the Company. All Materials shall belong exclusively to the Company, with the Company having the right to obtain and to hold in its own name patents, copyrights, registrations or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. During the period of Executive's employment, Executive will communicate and deliver to the Company promptly and fully all Materials. Executive agrees to give the Company and any person designated by the Company, at Company's expense, any assistance required to perfect and enforce the rights defined in this Section 5.4.

5.5   Remedies. The Executive agrees that the covenants contained in Section 5 of this Agreement are of the essence of this Agreement; that each of such covenants is reasonable and necessary to protect and preserve the interests, property, and business of the Company; and that irreparable loss and damage will be suffered by the Company should the Executive breach any of such covenants. Therefore, the Executive agrees and consents that, in addition to all the remedies provided at law or in equity, the Company shall be entitled to a temporary restraining order and temporary and permanent injunctions to prevent a breach or contemplated breach of any of the covenants. Except as expressly provided herein, the existence of any claim, demand, action or cause of action of the Executive against the Company shall not constitute a defense to the

enforcement by the Company of any of the covenants or agreements herein. Should the Company prevail in any action to enforce this Section 5, it shall be entitled to an award of fess, costs, and expenses incurred in such action including, but not limited to its attorney, paralegal, and expert witness fees.

5.6  **Reasonable Limitations.** The parties agree that the limitations on use of the Information and the Company's other trade secrets set forth in this Agreement are reasonable and necessary to protect the Company's proprietary interests and that these limitations do not unreasonably restrain or interfere with the Employee's ability to be gainfully employed in the future in Employee's chosen career. Employee acknowledges that this Agreement is a "contract for the protection of trade secrets" as that phrase is used in C.R.S. § 8-2-113.

5.7.  **Independent Covenants.** Each covenant contained in this Section II shall be construed as agreements independent of any other provisions of this Agreement or Employee's employment with Company, and the existence of any claim or cause of action of Employee against Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of such covenants.

## 6.  INDEMNITY

The Company shall indemnify Executive from and against any and all actions, damages, liabilities, costs, proceedings, suits, claims, or demands of any kind or nature arising out of Executive's proper performance of duties and functions pursuant to this Agreement.

## 7.  NOTICES

Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and shall be deemed given when sent by registered or certified mail to the Executive at the last residence address Executive has filed in writing with the Company or, in the case of the Company, at its Denver, Colorado offices.

## 8.  BINDING AGREEMENT

This Agreement shall be effective as of the date hereof and shall be binding upon and inure to the benefit of the Executive, Executive's heirs, personal and legal representatives, guardians and permitted assigns. The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon any successor of the Company.

## 9.  ENTIRE AGREEMENT

This Agreement and the agreements and plans referenced herein constitute the entire understanding of the Executive and the Company with respect to the employment of the Executive and supersedes, replaces, and renders unenforceable any and all prior agreements or understandings, written or oral. This Agreement may not be changed, modified or discharged orally, except by an instrument in writing signed by the parties. Executive agrees that the Company shall have the right from time to time to renegotiate the terms of this Agreement.

## 10. GOVERNING LAW

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Colorado. The sole and exclusive jurisdiction and venue for any action to enforce this Agreement shall be in the United States District Court for the District of Colorado or Denver District Court. By his signature below, Executive consents to personal jurisdiction before these courts.

## 11. SEVERABILITY

Each of the rights enumerated above shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Company at law or in equity. If any of the covenants contained herein or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants or rights or remedies which shall be given full effect without regard to the invalid portions. If any of the covenants contained herein are held to be invalid or unenforceable because of the duration of such provision or the area or scope covered thereby, Executive agrees that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision and in its reduced form said provision shall then be enforceable.

## 12. ADDITIONAL REPRESENTATIONS

12.1. Employee's employment with the Company and/or the execution, delivery, and performance of this Agreement by Employee do not and shall not conflict with, breach, violate, or cause a default under any contract, agreement, instrument, order, judgment, or decree to which Employee is a party or by which Employee is bound;

12.2. Other than Employee's employment agreement(s) with Seller, Employee is not a party to or bound by any employment agreement, non-compete agreement, non-solicitation agreement, confidentiality agreement, or other post-employment obligation or covenant with any other person or entity that would limit Employee's job duties or obligations with the Company in any way;

12.3. Employee will not use in Employee's employment with the Company or disclose to the Company any confidential information or trade secrets of a third party (including any former employer of Employee) unless the Company receives written approval to use such information from the applicable third party; and

12.4. Employee has had an opportunity to consult with legal counsel regarding all of the provisions contained in this Agreement, and Employee fully understands its terms and conditions.

## 13. TAX WITHHOLDING

All payments made by the Company to the Executive under this Agreement shall be subject to applicable federal, state and local tax withholding.

The parties have executed, sealed and delivered this Agreement as of the date first above written.

**FORTIS WARRANTY:**

By: *[signature]*
Title: **February 27, 2018**

**EXECUTIVE:**

*[signature]*

10

FPDOCS 33554758.1