**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-00254-NYW-TPO

FW-CO, INC., d/b/a FORTIS WARRANTY,

      Plaintiff and Counter-Defendant,

RICHARD LEWIS,

      Counter-Defendant,

v.

CHARLES SCHULZ;
DAVID SCHUPMANN;

      Defendants and Counter-Claimants,

TRIDENT SOLUTIONS OF SUGAR GROVE, LLC;
ROOFING USA, LLC; and
INSTALLATION SERVICES LLC d/b/a TOPKEY CONSTRUCTION,

      Defendants.

---

## THIRD AMENDED COMPLAINT & JURY DEMAND

---

Plaintiff FW-CO, Inc., d/b/a Fortis ("**Fortis**" or the "**Company**"), by and through its undersigned counsel, files the following Third Amended Complaint & Jury Demand against Defendants Charles Schulz ("**Schulz**"); David Schupmann ("**Schupmann**"), Trident Solutions of Sugar Grove, LLC ("**Trident**") (together, the "**Trident Defendants**"); as well as Roofing USA, LLC ("**Roofing USA**"); and Installation Services LLC d/b/a TopKey Construction ("**TopKey**") (collectively, "**Defendants**").

## <u>INTRODUCTION</u>

**"I have never been asked to do this in my other 28 years in the business" – Scott Reynolds**

1.    This case involves two former employees who, apparently unsatisfied with the significant compensation Fortis provided them, engaged in a massive scheme to enrich themselves at their employer's expense by both demanding kickbacks from contractors and diverting business to an entity that they created and operated.

2.    Schulz and Schupmann's actions were in clear violation of their respective duties of loyalty to Fortis, and in breach of the Employment Agreements ("**Agreements**" or individually an "**Agreement**") that Schupmann and Schulz executed as a condition of their employment with Fortis.

3.    Schulz and Schupmann's wrongdoing was aided and abetted by Trident, which intentionally interfered with Fortis's employment contracts and business relations with the intent of damaging Fortis for the benefit of Trident Defendants.

4.    Schulz and Schupmann's wrongdoing was further aided and abetted by Roofing USA, a competitor to Fortis which sought to steal materials, knowhow, and market share from Fortis, as well as TopKey, a general contractor which knowingly participated in and gave substantial assistance to the kickback scheme by embedding concealed fees into its external pricing and paying those fees to Trident at Schulz and Schupmann's direction.

5.      Fortis hired Schupmann on February 27, 2018 as part of its effort to build out the sales and marketing wing of its business.

6.      Schupmann's first hire was Schulz, who joined Fortis in June 2018.

7.      Fortis eventually promoted Schupmann to COO of Fortis in October 2021.

8.      As a member of Fortis's sales and marketing division, Schulz was primarily tasked with identifying and soliciting potential clients for Fortis's Roof Performance Program (the "**Program**"). The Program offers an initial roof reconditioning service, followed by the issuance of a roof warranty, which saves Fortis's customers significant amounts of money compared to a complete roof replacement. Fortis works with outside contractors to provide the labor and materials to complete these projects. In addition to a base salary, Schulz was awarded a 10% commission on his gross sales volume—two to three times more than that of any other Fortis salesperson.

9.      Schulz's supervisor was Schupmann, who developed a close relationship with Schulz. Like Schulz, Schupmann earned a large base salary of $400,000 and was eligible to earn significant bonuses based on his performance—Schupmann made over $1.1 million in 2023 alone and averaged over $700,000 in annual compensation during the last three years of his employment.

10.     Given that Schulz and Schupmann had the ability to accrue substantial bonuses and commissions through their compensation plans, an ordinary employee in their shoes would have worked hard on Fortis's behalf to maximize their compensation, benefitting themselves and the Company concurrently. If Schulz and Schupmann were concerned that their pay was less than they deserved, they could have resigned and

sought other employment or negotiated new terms with Fortis. Schulz and Schupmann instead chose a third path: to "double dip" from Fortis through demanding kickbacks from Fortis's contractors and, in other instances, diverting whole projects from Fortis to abscond with all of the revenue generated from that work without Fortis ever knowing of their scheme.

11.    To further this plot, Schulz and Schupmann created Trident, which they used both as a receptacle for their kickback payments and as a de facto competitor of Fortis's that diverted potential Fortis business secretly.

12.    Schulz and Schupmann successfully ran this illicit campaign for years, earning untold amounts before it was uncovered by Fortis in late 2024.

13.    Nothing about the Trident Defendants' actions was legal. Schulz and Schupmann usurped business opportunities from Fortis and artificially inflated Fortis's costs and liabilities in obvious violation of the duty of loyalty and in breach of their contractual obligations to Fortis. These actions were assisted by and greatly benefited Trident, which at all times had knowledge of Fortis's contracts and prospective business relations.

14.    Roofing USA knew that Schulz and Schupmann were parties to employment contracts with Fortis, and that they had duties of loyalty to Fortis, yet it nevertheless willfully exploited and benefited from Schulz and Schupmann's breaches of their contracts with Fortis—both while Schulz and Schupmann were employed by Fortis, and, for Schupmann, after his employment with Fortis ended.

15. TopKey benefited from the Trident Defendants' wrongful acts through its knowing participation in Schulz and Schupmann's breaches of their contracts and common law duties of loyalty through the kickback and diversion scheme they were a knowing and eager participant in.

16. Defendants' acts have significantly damaged and jeopardized Fortis's business by unfair methods. Defendants have caused Fortis to lose significant revenue and clients due to Schulz and Schupmann's unlawful kickback scheme and diversion of work away from Fortis, which Trident, Roofing USA, and TopKey knowingly and willingly participated in for their own profit. Accordingly, Fortis seeks money damages for its lost profits, contract damages, lost business, lost goodwill, Defendants' unjust enrichment, and disgorgement of all compensation that Fortis paid to Schulz and Schupmann during their periods of disloyalty. Fortis also seeks injunctive relief enjoining the Trident Defendants from continuing to unfairly compete with Fortis and ordering Schupmann and Schulz to comply with the restrictive covenants contained within the Agreements.

## PARTIES AND JURISDICTION

17. Plaintiff Fortis is a privately held Colorado corporation with its principal place of business in Colorado. Fortis is registered to do business in the state of Colorado.

18. Defendant David Schupmann is an individual who, upon information and belief, currently resides at S440 Crego Place, Geneva, IL, 60134.

19. The Court has personal jurisdiction over Schupmann because his Agreement contains a Colorado forum selection clause. The Court also has personal jurisdiction over Schupmann because he was employed by Fortis, a Colorado employer,

5

because he repeatedly came to Colorado for work, because he repeatedly made false or misleading statements to Fortis personnel located in Colorado, and because some or all of the wrongdoing committed by Schupmann was specifically targeted to harm Fortis in the state of Colorado.

20.     Defendant Charles Schulz is an individual who, upon information and belief, currently resides at S31W37307 School Section Lake Rd, Dousman, WI, 53118.

21.     The Court has personal jurisdiction over Schulz because his Agreement contains a Colorado forum selection clause. The Court also has personal jurisdiction over Schulz because he was employed by Fortis, a Colorado employer, because he repeatedly came to Colorado for work, because he repeatedly made false or misleading statements to Fortis personnel located in Colorado, and because some or all of the wrongdoing committed by Schulz was specifically targeted to harm Fortis in the state of Colorado. Moreover, Schulz has threatened Fortis with claims pursuant to the Colorado Wage Act, which further illustrates his understanding that he is subject to Colorado law and the jurisdiction of Colorado courts.

22.     Defendant Trident Solutions of Sugar Grove, LLC is a limited liability company owned by Defendants Schulz and Schupmann. For purposes of diversity jurisdiction, Trident is a citizen of Wisconsin and Illinois.

23.     The Court has specific personal jurisdiction over Trident because Trident intentionally and tortiously interfered with Fortis's employment contracts and prospective business relations in Colorado such that Trident's conduct was specifically aimed at this

state. Additionally, the various wrongful acts performed by Schupmann and Schultz in or directed to persons in Colorado were done as they were officers and owners of Trident.

24.    Defendant Roofing USA, LLC is a South Carolina Limited Liability Company with a primary place of business at 349 W. Coleman Blvd, Suite 202, Mount Pleasant SC 29464.

25.    This Court has specific personal jurisdiction over Roofing USA because Roofing USA committed intentional, wrongful acts directed at Fortis, a Colorado resident, with the knowledge that the brunt of the injury from its wrongful acts would be felt in Colorado. Roofing USA knew Fortis was a Colorado based company and knew this when it intentionally and tortiously interfered with Fortis's employment contracts, business relations, trade secrets and proprietary information, among other wrongs.

26.    Defendant Installation Services LLC; formerly known as Installation Services by HCR, LLC; doing business under the trade name of TopKey Construction ("TopKey"); is a limited liability company with its principal place of business at 14880 Sweitzer Lane, Laurel, Maryland, 20707. For purposes of diversity jurisdiction, TopKey is a citizen of Maryland.

27.    This Court has specific personal jurisdiction over TopKey because TopKey purposefully directed conduct at a Colorado resident (Fortis) by coordinating, calculating, and embedding concealed fees into TopKey's external pricing on Fortis-tied opportunities while maintaining direct contractual and confidentiality relationships with Fortis.

7

28.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are diverse in citizenship and the matter in controversy exceeds $75,000.

29.     Venue is proper in the Court because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Fortis and its Business.

30.     Founded in 2003, Fortis is a leader in the roof performance business. Fortis's primary revenue stream is the Program. The Program consists of three phases: (1) a proprietary Fortis Roof Risk Assessment, during which Fortis's Quality Control personnel assess the quality of a roof and relevant building conditions to determine the exact number of years Fortis can guarantee performance, (2) a roof reconditioning, performed by Fortis's contractor network, to bring each roof up to Fortis's standards, and (3) the issuance of a comprehensive warranty backed by Lloyd's of London. If a customer experiences a roofing issue while covered by a Fortis warranty, Fortis sends its Operations team to assess the issue and promptly schedule repairs through its nationwide network of contractor partners.

31.     The benefit of the Program to Fortis's customers is clear: rather than potentially spending millions on a roof replacement, customers can instead spend a fraction of the cost on the Program, which guarantees roof performance for a set amount of time.

32. The Program has been highly successful and leads the market as the most reliable, financially advantageous way to extend roof life, avoid the risk of roof performance issues, eliminate unexpected roof maintenance costs, and secure unmatched savings.

33. Due to the success of the Program, Fortis has developed strong relationships with its customers and roofing contractors alike based on confidence in the quality of Fortis's services and Fortis's commitment to providing such services at competitive prices.

34. However, not all roofs are eligible for the Program. If Fortis's initial assessment determines that reconditioning work would be insufficient to bring a roof up to Program standards, then Fortis will advise its client that the roof requires an immediate replacement. Often, clients will request that Fortis manage the roof replacement process due to their trust in Fortis as a reliable partner in the roofing industry. In these instances, Fortis receives a general management fee and works with its contractor network to replace the roof.

35. While Fortis's primary revenue stream comes from the Program, Fortis has received over $1,000,000 in revenue for roof replacement management projects between 2022-2024 and, as it learned, would have earned substantially more if not for Defendants' wrongful acts, including Schulz and Schupmann's diverting roof replacement projects for themselves and their Company, Trident; as well as wrongfully working with Roofing USA to steal trade secrets, proprietary information, and diverting opportunities to Roofing USA.

36.    Fortis's decision to engage in such reroofing management projects is subject to the discretion of its executive team working out of its Denver, Colorado headquarters.

37.    While Fortis's headquarters are located in Colorado, Fortis's success has allowed it to expand its services to cover buildings in six countries. Fortis's Program protects more than 150 million square feet of property and has helped customers defer over $550 million in costs. Fortis's efforts have allowed it to develop significant goodwill in the roofing industry.

## II.    Schupmann and Schulz Are Hired by Fortis.

38.    Schupmann joined Fortis in 2018 as a Senior Vice President of Sales and Marketing. In that role, Schupmann was tasked with building Fortis's sales and marketing operations. From the start of his employment, Schupmann operated in an executive role and managed Fortis's marketing and operations staff.

39.    Schupmann's initial base salary was $250,000 and included an options grant of 5% of Fortis's stock that would vest over time. Schupmann was ultimately compensated well in excess of this base salary, as he earned approximately $2.1 million in total compensation from the Company between 2022-2024, including $1.1 million in 2023 alone.

40.    In exchange for this executive position with significant access to Fortis's customer relationships, confidential information, and trade secrets, Fortis required that Schupmann sign the Agreement (attached hereto as Exhibit A) on February 27, 2018.

10

41.     The Agreement contains several lawful restrictive covenants in order to protect Fortis and the significant investment it made in Schupmann. For starters, Schupmann agreed that he would "devote substantially all of his business time, attention and skill to the performance of his duties as an employee of the Company."  (Ex. A, § 1.1.2.)

42.     Schupmann's Agreement includes several confidentiality provisions that provide as follows:

> 5.1.1 Executive acknowledges that, during employment with the Company, Executive will have access to confidential information of and pertaining to the Company and its clients, all of which is hereby agreed to constitute confidential information and trade secrets (as described in 5.1.3 hereof) of the Company. To ensure the continued secrecy and confidentiality of such information and trade secrets, Executive hereby covenants and agrees that Executive shall keep secret and shall not divulge any of the names of, or any other information relative to, the clients and business operations of Company, and any information concerning Company's clients, employees, employment practices, policies, techniques, methods, and any all business associations or activities of Company and its clients and any information or knowledge that Executive acquires during Executive's employment with the Company. Executive also further covenants and agrees that Executive will not keep, <u>or use for his personal advantage</u>, either directly or indirectly, any information documentation (regardless of the manner or form in which such documentation exists) relative to the business of the Company or its clients and, furthermore, will not furnish or make available any such information to any third party.
>
> 5.1.2 Upon leaving employment with the Company, Executive will return and not take with him any confidential information or trade secrets, including without limitation, manuals, programs, documents, computer programs, compilations of technical data, client and prospective client lists, specifications and other records of any nature relating to the Company, its clients or others, or any reproductions thereof. <u>Further, Executive will take no other action inconsistent with his obligations as an employee of the Company</u>.
>
> Executive acknowledges that the Company has certain trade secrets including, but not limited to, certain processes, formulae, data, know-how,

software programs, improvements, inventions (whether patentable or not), techniques, marketing plans, business plans, strategies, forecasts, computer programs, and other copyrightable material, the compensation and terms of employment of other employees, customers and customer lists, and other information relating to the Company's business which is secret and of value (Information"), which trade secrets the parties agree are and shall remain under the full control of the Company and shall remain of limited availability. In consideration for entering into this Agreement, Executive hereby covenants and agrees that Executive shall not divulge to any third party at any time any information regarding such trade secrets or the substance thereof without the prior written consent of the Company and, furthermore, with respect to such trade secrets, shall comply with all of the provisions of Section 5 hereof. Employee agrees that Company is the only firm offering its type of services in the United States and certain other countries, and further agrees (i) that the Company takes precautions above and beyond normal business precautions to guard secrecy of the Information; having knowledge of the Information is of great value to the holder as against competitors; the Company has expended considerable effort and money in obtaining and developing the Information; and (iv) the amount of time and expense it would take for others to acquire and duplicate the Information is also considerable. Employee acknowledges the confidentiality of the Information and that the Information is protected by this Agreement and by C.R.S. §§ 7-74-101 *et seq.*, the Colorado Uniform Trade Secrets Act, from unauthorized disclosure or use for any competitive purpose.

(Ex. A, § 5.1) (emphasis added).

43. The Agreement also contains an employee and customer non-solicitation clause:

During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not, either directly or indirectly, on the Executive's own behalf or on behalf of others, approach, solicit, induce, divert or hire, or attempt to approach, solicit, induce, divert or hire, any employee or customer or prospective customer of the Company, whether or not the employment or relationship of any such person or entity is pursuant to a written agreement or for a determined period or at will, to terminate such employment or relationship with the Company. Executive's agreement to not solicit customers shall be limited to the Area defined below in subparagraph 5.3.1.

(Ex. A, § 5.2.)

12

44.    Schupmann also agreed to a limited non-compete covenant:

During the Employment Period and for a period of two (2) years following the termination of such Employment Period, the Executive shall not (except on behalf of or with the prior written consent of the Company), within the Area, either directly or indirectly, on his own behalf or in the service or on behalf of others, as a manager or consultant, or in any other capacity which involves duties and responsibilities similar to those the Executive has undertaken for the Company, engage in any Competing Business.

(Ex. A, § 5.3.)

45.    The Agreement defines the restricted Area for purposes of the non-compete and non-solicitation covenants as "any state or country where the Company engages in business during Executive's employment with the Company." (Ex. A, § 5.3.1.)

46.    "Competing Business" is defined as any business organization directly engaged in any business which is the same as, or substantially the same as, the business of Fortis. (*See id.*)

47.    Upon executing the Agreement, Schupmann agreed that Fortis would be irreparably harmed should Schupmann breach any of the Agreement's restricted covenants, and that Fortis would be entitled to injunctive relief as a remedy and to its reasonable attorneys' fees if it were to prevail in any action to enforce the Agreement's covenants. (Ex. A, § 5.5.)

48.    Finally, the Agreement provides that it will be governed by Colorado law, and that sole and exclusive jurisdiction for any action to enforce the Agreement would be in the United States District Court for the District of Colorado or Denver District Court. (Ex. A, § 10.)

13

49.     Fortis included these restrictive covenants to protect Fortis's significant investment in Schupmann, its client relationships, and its trade secrets and confidential information.

50.     Schupmann's initial hire for Fortis's sales team was Schulz, who joined Fortis in June 2018. Schulz was hired at a base salary of $150,000 a year and was awarded 10% commission on Fortis's gross sales volume for Schulz's customers. This commission rate was between two to three times more than any other Fortis salesperson. Like Schupmann, Schulz's base salary represented only a fraction of his total compensation, which totaled approximately $1 million between 2022-2024. Both Schupmann and Schulz's total compensation reflected a substantial investment for Fortis, as both individuals informed Fortis that the company was paying them three times more than their former employers did.

51.     While Schulz resides in Wisconsin, he often attended certain Fortis board events in Colorado as a guest and traveled to Colorado multiple times a year for internal meetings.

52.     Like Schupmann, Schulz's primary duty at Fortis was to identify and solicit potential customers for the Program or Fortis's other services. Schulz was also responsible for developing and maintaining Fortis's goodwill and relationships with its customers on Fortis's behalf. In this role, Fortis exposed Schulz to customers and prospects throughout the country. To perform these functions, Fortis provided Schulz with access to confidential and proprietary information and assisted Schulz with client development. In other words, Fortis paid Schulz to develop and maintain relationships

14

with Fortis's current and prospective customers and to service those customers at a top level.

53.    In exchange for this exposure, as well as significant compensation, Schulz agreed to the terms of an Agreement containing restrictive covenants like Schupmann to protect the Company's confidential information and customer goodwill. (Ex. B.)

### III.    Schupmann and Schulz Begin to Operate Their Illicit Scheme.

54.    Fortis promoted Schupmann to become its COO in October 2021. The Company intended for Schupmann to eventually take over the role of Company President. However, Fortis ultimately demoted Schupmann rather than promoting him because of poor job performance.

55.    Schulz also displayed job performance issues. Soon after his hiring in June 2018, Fortis discovered that Schulz had abused his Company expense account by booking personal travel and entertainment on his Fortis account. In light of these findings, Fortis temporarily reduced Schulz's commission percentage, though it later returned to 10%.

56.    Despite these issues, Schulz and Schupmann formed a close relationship. To avoid suspicion, the two often denied that they interacted outside of work, but on multiple occasions, other Fortis personnel would overhear that the two had made extracurricular plans together.

a. <u>Schulz and Schupmann Receive Improper Kickbacks for Fortis Work.</u>

57.    Upon information and belief, Schulz and Schupmann's motivation to hide their close relationship from other Fortis employees and executives was because they

15

were engaged in a massive kickback scheme through which they profited directly at Fortis's expense.

58.     Schulz and Schupmann's strategy was simple: they would offer contractors guaranteed work on Fortis projects if those contractors would promise to inflate their bids by 5-7.5%. Then, after the contractor was paid for its work by Fortis, the contractor would pay that 5-7.5% directly to Schulz and Schupmann.

59.     For example, if a contractor's initial estimate for a project was $100,000, Schulz and/or Schupmann would instruct the contractor to submit an inflated bid of $105,000-$107,500. Schulz and Schupmann would then receive between $5,000-$7,500 in kickbacks for ensuring the contractor was awarded the job. In Schulz's own words to a contractor, "we understand we'll be paid after you are paid." (Ex. C, Emails Provided by Scott Reynolds, p. 5.)

60.     This plot injured Fortis in multiple ways. First, and most obviously, the kickbacks would result in Schulz and Schupmann being compensated significantly more than they were contractually owed (or that Fortis was aware). As previously stated herein, Schulz already received a commission two to three times higher than his peers for this work, and Schupmann earned an average of $700,000 in annual compensation across his last three years at the Company. These amounts were meant to compensate Schulz and Schupmann for the entirety of their work for Fortis.

61.     Second, these inflated contractor fees directly cut into the profit Fortis earned on each project. This also dramatically increased Fortis's business risk. Fortis generates profits when the maintenance that it is required to perform during the warranty

16

period it issues through the Program costs less than the customer pays for that warranty. By artificially increasing Fortis's front-end reconditioning and subsequent maintenance costs, Schulz and Schupmann decreased the likelihood that Fortis would profit on each warranty the Company issued through the Program.

62.   On information and belief, Schulz and Schupmann improperly profited through kickbacks from numerous contractors.

b.   The Scheme with TopKey.

63.   One of the most significant kickback relationships Fortis has uncovered to date was between Schulz and Schupmann and TopKey.

64.   TopKey, formerly known as Installation Services, provides commercial roofing services in multiple states, including Maryland, Virginia, and D.C.

65.   At some point or about January 1, 2024, Installation Services, LLC rebranded as TopKey Construction and continued operations under the TopKey name with Dan Schardt as President and Chief Executive Officer.

66.   TopKey and Fortis had a direct commercial relationship during the time in question. While also engaging in more informal collaboration, on June 28, 2022, they executed a Mutual Confidentiality and Non-Disclosure Agreement to govern the exchange of proprietary information in connection with potential business dealings, signed by Installation Services' Director of Operations, Construction Services, and Fortis's then-COO, Schupmann.

67.   On or about June 21, 2023, Fortis and TopKey again entered a written contract, this time for Fortis's program scope and warranty deliverables on a project

17

known as "Park Shirlington." Fortis later terminated the Park Shirlington reconditioning contract, citing roof deterioration beyond the contracted scope. Separate from Fortis's reconditioning contract, TopKey later pursued roof replacement scope on the same property through another general contractor, Whiting Turner.

68.     Schulz and Schupmann's primary contact at TopKey was Project Manager Scott Reynolds ("**Reynolds**"). Reynolds worked for TopKey from August 2022 to approximately August 2024. Soon after Reynolds commenced work for TopKey, he was contacted by Schulz and Schupmann, who proposed their kickback scheme. Schulz and Schupmann promised Reynolds that they would ensure TopKey was awarded Fortis projects if TopKey would pay Schulz and Schupmann a kickback, or "TPI," in exchange. This acronym became well-known throughout TopKey. (*See* Ex. C, p. 6.)

69.     Although Reynolds had never experienced this kickback scheme in his nearly three decades in the industry, he accepted Schulz and Schupmann's demand because it came with guaranteed work for TopKey. During the length of his employment with TopKey, Reynolds worked with Schulz and Schupmann to execute the kickback scheme. While the initial kickback amount was 5% of TopKey's initial cost estimate, the percentage eventually rose all the way to 7.5% because Reynolds knew that Schulz and Schupmann would make sure that TopKey was still awarded the project even if TopKey had not made the most competitive bid.

70.     Although Fortis maintains a nationwide network of contractors and typically engages local contractors for its projects, TopKey was assigned projects across the country thanks to Schulz and Schupmann's interference. Reynolds was willing to take on

18

any job Schulz and Schupmann offered because he knew it was guaranteed work for himself and his team.

71.    TopKey and Trident formalized their arrangement through a written agreement (albeit unsigned) under which Trident would receive percentage-based fees on projects steered to TopKey. Defendants confirmed this arrangement in verified interrogatory responses, stating that "Trident referred TopKey to businesses who were in need of roofing services in exchange for a referral fee." The parties then coordinated fee reconciliations on Park Shirlington, Homestead FL, and other projects under this framework. On information and belief, TopKey's payments to Trident were funded out of TopKey's receipts on projects that overlapped with Fortis accounts and opportunities.

72.    Schupmann instructed Reynolds to begin paying the kickbacks to Trident, which Schupmann created on September 9, 2022. (*See* Ex. D.) Trident's Operating Agreement lists Schulz and Schupmann as its two managers, and the two each hold a 50% stake in the company at the relevant time. (*See* Ex. E, § 7.2, Exs. A and B.) Reynolds and TopKey complied with this request and began to send the "TPI" payments directly to Trident. (*See* Ex. F.)

73.    Reynolds participated in Defendants' kickback scheme with the approval of TopKey's leadership, including TopKey President Dan Schardt. At times, Schardt directly confirmed the kickback percentage and total amount Schulz and Schupmann would receive for a given project. On one instance in June 2024, Schardt requested that Schulz provide TopKey with the correct fees for a certain project. (*See* Ex. D, p. 7.) Schulz confirmed that he would provide a proposal and noted that "the basics" involved a 7.5%

kickback in addition to a flat fee of $7,000 per roof section replaced for the project at issue. Schardt then sought confirmation a total amount of $109,977.33 was correct. (*See id*, p. 8.)

74.    All told, TopKey performed an estimated 130 jobs on behalf of Fortis during Reynolds' employment, most or all of which were subject to kickbacks for Schulz and Schupmann. Reynolds estimates that Schulz and Schupmann ultimately received between $350,000-$400,000 in kickback payments from TopKey, although Fortis believes that the number is much higher.

75.    At no time was Fortis aware of this illicit relationship until Reynolds informed Counter-Defendant Fortis CEO Richard Lewis ("**Lewis**") of its existence after Reynolds' employment at TopKey ended. Schulz and Schupmann displayed the extent of their disloyalty and a disdain for their own employer to Reynolds and questioned why the Company should be allowed to profit off their efforts as employees.

c.    Schulz and Schupmann Divert Work from Fortis.

76.    Schulz and Schupmann's request for the kickback payments described above was not their only method of lining their own pockets at Fortis's expense.

77.    In addition to their kickback arrangement, Schulz and Schupmann also diverted work from Fortis altogether in order to instead profit themselves and Trident. The Trident Defendants primarily employed this tactic in instances where customers were in need of a roof replacement as opposed to participating in Fortis's Program. When Fortis determines that a roof cannot be reconditioned and instead must be replaced entirely, Fortis often manages the replacement process for a consulting fee. Fortis's customers

20

can trust Fortis to coordinate with contractors and ensure the job is performed properly through the trust and goodwill Fortis has earned in the roofing industry.

78.    In violation of the duties they owed to Fortis, Schulz and Schupmann usurped these opportunities on numerous occasions to compete with Fortis directly and unfairly. In this context, Schulz and Schupmann also frequently collaborated with Reynolds and TopKey to divert roof replacement projects from Fortis. The first project Reynolds worked on with Schulz and Schupmann was SouthPoint Village Apartments (the "**SouthPoint Project**") in Durham, North Carolina. The SouthPoint Project involved a complete roof replacement, which Fortis could have managed. Notably, Schulz emailed the SouthPoint Project's job specifications from his Fortis email to his Trident email, yet Schulz and Schupmann never entered the SouthPoint Project as a potential lead in the Company's database. (*See* Ex. G.) This meant that Fortis never had the opportunity to evaluate the SouthPoint Project to determine if it was worth attempting to undertake. Upon information and belief, Trident Defendants made roughly $100,000 in kickbacks for the SouthPoint Project while concealing the project from Fortis.

79.    Schulz and Schupmann's improper relationship with TopKey spanned for multiple years. In May 2024, Reynolds contacted Schulz at Schulz's Trident email address to provide Trident Defendants with a roof replacement proposal for a building located at 1011 Marsh Avenue, Fort Myers, Florida, 33905. (*See* Ex. H.) This was yet another project that Schupmann and Schulz did not present to Fortis and that the Company could have performed if not for Schulz and Schupmann's disloyalty.

21

80.     Trident Defendants' diversion of potential Fortis business expanded far beyond their relationship with TopKey, however. On one instance, on September 24, 2019, Schulz received the following email from a Fortis client at his Fortis email address:

> Afternoon Charlie,
>
> We have some roof issues at our Oklahoma City location and was wondering if you're interested in taking a look. I don't believe this is in the spectrum of a warranty project but more like what Fortis did with our Santa Rosa location and a patch job. I've copied our manager Mr. Shore and if you're interested would you reach out to him and see about an evaluation and quote? Let me know, thank you!

(Ex. I.)

81.     Despite the fact that the email specifically provided that Fortis had previously completed the exact type of work the client was seeking, Schulz immediately forwarded the email to Schupmann and stated, "Should be a Trident job. What would you like to do here?" (*Id*.)

82.     An hour later, Schulz messaged Schupmann's Fortis email address again to suggest that the Trident Defendants ". . . should just send Kyle Crawford and **have him include a bump for us**." (*Id.*) (Emphasis added).

83.     Kyle Crawford works for Exterior Solutions Group, a contractor that is part of Fortis's strategic partner network.

84.     Schulz advised Schupmann that Crawford ". . . can just be vague and send me the invoice" and promised "10% for us." (*Id.*) Schupmann responded "10/4" to confirm his approval of the arrangement. (*Id.*)

85.     Schupmann and Schulz did not enter the project discussed in Exhibit H into Fortis's database as a potential opportunity nor did Fortis ultimately perform work on that

project. Upon information and belief, Schupmann and Schulz diverted the project away from Fortis and was instead performed by Schulz and Schupmann through Trident.

86.     One specific area of Fortis's business from which Schulz and Schupmann were especially aggressive for diverting was Fortis's work relating to the solar energy business. Solar energy clients comprise a significant portion of Fortis's customer base because roofs often need to be reconditioned, repaired, or replaced to be fit for solar panel installation. At times, Fortis and solar energy companies combine to offer their services jointly to a building owner. In other instances, solar energy companies lease roofs from building owners and then engage Fortis for roof reconditioning themselves as Fortis's end-client. In other words, Fortis works extensively with solar companies and generates significant revenue from these relationships.

87.     Undeterred by the fact that work with solar companies is directly within Fortis's scope of operations, Schulz and Schupmann continued with their operation to compete with Fortis from within.

88.     For instance, on January 30, 2023, Schulz sent a document titled "Aspen-Trident Channel Partnership Agmt [Aspen].docx from his Fortis email address to Schupmann's Trident email address. (Ex. J.) The document contemplates a "channel partnership" between Trident and Aspen Power Partners LLC ("**Aspen**"), through which Trident would identify prospective customers of Aspen's and refer them to Aspen in exchange for $0.01 per watt of electricity generated by Aspen's solar panels on projects identified by Trident. (*See* Ex. J, §§ 2, 4.) The term "channel partnership" was previously used by Schupmann to suggest that Fortis undertake similar agreements.

23

89.    Aspen is a Fortis client, but Fortis's work for Aspen declined in 2023 and 2024. Upon information and belief, this was due to Schulz and Schupmann's usurpation of Fortis's business despite their status as Fortis executives.

90.    In February 2023, Schulz emailed an attachment titled "Trident Solar opps 2023.xlsx" that includes eight buildings, each with a "Y" (short for "yes") under the column "RPP Candidate." (Ex. K.) "RPP" refers to the Program, which is a Fortis-specific term and is not industry standard. In other words, Schulz and Schupmann were open about the fact that these were opportunities for Fortis's core service yet failed to present them to Fortis in favor of diverting them to Trident. The buildings in the spreadsheet total over 2.3 million square feet in area; Fortis would generally expect to receive between $5-6 million in revenue from a project of this size. (*See id.*)  Instead, Fortis got none of it.

91.    Subsequent emails identify one of the prospective clients The Trident Defendants attempted to solicit. On March 14, 2023, Schulz emailed a spreadsheet titled "Trident IL_Lease Summary_3.13.2023.xlsx" with the following message:

Tom

I've broken out the sf area of the systems here.  You could put a valuation on this either on the area the solar system covers itself or the entirety of the footprint.

I'm not sure which way would work for Hiffman the best.

Charlie

(Ex. L.)

92.    "Tom" refers to Tom Murphy, Fortis's point of contact at Hiffman National, a major property management company. Even though Fortis had already established

relations with Hiffman National, Schulz did not report this project to Fortis. The attached spreadsheet includes many of the same building addresses as those found in Exhibit K.

93. In another instance, The Trident Defendants worked with TopKey to present a proposal to a different solar company—Citrine Power, LLC—for work on a building located at 210-230 West Parkway, Pompton Plains, New Jersey, 07444 in May 2024. (*See* Ex. M.) Schulz had previously entered Citrine Power, LLC in Fortis's systems as a potential opportunity but designated the opportunity "closed—lost" and "disqualified." Upon information and belief, this was done in order to perform work for Citrine Power, LLC on behalf of Trident rather than Fortis.

94. In addition to Trident, Defendants Schulz and Schupmann used entities associated with Schupmann—Top Pick Athletics, Inc. ("Top Pick Athletics") and Top Pick Investment Group LLC d/b/a Top Pick Investments ("Top Pick Investments")—as vehicles to receive disbursements from contractors in Fortis's customer ecosystem, including Smart Roof Commercial LLC, under the guise of purported "consulting" and "referral" services.

95. Top Pick Athletics is an entity associated with Schupmann, founded in approximately 2010, that he used in communications with Smart Roof for vendor onboarding and transmittal of Top Pick Investments invoices. On information and belief, he began engaging them in 2021.

96. Top Pick Investment Group LLC, which invoiced Smart Roof under the trade name "Top Pick Investments," is another entity associated with Schupmann and has been active since 2017. Top Pick Investments' invoices consistently list its business address

as 769 Heartland Drive, Unit/Suite D, Sugar Grove, Illinois 60554, the same complex where Trident is located.

97.    On information and belief, Schupmann converted Top Pick Athletics into Top Pick Investments in or around 2017.

98.    According to public filings on the Illinois Secretary of State website, Schupmann is a manager of Top Pick Investments.

99.    On information and belief, Top Pick Athletics and Top Pick Investments were used as additional vehicles to receive improper disbursements from contractors in Fortis's customer ecosystem.

100.    Beginning in early October 2021, Schupmann transmitted to Smart Roof, from his Top Pick Athletics email account, "TPI Consulting Services" invoices issued by Top Pick Investments for purported consulting work on multiple projects, including facilities for one of Fortis's largest clients, the Coca-Cola Company ("Coca-Cola"). Between October 2021 and late 2022, Top Pick Investments issued and transmitted to Smart Roof more than two dozen "TPI Consulting Services" invoices that included multiple Coca-Cola facilities managed by Fortis—as well as other commercial properties—and items tied to a specific project called "Coca-Cola Charlotte," alongside others. Based on present records, the aggregate amount of these Top Pick invoices exceeded $180,000.

101.    Smart Roof continued corresponding with Schupmann at his Top Pick Athletics email address as late as September 29, 2022.

26

102. Fortis's commercial relationship with Smart Roof dates back to at least October 2020, when Fortis issued a purchase order to Smart Roof for Coca-Cola facility work.

103. On June 2, 2022, Smart Roof transmitted an updated proposal for the Coral Hills Shopping Center to Fortis's then-COO, David Schupmann, at his Fortis email address, detailing the scope and pricing for an installation project. Just a few days earlier, on May 27, 2022, Schupmann had circulated a coordination email to Smart Roof personnel stating that Coral Hills was among the "upcoming projects" with a planned September start, reflecting that Coral Hills was being advanced within Fortis's pipeline and vendor workflow.

104. On July 15, 2022, Smart Roof internally tracked "Coral Hills: $80,000 – Waiting on contract" on the same receivables list as "Charlotte Coca Cola – $16,000 – Waiting on Fortis to pay SmartRoof."

105. Around the same period, Schupmann forwarded an Installation Services' Coral Hills quote externally to a New Columbia Solar contact, asking when "we can secure this and lock down the materials for a September start," further evidencing that the contracting channel for Coral Hills was routed outside of Fortis.

106. In or around February 2023, Schulz, on behalf of Trident Solutions, sent Smart Roof an invoice in the amount of $54,000 for "Coral Hills," which Smart Roof's accounting team received, processed, and paid by check later that month. In order to get the payment, Schulz told Smart Roof that the invoice should be sent to Trident as it was the name they were "now under."

107. The same day the invoice issued, Smart Roof personnel confirmed internally that Schulz "is going to send the final invoice for Coral Hills," asked accounting to "get him paid the next pay cycle," reflecting immediate processing of Trident's Coral Hills billing.

108. Taken together, the record reflects that Coral Hills originated and advanced within Fortis's pipeline and coordination with Smart Roof, yet the project's construction contract and subsequent payments went to Trident. Accordingly, Coral Hills is another lucrative project that the Trident Defendants diverted from Fortis.

109. The work described herein would have resulted in millions of dollars in revenue for Fortis had Schulz and Schupmann loyally performed their job duties on behalf of the Company. At no time did Schulz and Schupmann act to present these job opportunities to Fortis, nor did they inform Fortis of their competing business.

110. In fact, Schulz and Schupmann went even farther to cover their tracks. Schupmann explicitly instructed his direct reports that they were not allowed to communicate with Lewis about many subjects. Upon information and belief, Schupmann did this to prevent Lewis from becoming aware of Schulz and Schupmann's wrongdoing, which Lewis only discovered in 2024.

d. <u>Schulz's Disloyalty is Uncovered by Fortis.</u>

111. Schulz and Schupmann successfully continued their disloyalty undetected for several years. Fortis first learned that Schulz had been engaged in wrongdoing because of a project that occurred in July 2024.

28

112.    Schulz was entrusted with maintaining the Coca-Cola client relationship on behalf of Fortis. In July 2024, Schulz advised Fortis personnel that he was travelling to a Coca-Cola facility in Lexington, Kentucky (the "**Lexington Plant**") to meet one of Fortis's client contacts at Coca-Cola. At the time, the Lexington Plant had an active Fortis warranty for its roof that was not set to expire for several years.

113.    On July 30, 2024, Schulz began to call Fortis Director of Growth and Development Dan Kimball ("**Kimball**"), Schupmann's direct supervisor at Fortis after he was demoted from the COO position. Schulz claimed that the Lexington Plant's roof was in dire need of work and reported catastrophic roof damage. Schulz further informed Kimball that one of Fortis's contractors, FPS Roofing ("**FPS**"), happened to be working nearby and that Schulz had already coordinated with FPS President of Sales Michael Fusco ("**Fusco**") to begin immediate work on the Lexington Plant.

114.    This was unusual for two reasons: (1) FPS is based near Youngstown, Ohio, nearly six hours from Lexington, while a recognized Fortis service provider is located less than two miles from the Lexington Plant and (2) Fortis salespeople such as Schulz are not responsible for scheduling maintenance work on roofs under warranty because Fortis's Operations team conducts prompt in-person inspections of roofs whenever a claim is filed, determines the proper repairs, and then engages a contractor.

115.    Schulz represented to Kimball that the Lexington Plant's roof was in such poor condition that it could not wait for the Operations team to travel to Lexington to inspect it. Schulz attributed the amount of damage to poor contracting work or improper reconditioning when Fortis first issued the warranty. While Schulz claimed that a roof

29

replacement was necessary, FPS ultimately conducted repairs and did not need to replace the roof.

116.    In order to investigate these claims, Kimball contacted Jonathan Lewis ("**Lewis**"), Fortis's head of Operations and Quality Control. Lewis informed Kimball that it was highly unusual that the Lexington Plant's roof would display such damage because (1) Coca-Cola had not filed any warranty claims for the roof and (2) Fortis had spent $50,000 to recondition the roof one year prior. Lewis also informed Kimball that Schulz's assertions that the roof reconditioning had been improperly performed were incorrect because Lewis had personally supervised the work. Tellingly, Schulz refused to speak with Lewis even though these issues fell directly within Lewis's job duties.

117.    As a result of the events on July 29, 2024, Lewis traveled to the Lexington Plant to investigate the situation. Upon arrival, Lewis was informed by Coca-Coca facility manager Courtney Hundley that they had been directed by Schulz to not submit any claims to Fortis on the Lexington Plant. Lewis also reached out to Fusco to inquire about the nature of the damage and subsequent repairs conducted by FPS.

118.    On August 2, 2024, Fusco contacted Kimball (his former coworker at a previous employer) and expressed concern based on his conversation with Lewis. After his conversation with Lewis, Fusco feared that he had been misled by Schulz regarding the situation at the Lexington Plant. Fusco revealed to Kimball that Schulz had directed FPS to be present at the Lexington Plant on July 29 several days in advance for a roof replacement. This directly contradicted Schulz's representations to Fortis that he had only

30

discovered the damage to the Lexington Plant on the 29th and that FPS's presence in the area was coincidental.

119. In addition, Fusco informed Kimball that Schulz had requested that FPS "pad" its costs for its work at the Lexington Plant by a total of $40,000 and instructed that this amount be paid to Schulz directly after FPS was paid by Fortis. Fusco also detailed that Schulz had requested a "finder's fee" of $10,000 to be added to work FPS had planned to conduct for Fortis in Toledo, Ohio. At the time, Fusco was under the impression that this was standard practice, but his suspicions were raised by Schulz asking for a significantly higher amount of money with regard to the Lexington Plant. As a longtime partner of Fortis's who had performed a significant amount of work for Fortis, Fusco did not want Schulz's wrongdoing to affect the relationship between Fortis and FPS.

120. Schulz refused to admit any wrongdoing when confronted with this information. Additionally, when Schulz was asked why he had requested FPS perform a roof replacement rather than roof repairs even though the Lexington Plant's roof was under warranty (and thus Fortis would be required to pay for the replacement), Schulz replied that Coca-Cola was not aware that the Lexington Plant was under warranty. Fortis then terminated Schulz's employment for this behavior (among other reasons) on August 9, 2024.

121. When terminating Schulz's employment, Lewis set forth in the August 9, 2024 termination letter that Schulz was required to return all "company documentation … including all 'Confidential Information,' … and all copies in paper or electronic form." In so

31

doing, Lewis referenced the contractual obligations that Schulz had as set forth in his Agreement.

122.    Schulz refused to comply with his obligations set forth in the Agreement and as restated in the August 9, 2024 letter.  Instead, he retained 267 pages of Fortis materials, including numerous confidential categories of documents containing non-public, commercially valuable information relating to Fortis's business.

123.    Schulz did not disclose his retention of these materials until after preliminary injunction hearing in this case on May 30, 2025.  Schulz only returned the documents (through counsel) in late June 2025.

124.    Upon information and belief, Schulz misled Coca-Cola to believe they did not have a warranty on the Lexington Plant so that no repairs would be performed on the roof and the roof would need to be replaced. Schulz also created the "emergency" situation to ensure that FPS would perform work on the Lexington Plant's roof without Fortis supervision so that Fortis would not learn of the roof's exact condition. Upon information and belief, Schulz engaged in these various subterfuges so that he could charge $40,000 in kickbacks from FPS after the repairs were completed. In short, Schulz spun this complex web of lies to multiple parties in order to enrich himself at the expense of Fortis, Coca-Cola, and FPS.

e.    <u>Schupmann, a Repeat Offender, is Also Terminated.</u>

125.    After Schulz's termination, Fortis began to investigate Schupmann's level of involvement in Schulz's disloyal activities. Schupmann initially claimed that Schulz had acted alone. However, as Fortis's investigation continued, Schupmann's lies became

apparent. During the investigation, Schupmann offered contradictory explanations of his level of involvement with Schulz and Trident: (1) admitting that he was aware of Trident's formation but that Schulz had not used it prior to his termination, (2) stating that Trident had only been used to perform a roof replacement project that Fortis had declined two years prior, and finally (3) that he had not performed work for Trident in the last 12 months.

126.    In addition to Schupmann's dishonesty, Reynolds revealed the nature of the relationship between TopKey and The Trident Defendants in December 2024. Lewis offered Schupmann the opportunity to travel to Fortis's Denver headquarters to discuss what had happened, but Schupmann refused. Fortis then terminated Schupmann's employment on December 24, 2024.

127.    When terminating Schupmann's employment, Lewis set forth in the December 24, 2024 termination letter that Schupmann was required to return all "company documentation … including all 'Confidential Information,' … and all copies in paper or electronic form."  In so doing, Lewis referenced the contractual obligations that Schupmann had as set forth in his Agreement.

128.    Schupmann refused to comply with his obligations set forth in the Agreement and as restated in the December 24, 2024 letter.  Instead, he retained 850 pages of Fortis materials, including business plans, marketing plans, various documents containing financial information, budgets, customer materials, statements of work, and warranty forms.

129.    Schupmann did not disclose his retention of these materials until doing so at the preliminary injunction hearing in this case on May 30, 2025.  Fortis reiterated its

demand for the return of the materials on June 2, 2025, citing the specific provisions in Schupmann's Agreement requiring the return.  Despite numerous promises that he would return the materials. Schupmann only did so (through counsel) on July 25, 2025.

130.    Fortis has since learned that this is not the first time Schupmann has violated the fiduciary duties and contractual obligations that he has owed to an employer in the industry. In 2014, Schupmann was sued by his former employer, Tecta America Corporation ("**Tecta**"), where Schupmann had previously served as Vice President of National Accounts. Tecta discovered that Schupmann had been plotting with one of Tecta's subcontractors ("**Saratoga**") to orchestrate a mass raid in which the entire business unit that Schupmann supervised would join Saratoga, all in violation of Schupmann's restrictive covenants with Tecta. Tecta also learned that Schupmann had been providing Saratoga with confidential information regarding Tecta's customers and pricing. A copy of Tecta's Complaint is attached hereto as Exhibit N.

131.    All told, Defendants' actions have caused Fortis massive amounts of damage. Fortis has experienced significant lost profits and business opportunities because of Schulz and Schupmann's disloyal acts—act that were frequently, as identified herein, encouraged, supported, aided and/or abetted, intentionally and wrongfully, by the other Defendants. Additionally, Fortis has been irreparably harmed through the loss of its customer goodwill.

132.    Further, by signing the Agreements, Schupmann and Schulz expressly agreed not to compete with Fortis for a limited period after the end of their employment. Schupmann is violating his Agreement because he has commenced work for Roofing

USA, a roofing contractor that (like Fortis) provides roofing maintenance, repairs, and replacements. Upon information and belief, Schupmann is working as a management-level employee for Roofing USA.

133. Based on content on its web site, Roofing USA does business in Virginia, North Carolina, South Carolina, Georgia, Florida, Texas, and North Dakota.  Fortis does business within the same territory and Schupmann was responsible for that territory when he worked for Fortis.

134. Fortis first learned on January 31, 2025, that Schupmann had started work for Roofing USA, but now knows he was working for them as early as July of 2024—while still employed by Fortis.

135. In a managerial capacity for Roofing USA, Schupmann posed and poses a serious threat of unfair competition in that he can exploit—and has exploited—the relationships that he developed on behalf of Fortis with commercial clients and prospects to sell roofing maintenance, repairs, and replacement.

136. In fact, Roofing USA knowingly exploited and profited from Schupmann and Schulz's breaches and disloyalty, allowing Roofing USA to unfairly compete against Fortis. Indeed, Roofing USA knowingly permitted Schupmann to begin working for Roofing USA while Schupmann was still employed by Fortis in July of 2024. Roofing USA did this even though it knew that Schupmann was employed by Fortis and bound by a non-competition covenant and common law fiduciary duties.

137. Furthermore, Roofing USA knowingly and wrongfully solicited and accepted, from Schupmann and Schulz, Fortis's proprietary materials and work product.

35

Roofing USA did this knowing that the materials were misappropriated, stolen, and/or used without Fortis's authorization and in breach of Schupmann and Schulz's Agreements with Fortis and duties of loyalty to Fortis.

138.   The Program is often directly competitive with the services offered by companies like Roofing USA because a business in need of roofing services can choose to buy the Fortis warranty or have repairs done by a traditional roofing contractor.  In this context, through Schupmann and Schulz, a competitor like Roofing USA can potentially use—and has used—the vast amounts of confidential information Schupmann and Schulz they learned at Fortis to their advantage and the Company's detriment, exploiting the strengths and weaknesses of the Program to help Roofing USA tailor pitches to Fortis customers and prospects. These actions by Roofing USA would also be—and have been—to the detriment of Fortis's additional services, including the coordination of roof servicing, roof assessments, and roof management.

139.   Additionally, Fortis has received multiple inquiries from Coca-Cola regarding warranty forms and contractual language. Upon information and belief, Coca-Cola has taken such action because Schulz and/or Schupmann have continued to contact Coca-Cola in an effort to interfere with Fortis's contractual relationships and solicit Coca-Cola's business away from Fortis in favor of themselves and in violation of their contractual obligations to Fortis.

140.   At all relevant times, Trident, Roofing USA, and, on information and belief, TopKey, were aware of the Agreements as well as Fortis's customer relationships and prospects. Trident, Roofing USA, and TopKey all knowingly and intentionally interfered

with the Agreements, as well as these relationships, with the specific intent to damage Fortis, using wrongful means. Trident, Roofing USA, and Topkey's actions were improper and illegal because they were a wrongful, knowing act of aiding and abetting breach of fiduciary duty and breach of contract. It is clear that Schulz and Schupmann, violated the fiduciary duties they owed to Fortis as Fortis employees, and Roofing USA and TopKey knew that, and profited handsomely from it.

141.    The Defendants' actions were done intentionally and willfully, were calculated to cause damage to Fortis's lawful business, were maliciously done with the unlawful purpose to cause such damage and loss, with actual damage and loss resulting, and was accomplished by wrongful conduct through the violation of the duty of loyalty.

142.    The harm suffered by Fortis as a result of the Defendants' conduct and their continuing intent to violate the terms of the Agreements is and will be irreparable in nature, and incapable of being measured solely in terms of monetary damages, thereby leaving no adequate remedy at law for said harm to Fortis.

**FIRST CLAIM FOR RELIEF**
**BREACH OF THE FIDUCIARY DUTY OF LOYALTY**
**(Defendants Schulz and Schupmann)**

143.    Fortis incorporates all preceding paragraphs as if fully stated herein.

144.    At all times relevant, Schulz and Schupmann were employed by Fortis in positions of trust and responsibility as employees of the Company wherein they acted as the face of Fortis to its customers, prospects, and partners. In this capacity, Schulz and Schupmann owed Fortis a duty of loyalty to act in Fortis's best interests at all times and not to engage in activities harmful or detrimental to Fortis.

37

145. While still employed with Fortis, Schulz and Schupmann willfully and maliciously sought kickback payments and diverted business away from Fortis to Trident and other parties (including Roofing USA and TopKey) in order to benefit Trident, themselves, and/or the third parties at the expense of Fortis.

146. While still employed with Fortis, Schulz and Schupmann also willfully and disloyally provided assistance to a competitor, Roofing USA, by providing Roofing USA with proprietary information, sales advice, trade secrets, and even directly transmitting Fortis work product to to Roofing USA.

147. Schulz and Schupmann's breaches of their duty of loyalty has caused Fortis to suffer irreparable harm and economic damages in an amount to be determined at trial.

148. Fortis is entitled to disgorgement of the compensation paid to Schulz and Schupmann during their period of disloyalty, as well as any lost profits and/or unjust enrichment resulting from their breaches of their fiduciary duties.

149. Fortis is also entitled to punitive damages against Schulz and Schupmann because they have acted with malice in usurping Fortis's business opportunities with the attempt to injure Fortis.

**SECOND CLAIM FOR RELIEF**
**<u>BREACH OF CONTRACT</u>**
**(Defendants Schulz and Schupmann)**

150. Fortis incorporates all preceding paragraphs as if fully stated herein.

151. Schupmann and Schulz entered into valid confidentiality and non-compete covenants in the Agreements for good and valuable consideration, whereby they agreed not to use for their personal advantage Fortis's confidential information (including

information regarding its customers) during or after the end of their employment with Fortis or to provide the same or similar services they provided to Fortis on behalf of a competitor during their employment and for two years following the end of their employment in a limited territory.

152.    Upon information and belief, Schupmann's and Schulz's acts in using Fortis's confidential information for their personal gain and on behalf of Trident and Roofing USA constitutes a breach of the confidentiality provision of the Agreements.

153.    The Agreements' confidentiality provisions are reasonable under the circumstances to protect Fortis's legitimate interests in its confidential information, client/employee relationships, and goodwill.

154.    Upon information and belief, Schupmann is continuing to offer the same or similar services he provided for Fortis on behalf of Roofing USA within the area Fortis engaged in business during Schupmann's employment with Fortis. These actions constitute a breach of the non-competition provision of Schupmann's Agreement.

155.    The Agreements' non-competition provisions are reasonable under the circumstance to protect Fortis's legitimate interests in its confidential information and customer goodwill.

156.    Additionally, Schupmann and Schulz's work, during their employment, on behalf of themselves, Roofing USA, and Trident violated other provisions, including but not limited to Paragraph 1.1.2 of the Agreements, wherein they promised to devote substantially all of their business time, attention and skill to the performance of their duties as employees of the Company.

157.    Schulz and Schupmann both violated Paragraph 5.1 of the Agreements by retaining hundreds of pages of documents after the end of their employment.

158.    Schulz and Schupmann retained these documents despite specific demands by Fortis for the return of all materials in August and December 2024, respectively.  They finally returned the documents in June and July 2025, respectively.

159.    Fortis has complied with the material terms of the Agreements at all times relevant.

160.    As a result of Schupmann's and Schulz's actions and breaches of the Agreements, Fortis has suffered and/or will suffer irreparable harm, and should be awarded money damages, together with attorneys' fees, costs, and such other relief as the Court may deem just and proper.

### THIRD CLAIM FOR RELIEF
### TEMPORARY, PRELIMINARY, AND PERMANENT INJUNCTION
### (Trident Defendants & Roofing USA)

161.    Fortis incorporates all preceding paragraphs as if fully stated herein.

162.    As a condition of their employment with Fortis, and in exchange for valuable consideration, Schupmann and Schulz agreed not to provide the same or similar services they provided for Fortis on behalf of a competitor within the area Fortis engaged in business during their employment with Fortis.

163.    Trident and Roofing USA have induced, aided, and abetted Schupmann's and Schulz's violations of the Agreements in order to unfairly compete with Fortis by placing Schupmann and Schulz in a position to unfairly compete with Fortis in violation of the Agreements and through the exploitation of Fortis's confidential information. Trident

and Roofing USA have refused to stop this course of action and will continue to employ and abet Schupmann and Schulz in a manner that violates Fortis's contractual and other legal rights.

164.    In the absence of injunctive relief, Fortis will suffer irreparable harm, including, but not limited to, unfair competition, loss of customers and disclosure of customer information to a competitor.

165.    Fortis has no adequate remedy at law.

166.    The potential harm to Fortis if the Trident Defendants and Roofing USA are not enjoined is far greater than any harm that the Trident Defendants will suffer if injunctive relief is granted.

167.    Fortis is likely to succeed on the merits of its causes of action against the Defendants.

168.    The public interest weighs in favor of granting injunctive relief.

### FOURTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS: EMPLOYMENT AGREEMENTS
### (Defendants Trident & Roofing USA)

169.    Fortis incorporates all preceding paragraphs as if fully stated herein.

170.    At all relevant times, Fortis had valid and enforceable employment agreements with Schupmann and Schulz.

171.    Trident knew of the restrictive covenants in Schupmann's and Schulz's Agreements, including the Agreements' non-competition, loyalty, and confidentiality provisions.

41

172. Roofing USA knew, when it began working with Schupmann and Schulz in July of 2024, that both were employed by Fortis at the time. Roofing USA also knew that Schupman had an employment agreement with restrictions on competition. In fact, Roofing USA's CEO knew that the Agreements meant that, if they worked with Schupmann, there were "products that we couldn't try to sell" and "customers that we couldn't go after."

173. Upon information and belief, Trident and Roofing USA wrongly and without justification solicited and induced Schupmann and Schulz to breach the Agreements and compete with Fortis on behalf of Trident in violation of the Agreements' non-competition provisions. Schupmann and Schulz conducted such activities while using Fortis's confidential information in violation of the Agreements' confidentiality provision—and Trident and Roofing USA, knowingly used and accepted that confidential and proprietary information of Fortis, damaging Fortis.

174. For example, on July 19, 2024, Schupmann sent Brian Tice, CEO of Roofing USA, a "commercial service brochure" that Schupmann had apparently created for use as a Template, and the brochure included services in direct competition with Fortis—for example, roofing "maintenance" and "centralized" services for "oversight" and "peace of mind." Roofing USA was in the process of changing over from a residential to a commercial roofer.

175. Roofing USA received assistance from both Schupmann and Schulz—as individuals and through their company, Trident, when they were both still employed by Fortis—and received assistance in particular with sales and marketing. Schulz was

leading the way for them when it came to training and managing salespeople, while Schupmann was feeding them Fortis work product and operational insights.

176.    For example, on July 22, 2024, Roofing USA's CEO accepted a Powerpoint presentation from Schupmann that was to be used for Roofing USA's sales rep kickoff meeting—a presentation that Schupmann gave the next day.

177.    Upon seeing the slides, Schulz commented to Schupmann "Looks familiar with some new pizzazz nice work." He said that because the presentation and slides were identical to a presentation that Schupmann had created for Fortis—the only real difference was Schupmann changed the logo. On information and belief, Schupmann used the stolen work product to train Roofing USA's salespeople to compete against Fortis—at a time period when Roofing USA was well aware that Schupmann was still employed by Fortis.

178.    Upon information and belief, Trident and Roofing USA continues to interfere with Fortis's contractual rights by directing, encouraging, and allowing Schupmann and Schulz to violate the non-competition clause of the Agreements and/or inducing their violations of the Agreements by creating economic incentives to improperly compete with Fortis.

179.    At all relevant times, Trident and Roofing USA were strangers to the Agreements (the Employment Agreements) with which they improperly interfered because neither Trident nor Roofing USA: (a) was a signatory to the Agreements; (b) was an intended or unintended beneficiary of the Agreements; nor (c) had a direct economic interest in the Agreements.

43

180.    Trident and Roofing USA's actions were intentional and for the improper and wrongful purposes of (a) interfering with Fortis's contractual employee relationships; (b) unlawfully and unfairly competing with Fortis; (d) aiding and abetting breach of fiduciary duty; (c) misappropriation of trade secrets and proprietary information; and (e) unfairly harming Fortis's business. They were also actions done by wrongful means as they involved conversion, conspiracy, misappropriation of trade secrets, and aiding and abetting breach of fiduciary duty.

181.    Fortis has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships—in an amount to be determined at trial.

182.    Trident and Roofing USA's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that Fortis is entitled to punitive damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**
**(Defendants Trident & Roofing USA)**

183.    Fortis incorporates all preceding paragraphs as if fully stated herein.

184.    Upon information and belief, Schulz and Schupmann breached their fiduciary duties of loyalty owed to Fortis in order to unfairly compete with Fortis by usurping Fortis's business opportunities for the benefit of themselves and Trident.

44

185.   At all times relevant, Schulz and Schupmann committed these wrongful actions as managers and agents of Trident.

186.   Additionally, Roofing USA knowingly and wrongfully acted through its agents Schupmann and Schulz when interfering with Fortis customer relationships and potential projects to benefit Roofing USA. Beginning in July of 2024, Roofing USA worked with and paid Schulz, Schupmann, and/or Trident for "consulting" services, which consisted of getting insider deals, diversion of opportunities, copies of Fortis proprietary training, marketing, and sales materials direct from the source—Fortis's COO (Schupmann) and Head of Sales (Schulz).

187.   For example, on July 22, 2024, Schulz emailed his personal email address from his Fortis email address, sending proprietary and confidential details regarding a Fortis business opportunity with a Fortis's client, Coca-Cola.

188.   Schulz then forwarded the details from his personal email to himself and Schupmann at Trident. Ultimately, Schupmann, using his Trident email, then emailed the entire thread—<u>showing, to be clear, the origination of the opportunity at Fortis and thus clearly belonging to Fortis</u>—to Tice at Roofing USA, saying "here are the details. . . we can talk about it more after the call tomorrow."

189.   Roofing USA then sent the opportunity around internally in order to win the work, saying: "This is from our new sales consultant Dave [Schulz]. He had Coca Cola as a national account."

190.   Of course, Roofing USA knew where Schulz had the Coca Cola account: at Fortis. It knew this because Schulz and Schupmann's contacts, accounts, and diversion

45

of work was precisely the point: it was why Roofing USA wanted to work with them and paid them as "consultants." But in case there was any uncertainty: it was right there on the bottom of the email thread—Schulz and Schupmann were secretly stealing opportunities from their employer and feeding them to a competitor, Roofing USA, to benefit themselves.

191.    Ultimately, Roofing USA hired Schupmann to work for them full time, after things fell apart when Schupmann and Schulz's wrongdoing was finally discovered by Fortis.

192.    In other words, from the start Roofing USA knew that Schulz and Schupmann were disloyal, that they were breaching their employment agreements, and that they were stealing and providing Roofing USA with proprietary and confidential insider information and business opportunities that should have belonged to Fortis—and it took full advantage and paid the Trident Defendants for the privilege.

193.    Similarly, on July 24, 2024, Schulz emailed Roofing USA's CEO, another top leader at Roofing, and Schupmann from his Trident email asking "which of you would be best to steer opportunities through? I have this potential opportunity in Suffolk . . . There may also be some new construction to get involved with as well if we can win over the client on the existing roof opp."

194.    Trident and Roofing USA's interference with Fortis's business advantage was done intentionally and willfully, was calculated to cause damage to Fortis's lawful business, and was maliciously done without right or justifiable cause on part of Trident.

195.    Upon information and belief, through inducing Schulz and Schupmann's violation of the duty of loyalty to interfere with Fortis's business prospects, Trident and Roofing USA tortiously interfered with Fortis's prospective business advantage through improper or wrongful means.

196.    Trident and Roofing USA's actions have resulted in actual damage and loss to Fortis through the loss of Fortis's actual and potential customers, profits, and customer goodwill.

197.    The violation of the duty of loyalty for the purpose of wrongfully diverting business opportunities is independently wrongful and unlawful apart from its effect on Fortis's business relationships.

198.    Fortis has suffered injury and damages as a direct and proximate result of the challenged conduct, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships.

199.    Trident and Roofing USA's conduct exhibits willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences, such that Fortis is entitled to punitive damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### CIVIL THEFT
### (Trident Defendants)

200.    Fortis incorporates all preceding paragraphs as if fully stated herein.

201.    During their respective employments with Fortis, Schulz and Schupmann demanded that Fortis's contractors increase their bids for the work they performed on

behalf of Fortis. After Fortis compensated these contractors, the contractors would pay the excess money directly to Schulz, Schupmann, and/or Trident.

202.    The funds Fortis expended on the kickback payments are valuable to Fortis because they contributed to the revenue and overall profit of the business.

203.    In violation of C.R.S. § 18-4-405, Schulz and Schupmann knowingly, intentionally, and without authorization deceived Fortis with the intent to permanently deprive Fortis of the monies the Trident Defendants received as a result of the kickback payments.

204.    The Trident Defendants obtained, retained, and/or exercised control over these funds and permanently deprived Fortis of the benefits of these funds.

205.    Upon information and belief, Trident is now or may become in possession of these stolen funds, to the extent the funds are no longer in possession of Schulz and/or Schupmann.

206.    Schulz and Schupmann also retained hundreds of pages of documents that belong to Fortis, all despite specific requests for the return of those materials.

207.    As a direct and proximate result of the Trident Defendants' civil theft, Fortis has suffered damages in an amount to be proven at trial.

208.    As a direct and proximate result of the Trident Defendants' civil theft, and pursuant to C.R.S. § 18-4-4-5, Fortis is also entitled to treble damages equal to three times the amount of actual damages, as well as an award of costs and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
### CONVERSION
### (Trident Defendants)

209.    Fortis incorporates all preceding paragraphs as if fully stated herein.

210.    Fortis had an ownership interest and absolute, unconditional right to the revenues, profits, and funds it has earned, obtained, and maintained as a business.

211.    Through their kickback scheme, the Trident Defendants, wrongfully and without authorization, have assumed control, dominion, or ownership of this Fortis's property.

212.    Fortis also had an ownership interest and absolute, unconditional right to the business records that it maintains in the course of operating its business.

213.    Schulz and Schupmann, wrongfully and without authorization, assumed control, dominion, or ownership of Fortis's business records despite specific demands for the return of those materials.

214.    As a direct and proximate result of the Trident Defendants' civil conversion of Fortis's property, Fortis has suffered damages in an amount to be proven at trial equal to at least the fair market value of the converted property.

## EIGHTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (All Defendants)

215.    Fortis incorporates all preceding paragraphs as if fully stated herein.

216.    The Defendants agreed, by words or conduct, to engage in unlawful conduct to personally enrich themselves, including so that they could unlawfully compete

49

with Fortis, profit from Fortis's efforts, benefit from Fortis's proprietary information, trade secrets, and work product, and/or cause Fortis other economic harm.

217.   To accomplish this goal, the Defendants, acting in concert with each other, engaged in an improper scheme to convert and steal Fortis monies, stole business opportunities that rightfully belonged to Fortis, interfered with Fortis's contracts and prospective business advantage, breached their common law duties of loyalty, and otherwise unjustly enriched themselves at Fortis's expense.

218.   Additionally, Roofing USA conspired with the Trident Defendants to wrongfully obtain and use Fortis proprietary information, work product, insider information, know how, and trade secrets, as detailed above.

219.   The Defendants committed overt acts as described, including theft of proprietary information, aiding and abetting breach of fiduciary duty/breach of fiduciary duty, as well as other wrongful acts. Defendants formed and operated an unlawful scheme with a common purpose and object to injure Fortis by performing unlawful acts in violation of Fortis's employment practices, property rights, common law duties and obligations, and other applicable law.

220.   The Defendants' conduct was without justification or privilege and was taken for their respective personal and economic advantage.

221.   As a direct and proximate result of the Defendants' civil conspiracy, Fortis has suffered damages in an amount to be proven at trial.

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Defendants Trident, Roofing USA, and TopKey)**

50

222.   Fortis incorporates all preceding paragraphs as if fully stated herein.

223.   At all times relevant, Schulz and Schupmann were employed by Fortis in positions of trust and responsibility as employees of the Company wherein they acted as the face of Fortis to its customers, prospects, and partners. In this capacity, Schulz and Schupmann owed Fortis a duty of loyalty to act in Fortis's best interests at all times and not to engage in activities harmful or detrimental to Fortis.

224.   Under Colorado law, a plaintiff may seek recovery from a nonfiduciary defendant on a claim for aiding and abetting a breach of fiduciary duty when the nonfiduciary defendant knowingly helps cause a fiduciary's breach of its fiduciary duty.

225.   While still employed with Fortis, Schulz and Schupmann breached their fiduciary duties of loyalty in numerous ways, and this included by soliciting and accepting kickbacks from TopKey through Trident, diverting business opportunities from Fortis, and placing their personal financial interests above those of Fortis.

226.   TopKey, through its President Dan Schardt and its employee Scott Reynolds, knowingly participated in and gave substantial assistance to Schulz and Schupmann's breach of their fiduciary duties to Fortis.

227.   TopKey's knowing participation included calculating and confirming the "Referral Fee @ 7.5%" plus "$7k/roof" formula with Schulz.

228.   TopKey's knowing participation further included embedding those concealed payment increments into TopKey's external proposals for Fortis-tied work, paying the invoiced kickback fees to Trident on approximately 130 Fortis-tied projects, and, on information and belief, negotiating and entering into an agreement with Trident

51

that formalized the percentage-based payment structure through which Schulz and Schupmann received the fruits of their disloyalty.

229.    TopKey's employee Scott Reynolds accepted the kickback demands from Schulz and Schupmann because, in Reynolds's own assessment, it came with "guaranteed work" from Fortis.

230.    TopKey's leadership, including Schardt and Reynolds, understood that Schulz and Schupmann were Fortis employees and that the kickback payments were made in connection with Fortis's allocation of work to TopKey.

231.    Roofing USA knowingly aided and abetted Schulz and Schupmann's breaches of their fiduciary duties by engaging in the conduct described herein, and in particular, in paragraphs 177-184, and 191-199, *supra*, which are incorporated as if fully set forth herein.

232.    TopKey and Roofing USA's knowing participation in and substantial assistance to Schulz and Schupmann's breach of fiduciary duty is established by the conduct alleged above.

233.    As a direct and proximate result of TopKey and Roofing USA's aiding and abetting of Schulz and Schupmann's breach of their fiduciary duties of loyalty, Fortis has suffered damages, including but not limited to lost profits, the value of diverted business opportunities, and inflated project costs attributable to embedded kickback increments.

234.    Fortis has also suffered loss of value and goodwill of Fortis's impacted client relationships as a result of TopKey and Roofing USA's conduct.

235. Fortis is entitled to damages in an amount to be determined at trial, but which should include disgorgement of any benefits TopKey and Roofing USA obtained as a result of its knowing participation in Schulz and Schupmann's breach of fiduciary duty, as well as any lost profits and unjust enrichment resulting from TopKey and Roofing USA's wrongful actions.

**TENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Defendant TopKey)**

236. Fortis incorporates all preceding paragraphs as if fully stated herein.

237. Fortis conferred valuable benefits on TopKey through Fortis program opportunities, coordination, and Fortis's commercial relationships that positioned TopKey to receive revenue on Fortis-tied projects. TopKey received project awards and contract revenue on Fortis-tied work that it would not otherwise have obtained but for Schulz and Schupmann's steering of those opportunities to TopKey.

238. TopKey's benefits were conferred at Fortis's expense. Fortis paid or caused to be paid project costs that included concealed uplifts embedded in TopKey's external pricing, and Fortis was deprived of management fees and revenue on projects steered to TopKey through coordination with Schulz and Schupmann.

239. TopKey knowingly received and retained the benefit of those Fortis-tied project awards — including on projects across the country that Fortis would ordinarily have assigned to local contractors — while embedding concealed uplifts into its external pricing and paying Trident under the "TPI" arrangement. TopKey was willing to accept

53

non-competitive project assignments because the insider arrangement provided TopKey with guaranteed work it would not otherwise have secured.

240.    TopKey's retention of the benefits derived from Fortis's opportunities and relationships is unjust because TopKey's gains were facilitated by secret payments to Fortis insiders and concealed pricing uplifts.

241.    As a direct and proximate result of TopKey's unjust enrichment, Fortis has suffered damages in an amount to be proven at trial and TopKey should make restitution or disgorge unjust benefits received.

## ELEVENTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
### (Defendant TopKey)

242.    Fortis incorporates all preceding paragraphs as if fully stated herein.

243.    Fortis had valid prospective business relationships and expectancies in the form of ongoing and prospective projects within the Fortis program and customer ecosystem, including on properties such as Park Shirlington and Homestead FL.

244.    At all times relevant, TopKey was aware of Fortis's customer relationships and prospective business opportunities by virtue of TopKey's June 28, 2022 mutual NDA with Fortis, TopKey's direct contract with Fortis on Park Shirlington, and TopKey's ongoing coordination with Schulz and Schupmann on Fortis-tied projects. TopKey knowingly and intentionally interfered with these relationships by calculating and embedding percentage-based fees into TopKey's external proposals on Fortis-tied opportunities and paying those fees to Trident. TopKey's actions were improper because

TopKey's coordination with Schulz and Schupmann facilitated the violation of their fiduciary duties they owed to Fortis as employees.

245.    TopKey's interference employed improper means because TopKey embedded concealed uplifts into its external pricing and facilitated Schulz and Schupmann's breaches of their fiduciary duties to Fortis.

246.    TopKey's interference was maliciously done without right or justifiable cause and was calculated to damage Fortis's lawful business.

247.    The violation of the duty of loyalty for the purpose of wrongfully diverting business opportunities is independently wrongful and unlawful apart from its effect on Fortis's business relationships.

248.    Fortis has suffered injury and damages as a direct and proximate result of TopKey's interference, including but not limited to actual damages, lost profits, mitigation expenses, and loss of value and goodwill of Fortis's impacted client relationships—in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Fortis respectfully requests the Court grant the following relief:

A.    A temporary restraining order, followed by the issuance of a preliminary injunction against Schupmann, Schulz, Roofing USA, and all others acting in active concert (including Trident) with them prohibiting Schupmann and Schulz from breaching the terms of the Agreements, including any violations of their confidentiality and non-competition covenants;

55

B.      The entry of a judgment for monetary damages for Defendants' wrongful acts alleged herein, including, but not limited to actual damages (including all damages incurred by Fortis as a result of lost customers and profits), pre-litigation attorneys' fees and costs, and Defendants' unjust enrichment as a result of their unlawful acts;

C.      Disgorgement of all compensation received by Defendants Schulz and Schupmann during their period of disloyalty;

D.      An award of punitive damages for Defendant Schulz and Schupmann's violations of the fiduciary duty of loyalty;

E.      An award of punitive damages for Defendant Trident's malicious tortious interference with the Agreements;

F.      An award of punitive damages for Defendant Trident's malicious tortious interference with Fortis's prospective business advantage;

G.      Treble damages for Defendants' civil theft, as authorized by C.R.S. § 18-4-4-5;

H.      The fair market value of the property Defendants have converted;

I.      Damages resulting from Defendants' civil conspiracy;

J.      All other damages as alleged herein;

K.      An award of costs and attorneys' fees; and

L.      An award of such other relief that the honorable Court may deem just and proper.

Dated this 7th day of May, 2026.

Respectfully submitted,

56

SENN FORTIS, LLC

*/s/ Lenora B. Plimpton*
Christine K. Lamb, Atty. Reg. #30326
Lenora B. Plimpton, Atty. Reg. #48194
Megan M. Ratcliffe, Atty. Reg. #56489
Senn Fortis LLC
1700 Lincoln Street, Suite 2100
Denver, CO 80203
Telephone: (303) 298-1122
clamb@sennfortis.com
lplimpton@sennfortis.com
mratcliffe@sennfortis.com
*Attorneys for Plaintiff FW-CO, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2026, I served the foregoing **THIRD AMENDED COMPLAINT & JURY DEMAND** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kellie Nelson Fetter
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Telephone: (303) 299-8354
Facsimile: (303) 298-0940
kfetter@taftlaw.com
*Attorney for Defendant David Schuppman*

Todd Rowden
Taft Stettinius & Hollister, LLP
111 East Wacker Suite 2600, Chicago, IL 60601
TRowden@Taftlaw.com
Phone: 312.836.4060
Fax: (312) 527-4011
*Attorneys for Defendants David Schuppman and Trident Solutions of Sugar Grove, LLC*

Denesh Chukkapalli
Dworkin Chambers Williams York Benson & Evans, PC
3900 East Mexico Avenue
Suite 820
Denver, CO 80210
303-584-0990
Fax: 303-584-0995
Email: dchukkapalli@dnvrlaw.com

Gary J. Benson
Dworkin Chambers Williams York Benson & Evans, PC
3900 East Mexico Avenue
Suite 1300
Denver, CO 80210
303-584-0990
Fax: 303-584-0995
Email: gbenson@dnvrlaw.com
*Attorneys for Defendant Charles Schulz*

*/s/Katie Witt*
Katie Witt
SENN FORTIS LLC