TAFT DRAFT 4/16/24

## REFERRAL AGREEMENT

This REFERRAL AGREEMENT (this "Agreement"), dated as of May ___, 2024 (the "Effective Date"), is entered into by and between TRIDENT SOLUTIONS OF SUGAR GROVE LLC, an Illinois limited liability ("Provider"), and Installation Services by HCR, LLC, d/b/a Installation Services d/b/a Topkey Construction, a Maryland limited liability company ("Recipient" and together with Provider, the "Parties", and each, a "Party").

WHEREAS, the Parties desire to establish a referral program whereby Provider will introduce Recipient to potential Customers in order to expand and grow Recipient's business according to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Definitions. The following terms have the meaning ascribed to them below:

"Customer" means any Prospect that has entered into a Qualifying Engagement within one (1) year of Provider's referral hereunder or within the eighteen (18) month period ending on the Effective Date.

"Person" means an individual, corporation, trust, partnership, joint venture, unincorporated organization, governmental entity, government agency or any agency or political subdivision thereof, or other entity.

"Prospect" means a potential customer who was introduced or referred to Recipient by Provider pursuant to this Agreement or within the eighteen (18) month period ending on the Effective Date. For the avoidance of doubt, a "Prospect" shall not include a potential customer or customer to whom Recipient is providing Recipient Services which relationship did not result from Provider's referral hereunder.

"Qualifying Engagement" means a written agreement entered into *after* the Effective Date and which is between a Recipient Group Member and a Prospect for the provision of Recipient Services.  For the avoidance of doubt, unless otherwise agreed by the Parties in writing, the Parties recognize that Provider referred Customers and Prospects to Recipient prior to the Effective Date and which referrals have resulted in the provision of Recipient Services to Customers, however since such referrals occurred prior to the Effective Date they are fully disqualified from being treated as Qualifying Engagements and Provider is entitled to no compensation for such referrals or for the provision of associated Recipient Services.

"Recipient Group Member" means, collectively, the Recipient and each of its direct and indirect subsidiaries and affiliates.

"Recipient Services" means the provision of construction services.

2.    Engagement.

(a)    Recipient hereby engages Provider, on a non-exclusive basis, and Provider hereby accepts such non-exclusive engagement, to promote Recipient Services to Prospects in a positive manner and provide to Recipient information regarding Prospects located in the United States from time to time for Recipient's consideration of providing Recipient Services to such Prospect and to make introductions, in person, virtually or electronically, between Recipient and such Prospect. Any and all referral of a Prospect shall be submitted by Provider in writing. The provision of any Recipient Services for any Prospect shall be at the sole discretion of Recipient and nothing herein shall require Recipient to provide Recipient

131930511v3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 3**

SCHULZ 018941

Services for any Prospect. Recipient may accept the Prospect by notifying Provider of Recipient's acceptance. If Recipient determines, in its sole discretion, that the Prospect is not a viable prospect, Recipient may reject the Prospect by notifying Provider indicating Recipient's rejection (email sufficing). Recipient agrees that it shall cause all other Recipient Group Members providing Recipient Services under any Qualifying Engagement to comply with all of Recipient's obligations hereunder.

(b)    For all geographic areas in which Recipient operates, Provider shall provide Recipient with the exclusive opportunity to consider such Prospect, Customer, or the potential provision of Recipient Services ("Priority Consideration"). If Recipient rejects or declines an individual Priority Consideration, then thereafter the Parties acknowledge and agree that no provision of this Agreement shall otherwise restrict Provider from referring such Prospects to other third parties providing services identical or similar to Recipient Services.

(c)    Both Parties shall market this arrangement at each Party's own cost and expense. During the performance of this Agreement, both Parties shall adhere to the other Party's marketing and trademark guidelines. Each Party shall specify the manner in which its name, logo, and/or service description may appear in the other Party's marketing materials. Each Party shall retain ownership of any and all materials provided to the other Party. Nothing contained in this Agreement shall confer on the other Party any right to use the name, trademark, or other designation of the providing Party in advertising publicity or marketing materials except for purposes of fulfilling its obligations under this Agreement. Upon either Party's request, all materials belonging to such Party in the other Party's possession shall be returned to the providing Party. Either Party may revoke the other Party's rights to use its name, logo, and other identifying marks at any time.

3.    Compensation. In consideration for the referral services rendered by Provider hereunder, Recipient shall pay to Provider the percentage agreed in writing on a project-by-project basis of the invoiced amount(s) actually paid by a Customer pursuant to a Qualifying Engagement (the "Referral Fee").  In the event of no separate written agreement on such percentage for a given project, the applicable percentage for the Referral Fee for such project shall be seven percent (7.00%). The Referral Fee shall be paid within thirty (30) days of when a Recipient Group Member receives payment from a Customer pursuant to a Qualifying Engagement.

4.    Independent Contractor. Each Party is an independent contractor of the other Party, and this Agreement shall not be construed to create any association, partnership, joint venture, employee or agency relationship between the Parties for any purpose. Neither Party has any authority (and shall not hold itself out as having authority) to bind the other Party and neither Party shall make any agreements or representations on the other Party's behalf without such Party's prior written consent. Any persons employed or engaged by a Party in connection with the performance of such Party's obligations hereunder shall be such Party's employees or contractors and such Party shall be fully responsible for them and indemnify the other Party against any claims made by or on behalf of any such employees or contractors.

5.    Books and Records; Audit. For a trailing twelve (12) month period during the Term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, (a) Recipient will maintain financial and related records as is done by Recipient in the normal course of its business practices, which may include supporting and underlying documentation, all occurring in Recipient's sole discretion (collectively, "Records"), regarding Qualifying Engagements and (b) Provider and its representatives will (at Provider's complete and sole cost and expense), upon thirty (30) business days' prior written notice and upon Provider having submitted to Recipient a written description of a legitimate and unresolved Referral Fee dispute and having provided Recipient 15 business days to respond to same, have the right to audit, examine and make copies of or extracts from the Records, all of which will be made electronically available and/or physically available during normal business hours at Recipient's premises,

2

131930511v3

    SCHULZ 018942

and all of which Records, Proprietary Information, and exchanged documentation shall be subject to Recipient's confidentiality terms.  In the event that an audit reveals underpayment of Referral Fees or fraud or non-compliance with this Agreement, Recipient shall, in addition to promptly paying such underpayment (if applicable), promptly reimburse, and cause any other Recipient Group Member to promptly reimburse, Provider for all reasonable and documented costs incurred relating to such audit (with such costs not to exceed 25% of the value of the underpayment of Referral Fees actually recovered during the audit). This Section 5 expressly survives any termination or expiration of this Agreement.

6. Confidentiality.

(a) Confidential or proprietary information ("Proprietary Information") shall, for purposes of this Agreement, be deemed to be all such information, material and data of one Party (the "Disclosing Party") which (i) is labeled or designated in writing as confidential or proprietary, (ii) the other Party (the "Receiving Party") is advised is Proprietary Information, or (iii) in view of the nature of such information and/or the circumstances of its disclosure the Receiving Party knows or reasonably should know is confidential or proprietary, and solely by way of illustration and not in limitation shall include the following: drawings, designs, concepts, specifications, software programs, routines, subroutines, formulas, production plans, layouts, schedules, sales, cost and price analyses, financial information, personnel information, customer lists, formulae, and marketing analyses, plans, and data. Any Proprietary Information concerning the Disclosing Party which is disclosed to or obtained by the Receiving Party incident to the performance of this Agreement shall remain the property of the Disclosing Party and Receiving Party shall maintain all such Proprietary Information in strict confidence. The Receiving Party shall not use any Proprietary Information (except to fulfill its obligations hereunder) or disclose it to a third party during or at any time subsequent to the performance of this Agreement, unless in each instance the Receiving Party secures the prior written consent of the Disclosing Party. The Receiving Party shall disclose Proprietary Information only to those of its employees with a need to know for purposes of fulfilling its obligations hereunder.

(b) The obligations of this Section 6 shall not apply to information that (i) is or becomes part of the public domain through no act or omission of the Receiving Party; (ii) was in the Receiving Party's lawful possession prior to the disclosure and had not been obtained by the Receiving Party either directly or indirectly from the Disclosing Party; (iii) is lawfully disclosed to the Receiving Party by a third party without restriction on disclosure; (iv) is independently developed by the Receiving Party without use of or reference to the Disclosing Party's Proprietary Information; or (v) is required to be disclosed by law or judicial, arbitral, or governmental order or process, provided the Receiving Party gives the Disclosing Party prompt written notice of such requirement to permit the Disclosing Party to seek, at its sole cost and expense, a protective order or other appropriate relief.

(c) Upon termination of this Agreement or the Disclosing Party's earlier request, the Receiving Party agrees to promptly return or destroy any and all Proprietary Information received pursuant to this Agreement, together with all copies that may have been made. Upon this Disclosing Party's request, the Receiving Party shall certify in writing to the Disclosing Party that such destruction has occurred.

7. Publicity and Announcements. Neither Party shall (orally or in writing) publicly disclose or issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of this Agreement or the subject matter hereof, without the prior written approval of the other Party, except to a Party's agents, employees, attorneys, accountants, or other advisors, or to the extent that either Party is required to make any public disclosure or filing with respect to the subject matter of this Agreement by applicable law.

131930511v3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    SCHULZ 018943

8.     Term. This Agreement shall commence on the Effective Date and shall continue for a period of one (1) year thereafter unless and until earlier terminated pursuant to the terms of this Agreement, which such termination occurring in either Party's sole discretion (the "Initial Term"). Upon expiration of the Initial Term, this Agreement shall automatically renew for additional successive one (1) year terms unless and until either Party, in its sole discretion, provides notice of termination or non-renewal (email sufficing) with at least seven (7) days notice (each, a "Renewal Term" and together with the Initial Term, the "Term").

9.     Termination; Survival.

(a)     Either Party may terminate this Agreement without cause upon seven (7) days' prior written notice (email sufficing) to the other Party.

(b)     Either Party may terminate this Agreement with immediate effect upon notice to the other Party if the other Party (including any Recipient Group Member providing Recipient Services pursuant to a Qualifying Engagement): (i) fails to pay any amount when due under this Agreement; (ii) breaches the terms of this Agreement and such breach is not cured within thirty (30) days of notice of such breach; (iii) becomes insolvent, files a petition for bankruptcy, or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization, or assignment for the benefit of creditors; or (iv) fails to comply with applicable laws applicable to its business.

(c)     Notwithstanding any termination or expiration of this Agreement, Recipient's obligations under Section 3 and Section 5 shall continue for (i) any Qualifying Engagement that is consummated prior to such termination or expiration, (ii) any Qualifying Engagement resulting from a Provider referral made prior to such termination or expiration and which Qualifying Engagement is consummated within the six (6) month period occurring immediately after Provider's issuance of the written referral of Prospect hereunder.  This Section 9(c) expressly survives any termination or expiration of this Agreement.

(d)     Termination or expiration of this Agreement will not affect the accrued rights or liabilities of the parties arising out of this Agreement as at the date of termination or expiration, and all provisions which expressly survive or which by implication do so will remain in full force and effect.  This Section 9(d) survives any termination or expiration of this Agreement.

10.     Indemnification.

a)     General. Subject to Section 10(b), below, each Party will otherwise indemnify, defend and hold harmless the other Party against all claims, causes of action, judgments, damages, fines or expenses (including reasonable attorneys' fees) relating to (a) its breach of this Agreement and (b) its violation of law, rule or regulation in connection with this Agreement.

b)     Fortis. Provider is owned and operated by David Schupmann and Charles Schulz (collectively "Provider Owners"), both of whom have executed this Agreement below, and who are both current or prior employees of Fortis Roof Performance & Financial Certainty, Guaranteed, located at 50 South Street, Suite 375, Denver, Colorado, 80209 ("Fortis").  As a material term to this Agreement, Provider Owners are required to disclose to Recipient any and all agreements relating to Provider Owners' employment or work with Fortis or any of Fortis' direct and/or indirect subsidiaries and affiliates (collectively "Fortis Agreements") which may affect the eligibility of Provider or Provider Owners to perform or offer the services contemplated herein, so that Recipient shall then have the opportunity to independently review and assess such agreements.  Absent disclosing any and all Fortis Agreements to Recipient, as a material term to this Agreement, Provider and Provider Owners represent and warrant to Recipient that there is not any agreement, contract, or restrictive covenant of any kind or character preventing or limiting Provider or Provider Owners (individually or jointly) in any way from providing

4

131930511v3

services, referring Customers, referring Prospects, or otherwise conducting business with Recipient under the terms of this Agreement. Provider and Provider Owners, jointly and severally, shall defend, indemnify, and hold harmless Recipient and its affiliates and their officers, directors, employees, agents, successors, attorneys, and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind (including attorneys' fees or other legal expenses of any kind) arising out of or resulting from any claim asserted by Fortis (or any of Fortis' direct or indirect subsidiaries and/or affiliates) against Recipient and which in any way involves this Agreement or business transacted hereunder. Provider and Provider Owners shall be responsible for the indemnification described herein irrespective of whether Fortis is successful or not in the claims or allegations it may assert. Recipient, in its sole discretion, may satisfy such indemnity (in whole or in part) by way of deduction from any payment due to Provider. This <u>Section 10(b)</u> expressly survives any termination or expiration of this Agreement.

11.    <u>Restrictive Covenants</u>. During the Term and for six (6) months thereafter, (a) the Recipient shall not, and shall cause the Recipient Group Members not to, directly or indirectly, (i) solicit, induce, procure or encourage any business with Customers or Prospects other than pursuant to Qualifying Engagements originating from Provider referrals hereunder, (ii) interfere with the business relations between Provider, on the one hand, and any Prospect or Customer, on the other hand, or (iii) take any actions intended or which can reasonably be expected to circumvent, avoid, bypass or obviate the application of the provisions of this Agreement or to deprive the Provider of any benefit under this Agreement, and (b) Recipient shall pay a Referral Fee with respect to any consummated engagement for Recipient Services provided by a Recipient Group Member to a Customer or Prospect initiated directly by a Customer or Prospect that was previously a party to any Qualifying Engagement.

12.    <u>Mutual Warranties</u>. Each Party represents, warrants, and/or covenants to the other Party that (a) it has the capacity and authority to enter into this Agreement and that it is unaware of any facts which would prevent it from performing its obligations under this Agreement, (b) it has all necessary licenses, permits, certifications, and other similar authorizations necessary to perform its obligations under this Agreement, and (c) it has not been improperly induced in any way to enter into this Agreement.

13.    <u>Miscellaneous</u>.

(a)    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, summons and other legal process, and other similar types of communications hereunder (each, a "<u>Notice</u>") must be in writing (unless otherwise noted as email sufficing) and addressed to the relevant Party at the address set forth on the signature page (or to such other address that may be designated by the receiving Party from time to time in accordance with this <u>Section 13(a)</u>). All Notices must be delivered by electronic transmission, personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only (i) upon receipt by the receiving Party and (ii) if the Party giving the Notice has complied with the requirements of this <u>Section 13(a)</u>.

(b)    <u>Governing Law</u>. This Agreement and all matters arising out of or relating to this Agreement are governed by, and construed in accordance with, the laws of the State of Maryland, without regard to the conflict of laws provisions of such State.

(c)    <u>Modification</u>. This Agreement, and each of the terms and provisions hereof, may only be amended, modified, waived, or supplemented by an agreement in writing signed by each Party.

131930511v3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

SCHULZ 018945

(d)    <u>Assignment</u>. No Party shall not assign, transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of the other Party. Any purported assignment or delegation in violation of this <u>Section 13(d)</u> shall be null and void. This Agreement will inure to the benefit of and be binding upon each of the Parties and each of their respective permitted successors and permitted assigns.

(e)    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together constitutes one and the same agreement. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

(f)    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(g)    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(h)    <u>Successors and Assigns</u>. The Parties do not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

[SIGNATURE PAGE FOLLOWS]

6

131930511v3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    SCHULZ 018946

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

RECIPIENT:

INSTALLATION SERVICES BY HCR, LLC d/b/a INSTALLATION SERVICES d/b/a TOPKEY CONSTRUCTION

By:            _____
Name:
Title:

Notice         _____
Address:       _____
               _____
               _____

Email:         _____


PROVIDER:

TRIDENT SOLUTIONS OF SUGAR GROVE LLC

By:            _____
Name:
Title:

Notice         _____
Address:       _____
               _____
               _____

Email:         _____




DAVID SCHUPMANN

Signature:     _____

Title:

Notice         _____
Address:       _____
               _____
               _____

Email:         _____


Signature Page to Referral Agreement

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    SCHULZ 018947

CHARLES SCHULZ

Signature: _____

Title:

Notice            _____
Address:          _____
                  _____
                  _____

Email:            _____

Signature Page to Referral Agreement

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                                 SCHULZ 018948