Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

FW-CO, INC., d/b/a
FORTIS WARRANTY,

    Plaintiff,        Civil Action File No.
                    4:20-cv-00190-HLM-WEJ

vs.

                    1:25-cv-00254-HLM-WEJ

CHARLES SCHULZ,
DAVID SCHUPMANN, and
TRIDENT SOLUTIONS OF
SUGAR GROVE, LLC,

    Defendants.

DEPOSITION OF BRIAN TICE

April 15, 2025

2:37 p.m. - 5:49 p.m.

TAKEN BY REMOTE VIDEOCONFERENCE

Shawn E. Fleck, RPR, CCR #2859

**EXHIBIT 5**

Brian Tice                          April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 60

This is what?  May, June 2024?  Something in there?

A.  Yeah.  Probably June time frame.  Yeah.

Q.  What -- what else do you remember about that initial call?

A.  Not much more than, like, I got along with him a lot better than I thought.  I think he was -- he was less intimidating than I kind of expected.

And it seemed like he liked me, and what we were trying to do, and he seemed interested in wanting to try to help us.

Q.  Did he mention to you, at that stage, that he had a restrictive covenant agreement or an employment agreement with Fortis?

A.  I don't remember precisely.  So, like, the first couple of meetings are kind of blurry, right, where it's hard to tell exactly if it was in the first call, second call, or whatever.

It was pretty quick that he told us, but I couldn't -- I couldn't swear under oath that it was in that very first call or not; right?  But it was pretty quick that he kind of told us there was one.

Q.  Within the first few conversations, he mentioned he had a noncompete agreement; right?

A.  Yeah.  Yeah.

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 61

Q.   What specifically did he mention?

A.   I think, at that time, is when he told us a little bit about what Fortis did, and just like vaguely kind of described the service that they offered there, and what he did for them.

And, like, again, I don't want to say, like, verbatim exactly what he told me, but my takeaway was like, okay, if he comes here, we can't, like -- we're not going to -- we can't go starting to sell, like, long-term warranties.  We can't go over, like, warranty service -- like warranty as a product.  And there's going to be, like, clients that we can't go after.

And he said that he would have to be very careful about not -- he was kind of like -- I just remember his demeanor was like he wanted to be respectful of the noncompete.  Taking it very seriously, and saying, like, look, man, there's going to be, like, things I can't go do.

And I said I don't -- I don't -- my message was, that's stuff is five, six, seven, eight years.  I don't know.  Whatever.  Like here's what I need.  We've got to build a sales force to go talk to these, like, local companies, and teach them who we are, and get them selling.  We have zero sales.

Brian Tice                                      April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 67

Q.   You didn't do any sort of independent research on what Fortis did; correct?

A.   Other than just going to the website, and trying to -- like watching their promotional materials there, no.

Q.   Okay.  And so Mr. Schupmann told you that Fortis was, I think you said, predominantly a warranty company; right?

A.   Correct.

Q.   And you went to Fortis's website to see how they market themselves; right?

A.   Correct.

Q.   And it's your understanding, I guess based off of what you saw at the website, that Fortis markets itself as providing solutions to companies in need of roofing -- well, strike that.

What is your understanding, in terms of Fortis's offerings, based on your review of the website?

A.   It's probably been a year since I've been on the website.  My takeaway was that businesses that were going to be told they needed to replace their roofs, that Fortis could offer an alternative, kind of, financial product that would basically guarantee the roof for 10 years or some period like

Brian Tice                                     April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 68

a 10-year period at a fraction of the cost, and they would bear the burden of that liability.

Q.   Okay.

A.   Does that make sense?  Oh, sorry.  I'm not allowed to ask questions.  Sorry.

Q.   It's fine for you to say that something makes sense or doesn't make sense.  You can ask that question.

Okay.  So like I'm looking at their -- the Fortis website right now.  In fact, I can share my screen on this.

MR. MILLER:  And, Mike, while you're pulling that up, I'm going to object to the extent that we don't know that the website is the same as when Mr. Tice might have seen it.

MR. ELKON:  Right.  And I can ask him that question.

BY MR. ELKON:

Q.   Okay.

Okay.  Mr. Tice, do you see Fortis's website that I pulled up here?

A.   I do.

Q.   Okay.

Okay.  So the -- broadly speaking, what they're saying is, protect your roof, preserve your

Page 71

A.   We warrant our workmanship, right, not a roof life or -- or anything to that extent.  We warrant our workmanship.

Q.   Right.

A.   So we warranty -- yeah.

Q.   It's a warranty, but a different warranty than what Fortis offers; correct?

A.   Yes.

Q.   Okay.  But, I mean, like I'm approaching it from the perspective of I'm a commercial real estate developer.  I've got a portfolio -- the Fortis solution is one solution that I could have for my roofing needs.  The Roofing USA solution is another solution.

Fortis may go about it solving my problem a little differently than you would, because their warranty is different, but they could both solve the same problem that I have, which is I've -- I want to extend the life of my roof, and minimize my roofing expenditures; correct?

A.   (Pause.)

Yeah, I mean, again, I'm just trying -- my brain is going down like -- you know, the method of the warranty seems material to me, but I think what you're asking is -- isn't material to the customer.

Brian Tice                                      April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 72

Q.   Well, just that Fortis and Roofing USA are offering two different solutions to the same customer need?

A.   Okay.  Yes.

Q.   That's accurate?

A.   Uh-huh.

Q.   Sorry.  That's a "yes"?  That's accurate?

A.   Yes.  Oh, yes.  Yes.

Q.   All right.

Okay.  And then sort of scrolling down, like if I take a look at this piece right here; right?

No, I didn't want to do that.

So prolonging the performance life of a commercial roof, that is essentially something that Roofing USA offers in its sales pitch, as well; right?

A.   Yes.

Q.   Reducing the overall costs of managing roof assets, that's something that Roofing USA offers; correct?

I mean, you guys are selling that you're going to reduce the overall cost of managing a roof; correct?

A.   Yes.

Brian Tice                                   April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 77

right fit here.

So he came down for that visit, and then, you know, shortly afterwards, I think we started having a discussion of what -- what it would look like to be full-time.

And he started to talk a little bit about his compensation levels, and we were just like, look, man, like we're a bootstrap startup here. There's just no way. And, I mean, we never really got into the details. It was just like the ranges of things.

And it was -- we were like, okay, well, we're going to pivot here a little bit. And that's when he mentioned, hey, maybe I could just help, you know, more like on a weekly -- like let me help you guide your sales calls. Let me give you some -- let me sit in on those. Let me kind of help you run those meetings. Let me help you just kind of set some KPIs for you guys.

You know, be more like on a consulting side. And so that's what we started to do for the next six months.

Q. So when did the consulting relationship start?

A. I would have said August time frame. Early

Brian Tice                                April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 78

August.

Q.  Okay.

A.  I mean, again, those dates are roundabout. I can always go back, and try to find them more accurately, but that's going to be pretty close.

Q.  So 2024, August, Mr. Schupmann starts consulting with you.

I assume Mr. Schulz, Charles Shulz, is also involved?

A.  Not right away.  I think Dave sat in on a couple of meetings with us, and then I think he -- he's like, hey, I've got another guy I'd like to bring in on this agreement, and kind of have him help a little bit, too.

And it was -- so I would have said maybe like a few weeks into it, maybe.  Around the end of August or so.  And that's when Charlie started.

Q.  Did Roofing USA pay Mr. Schupmann?

A.  Uh-huh.

Q.  Did it pay him directly, or did it pay him through Trident?

A.  Through Trident.

Q.  What was your understanding about Trident, and its role?

A.  That it was kind of like their -- you know,

Brian Tice                              April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 79

it's what he and Charlie had set up to do these types of engagements.

And that's all I really understood.

Q.   Okay.

A.   It was just to kind of have an entity to pass through paychecks, and compensation.

Q.   How much was Roofing USA paying Trident for this consulting work?

A.   10K a month.

Q.   And from when to when was it making those payments?

A.   Yeah, through -- you know, August through, I guess, middle of January.

Q.   Middle of January is when Roofing USA hires Mr. Schupmann full-time; right?

A.   Yeah.

Q.   After he was fired by Fortis?

A.   Yes.

Q.   Okay.  So I have some text message exchanges that I wanted to ask you about.  And I'm pulling up the first one.  I'm just trying to find it.

There we go.  Okay.

(Plaintiff's Exhibit 5 marked.)

BY MR. ELKON:

Page 106

Schupmann is doing the same thing, broadly speaking, for you that he was doing for Fortis; right?

MR. MILLER:  Object to the form.  You can answer.

BY MR. ELKON:

Q.  I don't mean presently.  I mean when you hired him.

A.  I don't really know what he did at Fortis.

Q.  But your understanding was he was in a role engaged in sales; correct?

A.  Yes.

Q.  At Fortis?

A.  Yes.

Q.  He was -- and your understanding was also that, at some point ni his employment at Fortis, he was managing a team below him; right?

A.  Yes.

Q.  Okay.  I mean, were you aware that his first title at Fortis was VP of sales and marketing?

A.  I believe so.  I believe that was on his resume at the time.

Q.  Okay.

A.  I believe.

Q.  And then he was the chief operating officer.  You had that understanding?

Brian Tice                                          April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 107

A.   Yes.

Q.   Okay.   And then his last job title there was, I think, enterprise sales manager?

A.   Yes.

Q.   You remember that, as well?

A.   Yes.

Q.   I'm sorry.   Director of enterprise accounts.   But you had that understanding, as well; right?

A.   Yes.   Yes.

Q.   So, I mean, broadly speaking, when you hire him, it's your understanding that what he's doing is consistent with what he had done with Fortis, and then what he had done at Tecta before that; right?

A.   As far as -- yeah.   High level account sales, and managing sales teams; yes.

Q.   So this communication with Graystar is consistent with what you brought him in to do; right?

A.   Yes.

Q.   Okay.

And then broadly speaking, when you bring him in, he's -- he's managing people on his sales team; right?

A.   Yes.

Brian Tice                                        April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 144

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 22nd day of April, 2025.

Shawn E. Fleck, RPR, CCR #2859