**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-00254-NYW-TPO

FW-CO, INC.,
d/b/a FORTIS WARRANTY,

      Plaintiff and Counter-Defendant,

RICHARD LEWIS,

      Counter-Defendant,

v.

CHARLES SCHULZ,
DAVID SCHUPMANN,

      Defendants and Counter-Claimants,

TRIDENT SOLUTIONS
OF SUGAR GROVE, LLC; ROOFING USA, LLC; and
INSTALLATION SERVICES LLC d/b/a TOPKEY CONSTRUCTION,

      Defendants.

---

### PLAINTIFF'S RESPONSE TO ROOFING USA, LLC'S
### MOTION TO DISMISS THIRD AMENDED COMPLAINT

---

Plaintiff/Counter-Defendant FW-CO, Inc., d/b/a Fortis Warranty ("Fortis"), through

counsel, hereby responds to Defendant Roofing USA, LLC's Motion to Dismiss and states

as follows:

### INTRODUCTION

Roofing USA, LLC ("RUSA") is a competitor of Fortis. In 2024, it was seeking to

expand its commercial roofing operations. That July, RUSA hired Fortis's then-employees

Defendant David Schupmann ("Schupmann") and Defendant Charles Schulz ("Schulz")

1

as "consultants" and started paying them $10,000 a month in fees through their separate company, Trident Solutions of Sugar Grove, LLC ("Trident"). When RUSA hired Schupmann and Schulz as its consultants, it knew that they worked for Fortis, it knew that Fortis was its competitor, it knew that Schulz and Schupmann had duties of loyalty to Fortis, it knew that Schupmann was bound by a non-compete, and it knew that Fortis was a Colorado company. The allegations in the Third Amended Complaint, taken as true, paired with the declaration of Fortis's President, Rick Lewis, establish a prima facie case of personal jurisdiction over RUSA. The Motion must be denied.

## STATEMENT OF FACTS

Fortis incorporates the facts alleged in its Third Amended Complaint ("TAC") [ECF 153] and verified under penalty of perjury by Fortis founder and CEO, Richard Lewis, as if fully set forth herein. *See* Declaration of Richard Lewis in Support of FW-CO, Inc.'s Response to Roofing USA, LLC's Motion to Dismiss at ¶ 18 ("Lewis Decl.") & Exhibits 1 through 8 thereto. In addition to the allegations in the TAC, the following additional facts ("SOF") are relevant to the Motion:

1.      In May of 2024, Brian Tice ("Tice"), the CEO of RUSA, was seeking to hire a Vice President of Sales in order to expand RUSA's business into commercial services and sales. *See* Exhibit 9, Deposition of Brian Tice ("Tice Dep.") at 55:11-13, 56:1-57:9.

2.      Specifically, Tice was looking for someone who had "built and grown . . . and had hands-on experience growing a commercial service sales team." *Id.* at 57:1-4. Tice cared about "sales background" first, and "secondarily, about commercial roofing experience." *Id.* at 57:5-7.

3.      When he was introduced by the recruiter to Dave Schupmann, his reaction was: "I was just like, wow, okay, this is perfect." *Id.* at 57:8-9. In fact, Tice was "a little intimidated by [Schupmann's] level of experience" and thought he was "like a roofing Jedi." *Id.* at 58:11-17. Schupmann's resume, which Tice saw, listed Schupmann's various job titles at Fortis—VP of Sales and Marketing, Chief Operating Officer, and Director of Enterprise Accounts. *Id.* at 106:18-107:16.

4.      It is reasonable to infer that Schupmann's resume included the location of Fortis in Denver, Colorado, as a standard resume would.

5.      Tice knew, from the resume, the recruiter, and from his conversations with Schupmann that Schupmann was working for Fortis. Indeed, Schupmann "was pretty quick" to tell Tice that he had a "restrictive covenant agreement or an employment agreement with Fortis." *Id.* at 60:12-25; 65:1-20; 106:18:25. Schupmann's employment agreement was executed by Fortis in Colorado and called for the application of Colorado law, Colorado venue, and noted that Fortis's offices were in Colorado. TAC at ¶¶ 19, 21, 40-48 & TAC at Exs. A & B. Schulz agreed to similar terms. *Id.* ¶ 53 & Ex. B.

6.      Schupmann specifically told Tice that "he had a noncompete in place [with Fortis], and it was for a period of about two years." Tice Dep. at 64:22-65:20.

7.      As part of the interview process with RUSA, Schupmann described Fortis and his work for Fortis. *Id.* at 61:1-13; 66:23-25. Schupmann described to RUSA's CEO, Tice, exactly "what Fortis did," "the service that they offered there," and "what he did for them." *Id.* at 61:1-5. Tice concluded that if Schupmann were to start working for RUSA, there would be "clients" that RUSA couldn't "go after" and services that RUSA couldn't provide. *Id.* at 61:6-13.

8.      At that time, Tice also "went to Fortis's website" to see how they "market[ed] themselves," and "watch[ed] their promotional materials." *Id.* at 67:1-68:3.

9.      Fortis is based in Colorado and has been since 2003; and Fortis's website clearly listed—both in 2024 and to the present day—Fortis's Colorado address. Lewis Decl. at ¶¶ 3-4, 6-7.

10.     Tice knew that Fortis and RUSA were competitors because both were "offering two different solutions to the same customer need"—namely, roofing solutions like "prolonging the performance life of a commercial roof" and "reduc[ing] the overall cost of managing a roof." Tice Dep. at 70:2-17; 71:1-72:25.

11.     Tice's "takeaway was like, okay, if he comes here, we can't . . . we can't go starting to sell, like, long-term warranties . . . like warranty as a product. And there's going to be, like, clients that we can't go after." *Id.* at 61:2-13.

12.     Schupmann told Tice "that he would have to be very careful" and was "saying, like, look, man, there's going to be, like, things I can't go do." *Id.* at 61:14-19.

13.     Tice's response was "Whatever." *Id.* 61:22.

14.     Instead of worrying about Schupmann's obligations to be loyal to and not compete with his current employer, Fortis, Tice's response was simply "here's what I need. We've got to build a sales force . . . and get them selling"—and fast, because RUSA had "zero sales." *Id.* at 61:20-25.

15.     After having these discussions, and when Schupmann was still employed by Fortis, Tice testified that he hired Schupmann to "guide" sales calls and "be more like on a consulting side." *Id.* at 77:12-25.

4

16.     In fact, documents produced in this litigation show that Tice began working with Schupmann at least as early as July 19, 2024 – approximately 6 months before Schupmann was fired by Fortis. *See* Lewis Decl. at ¶¶ 11-12, Exs. 3-4.

17.     On July 22, 2024, RUSA referred to Schupmann as "our new sales consultant" and went after an opportunity with Fortis's client, Coca-Cola, that Schulz openly forwarded to RUSA *from his Fortis email address*. *Id.* at ¶¶ 10-11 & Exs. 2-3; TAC ¶¶ 187-190. The fact that the materials were taken from Fortis is clearly visible at the bottom of the email thread, which was sent along to both Tice and his employee, Steve Guaglianone. Lewis Decl. at ¶ 10 & Ex. 2. In it, Schupmann says to Tice: "Here are the details for those skylights in Monroe we talked about earlier." *Id.* The skylights in question are for a Coca-Cola facility located in Monroe, North Carolina, and the email chain shows clearly that this information, and numerous pictures, apparently of the Coca-Cola facility, were transmitted directly from Schulz's Fortis email address to Schulz's personal email address, then to Schupmann at his Trident email address, and then on to Tice. *Id.*; *see also* TAC ¶¶ 187-191.

18.     Tice knew where the Coca-Cola opportunity came from, because he told his team: "This is from our new sales consultant Dave. <u>He had Coca Cola as a national account</u>." Lewis Decl. at ¶ 11 & Ex. 3 (emphasis added).

19.     Roofing USA worked with Schulz to provide a quote for the Coca-Cola project and added $5,000 on the top as a kickback to Schulz for sending it the opportunity. *Id.*

20.    At least as early as the "end of August," (but actually in July) of 2024, Schupmann said "hey, I've got another guy I'd like to bring in on this agreement," and "that's when Charlie [Schulz] started." Tice Dep. at 78:10-17; Lewis Decl. at ¶¶ 11-12.

21.    Despite knowing (1) that Fortis was a national commercial roofing company based in Colorado offering customers the same solutions as RUSA, (2) that Schupmann was an experienced "roofing Jedi" and former COO of Fortis who at the time was still actively employed by Fortis as its Director of Enterprise Accounts, (3) that Schulz was also actively employed by Fortis, (4) that Schupmann was in charge of national accounts with Fortis, including for Coca-Cola, and (5) that both men had employment agreements and Schupmann in particular had an active noncompetition agreement with Fortis, RUSA nevertheless hired Schupmann and Schulz as "sales consultant[s]" to help RUSA jumpstart its own commercial roofing sales operation, paying them through Trident and knowingly profiting from their usurpation of Fortis's clients, opportunities, and even materials. Tice Dep. at 61:1-25, 66:23-25, 71:1-72:25, 77:12-25; 78:6-22; 106:18-107:16; TAC ¶¶ 25, 35, 136-138, 172, 174-177, 186-194.

22.    RUSA also knew that Schupmann and Schulz had "set up" Trident specifically "to do these types of engagements." *Id.* at 78:15-79:9. RUSA paid Schulz and Schupmann, through Trident, a recurring rate of $10,000 a month from August 2024 to January 2025. *Id.* at 78:1-79:16.

23.    Tice further testified that Trident was, in his understanding, the entity Schupmann and Schulz "had set up" as a "pass through" for receiving paychecks and compensation. *Id.* at 78:24–79:6.

6

24.     Tice never asked Schupmann "like, hey, you know, is your company [Fortis] okay with the fact that you're doing this side work for me?"—despite admitting that if he was in Fortis's shoes, that he "probably wouldn't like it a whole lot." *Id.* at 88:21-89:8.

25.     RUSA gained access to Fortis's confidential materials thanks to its hiring of Schupmann and Schulz as consultants. For example, in July of 2024, Schupmann stole one of Fortis's marketing PowerPoint presentations and renamed and rebranded it, nearly verbatim, for RUSA to use. TAC ¶¶ 176-177; Lewis Decl. at ¶¶ 13-15.

26.     Three days after Fortis fired Schupmann, RUSA hired Schupmann directly and dropped the façade of paying Trident for "consulting work." Tice Dep. at 79:5-18.

27.     When RUSA formally hired Schupmann, it was to do, "broadly speaking," the same job he had been doing for Fortis—"high level account sales" and "managing sales teams." *Id.* at 107:11-16.

28.     Schupmann was eventually fired by Fortis and formally hired by RUSA, where he and RUSA continued to engage in wrongful conduct directed at Fortis. Schupmann, for example, breached his non-compete agreement by working for RUSA at all, but he also retained, and used for RUSA's benefit, over 850 pages of Fortis's confidential materials, including its business plans, marketing plans, various documents containing financial information, budgets, customer materials, statements of work, and warranty forms. TAC ¶¶ 128, 132, 135-140, 190-191.

29.     Fortis was founded in 2003 in Colorado and has always been a Colorado-based corporation. TAC ¶¶ 17, 23; Lewis Decl. at ¶ 3.

30.     Fortis is well known in the commercial roofing industry, and it does business nationwide. TAC ¶ 30. RUSA knew about Fortis's business, saw its website, watched its promotional videos, knew that Schupmann and Schulz worked for Fortis, knew they owed Fortis contractual and common law duties, and knew at all relevant times that Fortis was based in Colorado. TAC ¶¶ 14, 25, 30, 35, 136-138, 172, 174-177, 186-194.

**ARGUMENT**

## I.     This Court Has Specific Personal Jurisdiction Over RUSA.

### A. Legal Standard.

It is the plaintiff's burden, when challenged under Fed. R. Civ. P. 12(b)(2), to establish personal jurisdiction. *See, e.g.*, *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984). However, this burden is "light" and requires only a prima facie showing that jurisdiction exists. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). In the absence of an evidentiary hearing, to defeat a motion challenging the Court's jurisdiction, a plaintiff need only point to facts in the Complaint, affidavits, or other written material that, taken as true, support the exercise of jurisdiction over the defendant. *Warad W., LLC v. Sorin CRM USA Inc.*, 119 F. Supp. 3d 1294 (D. Colo. 2015); *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). In evaluating personal jurisdiction, the Court takes the allegations in the Complaint "as true to the extent they are uncontroverted by the defendant's affidavits." *Wenz*, 55 F.3d at 1505. However, if the parties present "conflicting affidavits, all factual disputes must be resolved in the plaintiff's

8

favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.*

Because Colorado's long-arm statute permits the exercise of jurisdiction to the full extent of the United States Constitution, the personal jurisdiction inquiry under Colorado law "collapses into the single due process inquiry." *Intercon, Inc. v. Bell Atl. Internet Sols.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citation omitted); *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1220 (10th Cir. 2021) (holding that Colorado's long-arm statute means that the "statutory and constitutional requirements merge and we must assess only whether Colorado jurisdiction over this claim would be consistent with due process."). Personal jurisdiction comports with due process where a defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).

Following its seminal decision in *International Shoe,* the Supreme Court has recognized "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 582 U.S. 255, 262 (2017). To exercise specific jurisdiction over a defendant, "the suit must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). "In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (cleaned up) (citation omitted).

The contacts needed to establish specific jurisdiction "often go by the name 'purposeful availment.'" *Ford Motor Co.*, 592 U.S. at 359 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The question is whether the defendant took "some act" by which it "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Id.* (citation omitted). The contacts "must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). In the "tort context," courts typically ask "whether the nonresident defendant 'purposefully directed' its activities at the forum state." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (Gorsuch, C.J.). When analyzing personal jurisdiction in the tort context, the 10th Circuit has followed the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783 (1984), holding that, "[d]istill[ed] to its essence," *Calder* stands for the proposition that purposeful direction exists when the nonresident defendant is shown to have taken (a) "an intentional action," that (b) is "expressly aimed at the forum state," with (c) "knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov*, 514 F.3d at 1072 (citing *Calder*, 465 U.S. at 789).

B. <u>RUSA Established Minimum Contacts When It Intentionally Directed Wrongful Conduct Towards Fortis, a Colorado Resident, With Knowledge that Fortis Would Be Injured by That Conduct.</u>

On a motion to dismiss for lack of personal jurisdiction, all allegations in the complaint are "taken as true to the extent they are uncontroverted by the defendant's affidavits." *Wenz*, 55 F.3d at 1505. "[A]ny factual disputes found in the parties' affidavits must be resolved in plaintiffs' favor." *Dudnikov*, 514 F.3d at 1070. Here, the well pleaded allegations of the Third Amended Complaint, together with the declaration of Richard

Lewis, Fortis's President, satisfy Fortis's burden to make a prima facie showing sufficient to establish personal jurisdiction. Namely, the facts alleged and declared show that RUSA engaged in intentional actions, expressly aimed at Colorado, with the knowledge that the brunt of the injury would be felt by Fortis in Colorado.

The allegations in the TAC show that the connection between RUSA and Colorado goes well beyond "mere injury" to Fortis, a forum resident—although RUSA certainly injured a forum resident. Fortis's 55-page Third Amended Complaint contains myriad allegations as to RUSA's intentional actions and resulting injury inflicted on Fortis—allegations that go well beyond plausibility. These allegations are largely uncontradicted by any affidavit and must be accepted as true. They include, for example, allegations that RUSA "knowingly and wrongfully solicited and accepted, from Schupmann and Schulz, Fortis's proprietary materials and work product," and "knowingly permitted" Schupmann and Schulz to begin working for it even though it knew they were still employed by Fortis. TAC ¶¶ 136-137, 172-177. Indeed, RUSA knowingly accepted a sales training PowerPoint from Schupmann that Schupmann had misappropriated from Fortis. TAC ¶ 177. It also knowingly pursued a business opportunity with Coca-Cola, a company that it knew was a Fortis customer. SOF ¶¶ 17-18; TAC ¶ 190. RUSA also knew, when it went after the Coca-Cola opportunity, that it had been obtained through misappropriation—the email thread revealed that the information had been forwarded straight from Fortis's email servers under obviously wrongful circumstances—namely, from Schulz's Fortis account to himself at his personal email. SOF ¶¶ 17-18; TAC ¶¶ 186-190.

The sole exception to the uncontradicted nature of the allegations in the TAC is that RUSA's CEO, Tice, claims that "[a]t the time the allegations in the Third Amended

Complaint are alleged to have taken place, I did not know that Fortis was a Colorado company." Declaration of Brian Tice at ¶ 14 [ECF 170]. This statement is contradicted by the evidence and, as a disputed fact, must be resolved in Fortis's favor.

Documents in the record and Tice's own testimony contradict his claim to have been unaware, at the time, that Fortis is a Colorado resident. First, Tice admitted, under oath, that he extensively perused Fortis's website prior to hiring Schupmann and Schulz as consultants. SOF ¶ 8. In 2024 (and still today) Fortis's website contained a prominent indication of its address in Colorado at the bottom of the home page. Tice also admitted that he discussed Fortis at length with Schupmann, which included learning about "what Fortis did," "the service that they offered," and "what [Schupmann] did for them." SOF ¶ 7. Not only that, but Tice further acknowledged that he received and reviewed a copy of Schupmann's resume, which listed Fortis and, it can be inferred, Fortis's Colorado location (as would be standard resume formatting). SOF ¶¶ 3-4, 7. These alone are sufficient to establish personal jurisdiction through intentional conduct, but there is more.

The record also reveals that, on July 22, 2024, Schupmann sent Tice and another employee of RUSA an email with an opportunity for a job, saying "Here are the details for those skylights in Monroe we talked about earlier." SOF at ¶ 17. The email in question shows, on its face, that the skylight opportunity was taken from Fortis. *Id.* Tice received the email and he and his employees would have seen that the information originated with Fortis, but even beyond that, he clearly indicated his awareness that the Coca-Cola opportunity was a "national account" of Schupmann's at Fortis. *Id.* at ¶ 18.

The physical location of Tice and Schupmann "does not tell the whole story" because it overlooks the fact that these men intended to usurp the national account of a

Colorado business—that was their "ultimate purpose," and it was intentional. *Dudnikov*, 514 F.3d at 1075; *contra* Motion at 9. Almost two decades ago, the Tenth Circuit held that it "is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications," holding that "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [courts] have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 1075–76 (citation omitted). As in *Dudnikov*, RUSA's "express aim" was to poach a Colorado company's employee relationships, interfere with their contracts with a Colorado company, and explicitly to take actions to usurp Fortis's business relationship, i.e., its "national account" with Coca-Cola. *Id.*; SOF ¶ 18.

Grynberg v. Ivanhoe Energy, Inc., cited by RUSA, is inapposite. 490 Fed. App'x 86 (10th Cir. 2012); Motion at 9. There, unlike here, minimum contacts were not shown where the plaintiff only identified conduct that was "connected in an attenuated fashion to Colorado" and made only "broad assertions that the defendant's conduct was 'related' to Colorado" without further explanation. 490 Fed. App'x at 97. That is not the case here. Fortis's allegations amply show that RUSA's conduct was knowingly and intentionally directed at interfering with *Fortis's* contracts with its employees, *Fortis's* business opportunities, and *Fortis's* customer relationships. As in *Dudnikov*, RUSA targeted a "known [Colorado] business" and RUSA "*knew* that the brunt of that injury would be felt by" Fortis in Colorado. *Dudnikov,* 514 F.3d at 1076, 1072. RUSA wanted to hire—and did hire—Fortis's employees, causing them to breach their agreements and fiduciary duties. That is an intentional action purposely and knowingly directed at a Colorado resident.

13

Moreover, RUSA's protest that it did not know that Fortis was located in Colorado is unavailing. "[W]hile defendants are of course free to pursue that defense in later stages of this litigation, plaintiffs have alleged that defendants knew the location of their business," and, as in *Dudnikov*, this allegation does not "rest on conjecture or supposition, but on well-pled and record facts." The facts, taken in the light most favorable to Fortis, show that Fortis has satisfied its burden to make a prima facie showing that RUSA took (a) "intentional action[s]" that (b) were "expressly aimed at" Colorado, with (c) "knowledge that the brunt of the injury would be felt in [Colorado]." *Dudnikov*, 514 F.3d at 1072 (citing *Calder*, 465 U.S. at 789). RUSA had minimum contacts and personal jurisdiction is appropriate. The Court should deny the Motion.

C. <u>Exercising Jurisdiction Over RUSA in Colorado is Reasonable.</u>

Because Plaintiff's injuries arise from RUSA's minimum contacts in Colorado, the burden shifts to RUSA to make a "compelling case" that exercising jurisdiction offends fair play and substantial justice. *Burger King Corp*., 471 U.S. at 477-78. Courts engage in a five-factor reasonableness test to assess whether the exercise of jurisdiction offends due process, even when the plaintiff has established the defendant's minimum contacts. *Old Republic Ins. Co*., 877 F.3d 904-06. The factors are: "'(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.'" *Id.* at 909. "The strength of these factors sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be

required." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1095 (10th

Cir. 1998). Each of these factors favors a finding of personal jurisdiction in this case.

On the first factor, litigating in Colorado is not constitutionally burdensome to

RUSA. RUSA's attorneys, Taft, have an office in Denver and currently represent

Defendant Schupmann, and have done so since the inception of the case. Until

recently, Taft also represented Defendant Trident. Roofing USA was only just added to

this case, but it has long been involved—for example, its CEO, Brian Tice, was both

deposed and testified in court at the preliminary injunction stage of the case. Given

modern travel and telecommunications, it is not unduly burdensome to require [RUSA's]

representatives to travel or call from [South Carolina] to Colorado. *Watson v. Dillon

Companies, Inc.*, 615 F. Supp. 2d 1221, 1228 (D. Colo. 2009); *see also, e.g.*, *AST

Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1061 (10th Cir. 2008) (holding

that it was not unduly burdensome to require an English company to litigate in Colorado

thanks to "modern transportation and communications" and where the Company's

president had previously demonstrated his "ability to journey to the United States.")

On the second factor, Fortis is a Colorado resident and "[s]tates have an

important interest in providing a forum in which their residents can seek redress for

injuries caused by out-of-state actors." *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428

F.3d 1270, 1280 (10th Cir. 2005) (quotation omitted). Federal courts nationwide find this

factor weighs in favor of exercising jurisdiction where the forum state wishes to protect

its citizens from misconduct. *See, e.g., Paz v. Brush Engineered Materials, Inc.*, 445

F.3d 809, 814 (5th Cir. 2006) (weighing the forum state's interest in protecting its

citizens from a tort as a factor in favor of finding personal jurisdiction). Here, Colorado

has a strong interest in protecting Colorado businesses from precisely the conduct alleged here—injury at the hands of unscrupulous out-of-state actors who interfere with the contractual relationships of residents, engage in unfair competition, harm local business, damage the local economy, and who aid and abet breach of fiduciary duties to Coloradans.

As for the third factor: Fortis's interest in convenient and effective relief at home is obvious: Fortis and its owner reside in the state and filed this case in Colorado. Moreover, this case has been ongoing for more than a year against multiple defendants in Colorado. It will absolutely be inconvenient and inefficient if Fortis is required to proceed in a separate forum, piecemeal, against RUSA alone. Courts in this district have recognized that Plaintiffs have a "strong interest in having all the defendants in a single lawsuit rather than pursuing piecemeal litigation," particularly where "other defendants do not dispute jurisdiction." *Watson*, 615 F. Supp. 2d at 1228. Here, as in *Watson*, there is personal jurisdiction against all of the other Defendants, and the case should proceed here, in a single lawsuit. *Id.* While RUSA casually argues that Fortis has not shown that "relief would be impossible in a different jurisdiction," Motion at 14, that does not cause this factor to favor it where Fortis would certainly be burdened unduly if it must sever its claims against RUSA and pursue them in a distant state. Not only that, but RUSA's attorneys *already represent* one of the Defendants in this case—Schupmann. It is clear that it would be most efficient for the parties, not to mention the federal court system, to keep this case unified in one forum.

The fourth and fifth factors are related: they are the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the "shared

interest of the several states" in furthering social policies. *Pro Axess, Inc*., 428 F.3d at 1274. "Key" considerations on the fourth factor are "the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI Holdings, Inc.,* 149 F.3d at 1097. Here, to grant RUSA's motion will *require* piecemeal litigation.

Moreover, "[s]ince all of the defendants come from different states, no other single state has a greater interest in resolving this matter than Colorado." *Watson*, 615 F. Supp. 2d at 1228. As in *Watson*, the state with the greatest connection to and interest in this matter is Colorado. Moreover, the judicial system's interest in avoiding piecemeal litigation and waste of resources is strong. This case has been pending in this court since 2025, and it should stay here. While a number of the witnesses certainly reside outside of Colorado, at best they reside in a hodge-podge of different states. In this age of remote work, it is by pure chance that Schulz and Schupmann do not reside in Colorado—but they worked for a Colorado company, and the litigation is best suited to proceed here.

RUSA vaguely remarks that "several other relevant jurisdictions" have policy interests that relate to this case—without saying which ones, or why Colorado's interests shouldn't win the day. Motion at 15. Colorado has a strong interest in protecting its citizens from torts, and everyone has an interest in avoiding piecemeal litigation. It would be less efficient for everyone involved if the claims against RUSA are dismissed and refiled in a new forum. Taken together, each of these considerations favors Fortis. The Court should conclude that the exercise of personal jurisdiction over RUSA comports with traditional notions of fair play and substantial justice.

## CONCLUSION

For the foregoing reasons, Fortis requests that the Court deny RUSA's Motion to

Dismiss, permit the case to proceed, and grant such other and further relief as the Court

may deem just and proper.

DATED this 14th day of July, 2026.

Respectfully submitted,

SENN FORTIS, LLC

*/s/ Lenora B. Plimpton*
Christine K. Lamb, Atty. Reg. #30326
Lenora B. Plimpton, Atty. Reg. #48194
Megan M. Ratcliffe, Atty. Reg. #56489
Senn Fortis LLC
1700 Lincoln Street, Suite 2100
Denver, CO 80203
Telephone: (303) 298-1122
clamb@sennfortis.com
lplimpton@sennfortis.com
mratcliffe@sennfortis.com
*Attorneys for Plaintiff/Counter-Defendants*

18

## CERTIFICATION REGARDING THE USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to Judge Nina Wang's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, undersigned counsel hereby certifies as follows:

1)      The individuals who contributed to the drafting of this filing used tools provided by Harvey, which is a Generative Artificial Intelligence ("AI") platform, to prepare this filing. AI was used to prepare this filing only in limited administrative ways, such as for proofreading.

2)      No language in this filing was drafted by or generated by AI, and no legal citations in this filing were drafted, written, or generated by AI.

*/s/ Lenora B. Plimpton*
Lenora B. Plimpton, Atty. Reg. #48194

19

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2026, I served the foregoing **PLAINTIFF'S RESPONSE TO ROOFING USA, LLC'S MOTION TO DISMISS THIRD AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kellie Nelson Fetter
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Telephone: (303) 299-8354
Facsimile: (303) 298-0940
kfetter@taftlaw.com
*Attorney for Defendant David Schupmann*

Todd Rowden
Taft Stettinius & Hollister, LLP
111 East Wacker Suite 2600
Chicago, IL 60601
TRowden@Taftlaw.com
Phone: 312.836.4060
Fax: (312) 527-4011
*Attorney for Defendants David Schupmann and Roofing USA, LLC*

Gary J. Benson
Denesh Chukkapalli
Dworkin, Chambers, Williams, York, Benson & Evans, P.C.
3900 East Mexico Avenue
Suite 1300 & Suite 820
Denver, CO 80210
303-584-0990
Fax: 303-584-0995
Email: gbenson@dnvrlaw.com
dchukkapalli@dnvrlaw.com
*Attorneys for Defendant Charles Schulz*

Gabriel D. Pinilla (CO Bar # 54504)
Uriel Martinez (CO Bar # 57394)
ADAMS & REESE, LLP
1001 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 970-2156
Gabriel.Pinilla@arlaw.com
Uriel.Martinez@arlaw.com
Alisyn.Bukowski@arlaw.com
*Attorneys for Defendant Installation Services dba TopKey Construction*

*Via U.S. Mail*:
Trident Solutions of Sugar Grove
c/o David Schupmann
0S440 Crego Place
Geneva, IL 60134

/s/ Lenora B. Plimpton
Lenora B. Plimpton
SENN FORTIS LLC

21