Brian Tice    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

FW-CO, INC., d/b/a
FORTIS WARRANTY,

    Plaintiff,        Civil Action File No.

                     4:20-cv-00190-HLM-WEJ

vs.

                     1:25-cv-00254-HLM-WEJ

CHARLES SCHULZ,
DAVID SCHUPMANN, and
TRIDENT SOLUTIONS OF
SUGAR GROVE, LLC,

    Defendants.

DEPOSITION OF BRIAN TICE
April 15, 2025
2:37 p.m. - 5:49 p.m.
TAKEN BY REMOTE VIDEOCONFERENCE

Shawn E. Fleck, RPR, CCR #2859

**EXHIBIT 9**

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 55

Q.  I think we've been going for an hour. Should we take a little break?

MR. MILLER:  Sounds great.

MR. ELKON:  Okay.  I can give you five minutes, 10 minutes.  Whatever you all prefer.

THE WITNESS:  Five is fine with me.

MR. MILLER:  Five, it is.

MR. ELKON:  Five minutes.  See you at 3:45.

(Recess 3:41 p.m. - 3:49 p.m.)

BY MR. ELKON:

Q.  Mr. Tice, how did you first become aware of Mr. Schupmann?

A.  Through a recruiter.

Q.  Who was the recruiter?

A.  Thomas -- okay.  I mean, I can pull it up real quick, and find it for you, if you want.

Q.  If you want to, sure.

A.  Sure.

His name was Thomas Burges -- it's got a hyphenated last name.  Burges, B-U-R-G-E-S, dash, Lumsden, L-U-M-S-D-E-N.

Q.  L-U-M-S-D-E-N?

A.  Correct.  Yeah.

Q.  Okay.  Had you guys hired the headhunter?

A.  Yes.  Yeah.

Brian Tice                                                  April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 56

Q.   What -- what sort of instructions did you give to the headhunter?

A.   I was looking for a VP of sales.

Q.   When --

A.   So again, it was like the big -- the big hole in the business was someone to help me grow a sales team.

Q.   Okay.  And when did you tell the headhunter to put up that bat signal?

A.   It would have been --

MR. MILLER:  Object to the form of the question.

You can go ahead and answer, Brian.

MR. ELKON:  Is bat signal too vague, Pat?

MR. MILLER:  Yes.

BY MR. ELKON:

Q.   Okay.  When did you give that instruction to Mr. Burges-Lumsden?

A.   Oh, now I get it.

I would have said like May -- May time frame.  It was somewhere around then.  Yeah, May.

Q.   May 2024?

A.   Correct.  Yes.

Q.   Okay.  What did you tell them you were looking for in a VP of sales?

Brian Tice                                           April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 57

A.   I told them that I was looking for somebody who had built and grown -- like had -- had built and had hands-on experience growing a commercial service sales team.

I cared more about some sales background, and secondarily, about commercial roofing experience.

And, yeah, obviously, he found David, and I was just like, wow, okay, this is perfect.

Q.   So it was more important for you to find somebody who could build -- build a sales team, based on experience building a sales team, but the fact you found somebody who could have done it in the roofing business was more important to you; right?

A.   It was just kind of like the thing that kind of pushed it over; yeah.

Q.   Were you aware of or did you have any discussions about his building of a sales team at Tecta?

A.   Yeah.  That was what we -- I mean, again, it's been a long time, but that was -- this is the memory I have, is that that was what we spent most of our time talking about.

Q.   Okay.

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 58

A.   Was that, kind of, 20-year period.

Q.   So tell me about your first communications with Mr. Schupmann.

A.   It was a Zoom video.  And, you know, frankly, I didn't -- I hesitated to talk to him, even, because I think what I was wanting to hire was, you know, a 33- to 34- or 35-year-old kind of midlevel VP or director of sales that could come in here, and just be a grunt on the ground, recruit people, train them, get them on the ground.

And when Tom presented Dave to me, I mean, this guy's like -- like a roofing Jedi.  So like I -- I mean, he's way -- he's going to be way out of my price point.  He's going to be way out of my -- like, yeah, I honestly hesitated, because I was a little intimidated by his level of experience in the roofing industry.

And I was like, I mean, we're just like a -- we're a couple of boneheads over here, trying to put this thing together.  Like this guy's been in the industry for decades.  He's worked at the biggest company -- one of the biggest companies in the country.

So I actually kind of looked at it more like let me have a call with him, see how it goes.

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 60

This is what?  May, June 2024?  Something in there?

A.  Yeah.  Probably June time frame.  Yeah.

Q.  What -- what else do you remember about that initial call?

A.  Not much more than, like, I got along with him a lot better than I thought.  I think he was -- he was less intimidating than I kind of expected.

And it seemed like he liked me, and what we were trying to do, and he seemed interested in wanting to try to help us.

Q.  Did he mention to you, at that stage, that he had a restrictive covenant agreement or an employment agreement with Fortis?

A.  I don't remember precisely.  So, like, the first couple of meetings are kind of blurry, right, where it's hard to tell exactly if it was in the first call, second call, or whatever.

It was pretty quick that he told us, but I couldn't -- I couldn't swear under oath that it was in that very first call or not; right?  But it was pretty quick that he kind of told us there was one.

Q.  Within the first few conversations, he mentioned he had a noncompete agreement; right?

A.  Yeah.  Yeah.

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Brian Tice
April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 61

Q. What specifically did he mention?

A. I think, at that time, is when he told us a little bit about what Fortis did, and just like vaguely kind of described the service that they offered there, and what he did for them.

And, like, again, I don't want to say, like, verbatim exactly what he told me, but my takeaway was like, okay, if he comes here, we can't, like -- we're not going to -- we can't go starting to sell, like, long-term warranties. We can't go over, like, warranty service -- like warranty as a product. And there's going to be, like, clients that we can't go after.

And he said that he would have to be very careful about not -- he was kind of like -- I just remember his demeanor was like he wanted to be respectful of the noncompete. Taking it very seriously, and saying, like, look, man, there's going to be, like, things I can't go do.

And I said I don't -- I don't -- my message was, that's stuff is five, six, seven, eight years. I don't know. Whatever. Like here's what I need. We've got to build a sales force to go talk to these, like, local companies, and teach them who we are, and get them selling. We have zero sales.

Brian Tice                                        April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 64

work for anyone else without the Fortis CEO's permission, at least while he's at Fortis; correct?

MR. MILLER:  Object to the form, and to the extent that it calls for a legal conclusion.

You can answer, Mr. Tice.

A.  Yeah, will you ask that again, please?

BY MR. ELKON:

Q.  Sure.  I mean, looking at the language that I have -- no, I don't.  Not that.

Looking at the language that I've highlighted here, Mr. Schupmann had agreed to devote substantially all of his business time, attention, and skills in the performance of his duties as an employee of Fortis, unless otherwise authorized in writing by Fortis's CEO.

Do you see that?

A.  I do.

Q.  Okay.  You were not aware of this restriction when Mr. Schupmann was working for Fortis; right?

A.  No.

Q.  Okay.  Mr. Schupmann described to you that he had an agreement with restricted covenants in it; correct?

A.  Yeah, I -- I don't want to say yes to those

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 65

specific words, because I don't remember those specific words.  I just remember, again, my takeaway was that there are -- like if he was to come and potentially work for us, then there would be products that we couldn't try to sell, and that there would be customers that we couldn't go after.

Q.  Okay.

A.  And that he had a non -- and that he had a noncompete in place, and it was for a period of about two years.

Q.  Right.  So you understood, at least, that he had a noncompete restriction with Fortis that lasted for two years after the end of his employment; right?

A.  Yeah, that's fair.

Q.  And you also understood that he had some sort of restriction, in terms of what customers he could solicit based on an employment agreement with Fortis; correct?

A.  Generally, yes.

Q.  Okay.  But you never asked to see the specific contract that he was referring to?

A.  Nope.

Q.  And he provided it to you; right?

A.  Nope.

Brian Tice                        April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 66

Q.   Okay.   So if I scroll down here, you don't know what his compensation was at Fortis, you don't know what his severance rights were, and you specifically don't know if he had confidentiality obligations, non-solicitation of employees' or customers' obligations, the noncompete?

You've never seen any of this; correct?

A.   Correct.

Q.   Had you ever hired an employee before at any of your prior ventures, where you were hiring from a competitor?

A.   I didn't see this as a competitor.

Q.   That was not my question, Mr. Tice.   I'm talking prior to hiring Mr. Schupmann, in all your business experience, had you ever hired somebody from a competitor?

A.   No.

Q.   Okay.   And so not having seen this agreement, you didn't understand how competitor was defined within Mr. Schupmann's agreement with Fortis; correct?

A.   Correct.

Q.   Okay.   And what you knew about Fortis was based on what Mr. Schupmann had told you; right?

A.   Correct.

Brian Tice                                  April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 67

Q.   You didn't do any sort of independent research on what Fortis did; correct?

A.   Other than just going to the website, and trying to -- like watching their promotional materials there, no.

Q.   Okay.  And so Mr. Schupmann told you that Fortis was, I think you said, predominantly a warranty company; right?

A.   Correct.

Q.   And you went to Fortis's website to see how they market themselves; right?

A.   Correct.

Q.   And it's your understanding, I guess based off of what you saw at the website, that Fortis markets itself as providing solutions to companies in need of roofing -- well, strike that.

What is your understanding, in terms of Fortis's offerings, based on your review of the website?

A.   It's probably been a year since I've been on the website.  My takeaway was that businesses that were going to be told they needed to replace their roofs, that Fortis could offer an alternative, kind of, financial product that would basically guarantee the roof for 10 years or some period like

Brian Tice                                April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 68

a 10-year period at a fraction of the cost, and they would bear the burden of that liability.

Q.   Okay.

A.   Does that make sense?  Oh, sorry.  I'm not allowed to ask questions.  Sorry.

Q.   It's fine for you to say that something makes sense or doesn't make sense.  You can ask that question.

Okay.  So like I'm looking at their -- the Fortis website right now.  In fact, I can share my screen on this.

MR. MILLER:  And, Mike, while you're pulling that up, I'm going to object to the extent that we don't know that the website is the same as when Mr. Tice might have seen it.

MR. ELKON:  Right.  And I can ask him that question.

BY MR. ELKON:

Q.   Okay.

Okay.  Mr. Tice, do you see Fortis's website that I pulled up here?

A.   I do.

Q.   Okay.

Okay.  So the -- broadly speaking, what they're saying is, protect your roof, preserve your

Page 70

different product than what we offer.

Q. Well, it serves the same need; correct? Like if I have -- I'm a commercial developer, right, and I've got a portfolio of commercial real estate; right? I can go to Fortis, and I can say, you know, I can buy the reconditioning of the warranty from you for 10 years from now. My roof's under warranty, and, you know, you're going to be responsible for repairs. Right?

I could also go to Roofing USA, right, and I can have -- I can get put on a maintenance plan, and you guys show up, and make sure that the roof is up to spec, looks good, and then over the course of however long I'm on the maintenance plan, I am going to have you do the repairs to make sure that the roof stays up to code. Right?

A. Yes. But we're not warranting the roof. We're -- right? Like we're not warranting that that roof is going to last any time -- any amount of period. We're just providing --

Q. Right.

A. Yeah.

Q. The warranty is an offering. I mean, Roofing USA offers warranties; right? It's just a different warranty than what Fortis offers; correct?

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 71

A.   We warrant our workmanship, right, not a roof life or -- or anything to that extent.   We warrant our workmanship.

Q.   Right.

A.   So we warranty -- yeah.

Q.   It's a warranty, but a different warranty than what Fortis offers; correct?

A.   Yes.

Q.   Okay.   But, I mean, like I'm approaching it from the perspective of I'm a commercial real estate developer.   I've got a portfolio -- the Fortis solution is one solution that I could have for my roofing needs.   The Roofing USA solution is another solution.

Fortis may go about it solving my problem a little differently than you would, because their warranty is different, but they could both solve the same problem that I have, which is I've -- I want to extend the life of my roof, and minimize my roofing expenditures; correct?

A.   (Pause.)

Yeah, I mean, again, I'm just trying -- my brain is going down like -- you know, the method of the warranty seems material to me, but I think what you're asking is -- isn't material to the customer.

Brian Tice                                           April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 72

Q.  Well, just that Fortis and Roofing USA are offering two different solutions to the same customer need?

A.  Okay.  Yes.

Q.  That's accurate?

A.  Uh-huh.

Q.  Sorry.  That's a "yes"?  That's accurate?

A.  Yes.  Oh, yes.  Yes.

Q.  All right.

Okay.  And then sort of scrolling down, like if I take a look at this piece right here; right?

No, I didn't want to do that.

So prolonging the performance life of a commercial roof, that is essentially something that Roofing USA offers in its sales pitch, as well; right?

A.  Yes.

Q.  Reducing the overall costs of managing roof assets, that's something that Roofing USA offers; correct?

I mean, you guys are selling that you're going to reduce the overall cost of managing a roof; correct?

A.  Yes.

Page 77

right fit here.

So he came down for that visit, and then, you know, shortly afterwards, I think we started having a discussion of what -- what it would look like to be full-time.

And he started to talk a little bit about his compensation levels, and we were just like, look, man, like we're a bootstrap startup here. There's just no way. And, I mean, we never really got into the details. It was just like the ranges of things.

And it was -- we were like, okay, well, we're going to pivot here a little bit. And that's when he mentioned, hey, maybe I could just help, you know, more like on a weekly -- like let me help you guide your sales calls. Let me give you some -- let me sit in on those. Let me kind of help you run those meetings. Let me help you just kind of set some KPIs for you guys.

You know, be more like on a consulting side. And so that's what we started to do for the next six months.

Q. So when did the consulting relationship start?

A. I would have said August time frame. Early

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 78

August.

Q.   Okay.

A.   I mean, again, those dates are roundabout.
I can always go back, and try to find them more
accurately, but that's going to be pretty close.

Q.   So 2024, August, Mr. Schupmann starts
consulting with you.

I assume Mr. Schulz, Charles Shulz, is also
involved?

A.   Not right away.  I think Dave sat in on a
couple of meetings with us, and then I think he --
he's like, hey, I've got another guy I'd like to
bring in on this agreement, and kind of have him
help a little bit, too.

And it was -- so I would have said maybe
like a few weeks into it, maybe.  Around the end of
August or so.  And that's when Charlie started.

Q.   Did Roofing USA pay Mr. Schupmann?

A.   Uh-huh.

Q.   Did it pay him directly, or did it pay him
through Trident?

A.   Through Trident.

Q.   What was your understanding about Trident,
and its role?

A.   That it was kind of like their -- you know,

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 79

it's what he and Charlie had set up to do these types of engagements.

And that's all I really understood.

Q. Okay.

A. It was just to kind of have an entity to pass through paychecks, and compensation.

Q. How much was Roofing USA paying Trident for this consulting work?

A. 10K a month.

Q. And from when to when was it making those payments?

A. Yeah, through -- you know, August through, I guess, middle of January.

Q. Middle of January is when Roofing USA hires Mr. Schupmann full-time; right?

A. Yeah.

Q. After he was fired by Fortis?

A. Yes.

Q. Okay. So I have some text message exchanges that I wanted to ask you about. And I'm pulling up the first one. I'm just trying to find it.

There we go. Okay.

(Plaintiff's Exhibit 5 marked.)

BY MR. ELKON:

Brian Tice                                    April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 88

Q.   Okay.   Do you know if you guys hired him or not?

A.   We did not.

Q.   Okay.   And then Enzo and Evan -- you definitely hired Enzo; right?

A.   We did.

Q.   Okay.   Because Enzo was reporting directly to Mr. Schupmann; right?

A.   Correct.

Q.   Okay.   And then Evan is -- that's somebody else you hired, or no?

A.   No, we did not hire Evan.

Q.   Okay.   I'm confusing it with Ellis, because you do have --

A.   Yeah.

Q.   Okay.

So, I mean, essentially, the process is, it's a collaborative effort among the four of you to hire salespeople for Roofing USA; right?

A.   Correct.

Q.   Okay.   I mean, you -- you knew at this point at least that Mr. Schupmann is working for Fortis; right?

A.   Yep.

Q.   Did you ever ask him, like, hey, you know,

Brian Tice                                      April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 89

is your company okay with the fact that you're doing this side work for me?

A.   No.

Q.   Okay.   It wouldn't bother you if you had an executive working for you, and on the side is doing work for another company in the roofing industry?

A.   I mean, I probably wouldn't like it a whole lot.   I got -- at the same time, I started two of my companies when I was working at other businesses.

I mean, I've always felt like the executives had a little more leeway with their time, but it didn't really dawn on me to dive into that.

Q.   Right.   But, I mean, were you opening new businesses within the same industry?

A.   Real estate, but not in the specific industry.

Q.   Okay.   And specifically, like were you working on behalf of somebody in the real estate industry while somebody else is paying your salary in the real estate industry?

A.   No.

Q.   Here's another text exchange, if you want to take a look at it.

(Plaintiff's Exhibit 7 marked.)

BY MR. ELKON:

Page 106

Schupmann is doing the same thing, broadly speaking, for you that he was doing for Fortis; right?

MR. MILLER:  Object to the form.  You can answer.

BY MR. ELKON:

Q.  I don't mean presently.  I mean when you hired him.

A.  I don't really know what he did at Fortis.

Q.  But your understanding was he was in a role engaged in sales; correct?

A.  Yes.

Q.  At Fortis?

A.  Yes.

Q.  He was -- and your understanding was also that, at some point ni his employment at Fortis, he was managing a team below him; right?

A.  Yes.

Q.  Okay.  I mean, were you aware that his first title at Fortis was VP of sales and marketing?

A.  I believe so.  I believe that was on his resume at the time.

Q.  Okay.

A.  I believe.

Q.  And then he was the chief operating officer.  You had that understanding?

Brian Tice                                          April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 107

A.   Yes.

Q.   Okay.   And then his last job title there was, I think, enterprise sales manager?

A.   Yes.

Q.   You remember that, as well?

A.   Yes.

Q.   I'm sorry.   Director of enterprise accounts.   But you had that understanding, as well; right?

A.   Yes.   Yes.

Q.   So, I mean, broadly speaking, when you hire him, it's your understanding that what he's doing is consistent with what he had done with Fortis, and then what he had done at Tecta before that; right?

A.   As far as -- yeah.   High level account sales, and managing sales teams; yes.

Q.   So this communication with Graystar is consistent with what you brought him in to do; right?

A.   Yes.

Q.   Okay.

And then broadly speaking, when you bring him in, he's -- he's managing people on his sales team; right?

A.   Yes.

Brian Tice                                          April 15, 2025
FW-CO, Inc. v. Schulz, Charles

Page 144

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 22nd day of April, 2025.

Shawn E. Fleck, RPR, CCR #2859