Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00254-NYW-TPO

FW-CO, INC.,
d/b/a FORTIS WARRANTY,

  Plaintiff and Counter-Defendant,

RICHARD LEWIS,

  Counter-Defendant,

v.

CHARLES SCHULZ,
DAVID SCHUPMANN,

  Defendants and Counter-Claimants,

TRIDENT SOLUTIONS
OF SUGAR GROVE, LLC; ROOFING USA, LLC; and
INSTALLATION SERVICES LLC d/b/a TOPKEY CONSTRUCTION,

  Defendants.

---

## DECLARATION OF GARY SCOTT REYNOLDS

---

  I, Gary Scott Reynolds, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

  1. I am over 18 years of age, of sound mind, and I am otherwise competent to make this Declaration. Everything in this Declaration is based on my own personal knowledge.

  2. I go by "Scott," which is my middle name.

  3. I currently live in Annapolis, Maryland.

  4. I am a former employee of Installation Services, LLC, d/b/a TopKey Construction ("TopKey"). I worked for Installation Services LLC, which later changed its

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

name to TopKey Construction, as a Project Manager from July of 2022 through November 18, 2024.

5.      During my employment, I reported to and worked closely with Dan Schardt ("Schardt"), TopKey's President and CEO, and I was closely involved in TopKey's extensive business dealings with FW-CO, Inc., d/b/a Fortis ("Fortis").

6.      I also worked closely with Nancy Dyer ("Dyer"), the Operations Director at TopKey. Her email was nancy@installservices.net.

7.      Dyer, Schardt, and I all frequently communicated with employees of Fortis.

8.      As a project manager, it was my job to manage client relationships and oversee projects.

9.      I began working with Fortis right when I started, in about August of 2022, and that is when I first met Fortis's Chief Operating Officer, David Schupmann, ("Schupmann") and his colleague Charlie Schulz ("Schulz"). When I started, TopKey had already been working with Fortis for some time. Fortis was a key partner and a major source of business for TopKey.

10.     It was my job, as project manager, to create proposals for roofing projects that TopKey would complete as a subcontractor to Fortis, and then to act as the manager of each project.

11.     I believe it was well known by all of us who worked with Fortis, including me, Dyer, TopKey partner "JVM," and Schardt, that Fortis was based in Colorado.

12.     The Fortis address appeared at the bottom of nearly every email we received from Fortis employees. For example, **Exhibit A** is a true and correct copy of an email I received from Schupmann on September 21, 2022, and it shows his email signature with Fortis's Denver address. This email chain also shows the amount of work I was doing with Fortis as part of my job at TopKey right from the start.

13.     Additionally, on September 21, 2022, Schulz explained to me via text message that Fortis's "hq office" was in Denver. *See* **Exhibit B**, which is a true and correct copy of text messages that I exchanged with Schulz early in my employment.

14.     I frequently exchanged email with Schulz and Schupmann, and their email signature lines were often included at the bottom of each of their emails. Their email signatures—as well as every other Fortis employee's email signature—always listed the Company's address as being at "50 South Steele Street, Suite 375 Denver, CO 80209"— which is what it was back then.

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

15.     When I worked for TopKey, my email address was sreynolds@installservices.net. Due to the systems we used, when I was sending proposals, my email would come from "mail@jobprogress.com."

16.     Fortis was easily TopKey's most important client—people at TopKey even used to call me "Mr. Fortis" because so much of my work revolved around Fortis. I did over 100 Fortis-related jobs, generating far more revenue than any other client relationship we had.

17.     Schardt and other members of TopKey's management were certainly aware of the revenue that we generated from working with Fortis—because it was a major source of business for us. In fact, Schardt and Schulz referred to TopKey as Fortis's "partner," both in communications together and externally, with third parties. *See* **Exhibit C**; **Exhibit D**.

18.     At one point, Fortis and TopKey discussed entering into a formalized "Strategic Contractor Partner Agreement." **Exhibit E** is a true and correct copy of an email I received from Shannon Dinsdale ("Dinsdale"), Accounting Manager at Fortis on February 1, 2023. The other TopKey employees on that email were Leslly Calderon, the Business Operations Coordinator, and Dyer, the Operations Director. In that email, Dinsdale was presenting TopKey with documents to formalize the partnership between our companies. In her email she attached a "Strategic Contractor Partner Agreement".

19.     Fortis would identify roofing projects through its sales team—Schulz and Schupmann—and TopKey would serve as the installation subcontractor. The relationship was strong and high volume—and it had been in place since before I started, and for the duration of my employment with TopKey.

20.     Typically, Schulz or Schupmann would instruct me to go inspect a roof at a Fortis client site. I would fill out Fortis's paperwork, grade the roof using their rating system, and report back. If the inspection turned up work, TopKey got the job through Fortis. That was the business model and it was lucrative for both companies.

21.     As a TopKey project manager, I communicated with Schulz and Schupmann practically every day for a year and a half, sometimes multiple times a day.

22.     Everyone at TopKey, including Schardt, knew that Fortis was located in Colorado. It was unmissable: As far as I recall, every work order, every email, and every piece of Fortis paperwork had Fortis's Denver address on it.

23.     One of the main things I did was creating proposals for the cost of our Company to do roofing work that would be bundled into Schulz and Schupmann's services and product offerings. They would instruct me to charge a higher price than my proposal, which I found odd. I figured out that the higher prices were being kicked back

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

to Schulz and Schupmann by TopKey. They called it a "finder's fee"—but it didn't make sense to me that someone would get a finder's fee simply for doing their job.

24.     I figured out that something shady was going on and it didn't seem right—these guys were working for Fortis, getting salary and commission from Fortis, *and* they were padding the numbers to get themselves more money. I started to get a weird feeling about it. And if I could see that this was happening, so could Schardt and the other leaders at TopKey.

25.     At the beginning Schulz and Schupmann were using their Fortis emails, but later they used their own company—Trident—and all of their emails about the purported "finder's fees," which they often described (inappropriately) as "referral fees" or "mark ups," went through Trident. They specifically asked me and Schardt to always use their Trident email addresses when the topic involved the kickback payments.

26.     One time, I mistakenly used Schupmann's Fortis address instead of his Trident email address regarding something to do with one of the kickbacks, and he called me and told me not to use the Fortis address anymore but to instead use his Trident email "so that nothing is flagged."

27.     It was obvious that the purpose of Trident was to accept these fees. It didn't take much to figure out that Schulz and Schupmann were going behind Fortis's back to take the money. It was also clear to me that Schardt knew this, too. But Schardt was profiting from all the work that Schulz and Schupmann were feeding to TopKey and didn't want to change that. Thanks in large part to Fortis, when I worked at TopKey, we were on track to double our revenue.

28.     At one point when I questioned the involvement of Trident, Schardt told me, in effect, "don't worry about it."

29.     Schulz would often ask me to increase the dollar amount of our proposals above what I normally would do, and then we were kicking back money to Trident at a rate of about 7.5% on top. I suspected strongly that the "referral fees" were actually just Schulz and Schupmann skimming money off the top. Trident was their way of doing that secretly, and undetected by Fortis.

30.     I did not like what was going on and I was getting increasingly uncomfortable. Dyer also told me that she was uncomfortable with the way things were going.

31.     The kickback arrangement between TopKey and Trident was structured and ongoing.

32.     **Exhibit F** is a true and correct copy of an email chain that I was included on, involving a conversation between Schardt and Schupmann about the kickback

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

scheme. In this thread, you can see how it worked: I would create proposals for TopKey to do work on "reroofs" for Fortis projects. Then, my proposals were marked up by at least 7.5% and the inflated price would be packaged into the Fortis product and passed along to the end customer.

33.    I understood that Schulz and Schupmann either told or implied to TopKey (i.e. Schardt) that if it did not pay the "referral fees" via the inflated proposals, Schulz and Schupmann could find another contractor who would.

34.    Schardt played ball—he wanted the Fortis work, and the fees were the cost of keeping it. I remember him telling me and Dyer: "If you guys want your money, your commission, keep doing what they want you to do."

35.    I was also copied on earlier invoices with similar structures. In June 2023, Schulz sent Invoice 997 for kickbacks on projects in West Memphis, Arkansas; Zanesville, Ohio; and Glen Burnie, Maryland. In August 2023, he sent Invoice 998, which included a $144,850 fee for Park Shirlington alone. Mr. Schardt was on both emails.

36.    When it comes to the so-called Trident "referral fees" paid by TopKey, it is simply not true that TopKey only provided them because "[a]t all times," it "understood that Fortis was not interested in pursuing said project or had elected to decline to bid on same," as Schardt stated in his declaration. The reality was that these projects were done with Fortis and TopKey working together.

37.    For example, **Exhibit G** is a true and correct copy of an email thread that I was on, along with Schulz and Schardt. In this email, you can see that I had created a proposal to do certain roofing work for Fortis, on a Coca Cola facility in Zanesville, Ohio. Schulz wrote me back and asked me and Dan to "please add $509 to the proposal here so your internal price will be $16,427.00" but the proposal submitted to Fortis would be much higher. Schulz was very clear that, once we inflated the proposal, "The payout to Trident will be $5k even after your [sic] are complete and paid out."

38.    **Exhibit H** is another example of this. In this email, you can see that I had issued a roofing proposal for the "Norfolk" project to Schupmann at his Fortis email. I proposed doing the project for Fortis for about $8,000. Here, it shows how Schulz took my proposal from his Fortis email account and sent it to his personal iCloud email. Then, from his Trident email, Schulz asked me (copying Schardt) to "resubmit the proposal attached" to reflect a new, higher sales price—higher by about $3,500. The difference between the two prices was "the Trident mark up for this project"—this markup was a kickback that Schulz expected TopKey to pay to him and Schupmann via Trident, and which TopKey did in fact pay.

39.    TopKey—through me, Schardt, Dyer, and others—knew that the referral fees were actually secret kickbacks—kickbacks that we were enabling by submitting inflated estimates and paying Fortis's self-dealing employees behind Fortis's back.

5

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

40.     In fact, the kickbacks or "referrals" that TopKey paid to Trident, or, before Trident was formed, to Schulz and Schupmann, were for work that TopKey got as a subcontractor to Fortis but it was work directly tied to the services that Fortis was providing.

41.     Park Shirlington was only one of these—there were many others.

*Park Shirlington*

42.     Park Shirlington was one of the many Fortis projects I worked on with TopKey; but it was a particularly large and memorable one—and it perfectly captures the wrongful conduct that I personally saw from TopKey, Trident, Schulz, and Schupmann.

43.     Park Shirlington was a roofing project at an apartment complex in Arlington, VA, with a total project contract that was to exceed $1 million—the roofing work needed was substantial, and everyone stood to make money.

44.     I was involved in managing Park Shirlington from the start: preparing the proposal, participating in inspections, and coordinating with my boss, Schardt, as well as Fortis's representatives Schulz and Schupmann on scope, project needs, and terms. Naturally, as the project manager, I was on most of the emails involving the project, including those between Schardt and Dyer for TopKey, as well as Schulz, Schupmann, and certain other Fortis employees. Sometimes the general contractor for the apartments was on the emails or the email threads, as well.

45.     On September 27, 2022, I created an initial proposal for the Park Shirlington re-roofing job, to be completed by TopKey as a subcontractor to Fortis, which I sent to Schupmann. **Exhibit I** is a true and accurate copy of the original proposal that I sent.

46.     It was a huge project: Everyone at TopKey, including Schardt, knew about the Park Shirlington project and knew that it was a project that was coming to us through our relationship with Fortis.

47.     Schardt was involved at every stage and oversaw the entire process. He frequently coordinated and communicated with Fortis employees as we worked out the project details, and he included me in critical communications. In short, Schardt not only knew about the Park Shirlington project, but he was involved at the highest levels, including in negotiating the deal with Fortis. As my supervisor, he managed and directed my work on the project at all times.

48.     In April and May of 2023, Schardt was talking to Schulz and Schupmann about "our partnership" and trying to get them to come visit our facility, and including me on all of the emails. *See* **Exhibit J**, which is a true and correct copy of an email chain that I received.

6

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

49.     At that point, these conversations were taking place through Schupmann and Schulz's Fortis email addresses. We were all discussing the different projects that TopKey (at the time called Installation Services) could do with Fortis. I suggested that we add Coca Cola to our discussions, because I knew that Coca Cola was a huge Fortis client with a lot of roofing needs. *Id.*

50.     In early May, Schupmann and Schulz came out and visited us, and Schardt was very excited about our partnership with Fortis. *See* **Exhibit K**, which is a true and correct copy of an email thread I received.

51.     On May 24, 2023, Schardt emailed me (sreynolds@installservices.net) and Schulz (cschulz@fortis.us.com), directly, copying Schupmann (dschupmann@fortis.us.com) and telling me that he wanted to "connect early AM" with me regarding the Park Shirlington project, which needed to get started soon—the general contractor (Whiting-Turner) was eager to get going. *See* **Exhibit L.**

52.     That email was in response to Schulz, who had forwarded the submittal list for the reroofing to Schardt, noting it was "IMPERATIVE we all sit down and talk prior to contract execution." *Id.* I was tasked with finalizing the Park Shirlington Contract and worked closely with Schardt on it.

53.     There can be absolutely no doubt that Schardt was aware of the project, that he was involved in all aspects, and that he pushed it forward towards contract signing and completion. Indeed, I recall Schardt also attended pre-construction meetings at the Park Shirlington job site, along with Fortis employees. *See, e.g.,* **Exhibit M**.

54.     He also knew about the Park Shirlington contract and, in fact, directed me to sign it on his behalf. **Ex. C** is a true and correct copy of an email that I received on May 25, 2023 from Schardt. In this email chain, you can see that Schardt was working directly with Schulz on the Park Shirlington project, and that Schardt looped me in, as was typical of my role. He said, "Scott will call you but we are working on putting this all together for IS/Fortis/WT." **Ex. C**. In that sentence, "IS" stands for Installation Services, and "WT" refers to the general contractor of Park Shirlington, Whiting-Turner.

55.     I was working closely every day during this time with Schardt, Schulz, and Schupmann, all of us trying to get the Park Shirlington arrangement sorted out and a contract finalized and signed.

56.     I signed the Park Shirlington contract with Fortis for Schardt on or about June 21, 2023, on Schardt's behalf and at his direction. He knew everything that was going on at this time and nothing was hidden from him.

57.     The reason that I signed for Schardt was that Schulz was pushing to get it signed quickly, but Schardt was out of town, so Schardt told me over the phone to go ahead. I did not and would never have signed without his permission. I was a project

Docusign Envelope ID: EA429A43-2A04-8968-82AE-9E0BB84E694C

manager, not an officer. I knew if I signed a contract, especially one of this magnitude, without authorization I would have been fired. The fact that I was authorized to sign for Schardt is also obvious from the fact that Schardt and TopKey never rejected the contract and even paid referral fees to Fortis for it.

58.    **Exhibit N** is a true and accurate copy of the contract I signed for Schardt via Docusign on June 21, 2023, at his oral direction and with his explicit authorization.

59.    Approximately a year later, on June 13, 2024, I was copied on an email where Schulz invoiced Schardt for the kickback fees on Park Shirlington. **Exhibit O** is a true and correct copy of that email. Invoice 999, which is attached that that email, shows that "Park Shirlington Referral Support" was a kickback of 7.5% of the project and $7,000 per roof. These were markups that were skimmed off the top by Schulz and Schupmann via Trident, in exchange for funneling work to us at TopKey.

60.    After receiving the invoice, Schardt pushed back on the number and calculated the fees himself: 7.5% on the reroof portion, plus $7,000 per roof section, totaling about $109,977. *See* **Exhibit P**, which is a true and correct copy of an email chain I received on and around June 14, 2024.

61.    I was subsequently included on numerous emails between Schardt and Schulz regarding the amount of the Park Shirlington kickback fees that Schulz was trying to collect from TopKey. A true and accurate copy of that email thread is attached as **Exhibit Q**.

62.    Schulz laid out the kickback deal very clearly: "The basics-your number to me had the 7.5% m/u innit from Scott I then added $7k per roof section replaced as well [sic]. That was the total amount in our proposal to Whiting for that replacement work." *Id.* In that email, I understood that "m/u" meant "markup." This is Schulz referring to the markups that he would have me put into my proposals, to account for the payments to Trident. *Id.*

63.    Ultimately, Schardt refused to pay me my owed commissions and in November of 2024 I'd had enough—I quit.


I declare under penalty of perjury that the foregoing is true and correct.

7/14/2026
Executed on _____ [DATE].

Signed by:
Scott Reynolds
127180183AEB4C7...
_____
Scott Reynolds

8