## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00254-NYW-TPO

FW-CO, INC.,
d/b/a FORTIS WARRANTY,

      Plaintiff and Counter-Defendant,

RICHARD LEWIS,

      Counter-Defendant,

v.

CHARLES SCHULZ,
DAVID SCHUPMANN,

      Defendants and Counter-Claimants,

TRIDENT SOLUTIONS
OF SUGAR GROVE, LLC; ROOFING USA, LLC; and
INSTALLATION SERVICES LLC d/b/a TOPKEY CONSTRUCTION,

      Defendants.

---

### PLAINTIFF'S RESPONSE TO INSTALLATION SERVICES, LLC
### D/B/A TOPKEY CONSTRUCTION'S MOTION TO DISMISS
### THIRD AMENDED COMPLAINT

---

Plaintiff/Counter-Defendant FW-CO, Inc., d/b/a Fortis Warranty ("Fortis"), through

counsel, hereby responds to Defendant Installation Services LLC d/b/a TopKey

Construction's Motion to Dismiss [ECF 164] (the "Motion") and states as follows:

## INTRODUCTION

Installation Services, LLC, d/b/a/ TopKey Construction ("TopKey") maintained an extremely intimate and longstanding business relationship with Fortis. Astonishingly, it now tries to disavow more than four years of work together, comprising thousands of emails, deals done together, roofing services proposed and provided, and even written contracts between it and Fortis.

## STATEMENT OF FACTS

Fortis incorporates the facts alleged in its Third Amended Complaint ("TAC") [ECF 153] and verified under penalty of perjury by Fortis founder and CEO, Richard Lewis, as if fully set forth herein. *See* Declaration of Richard Lewis in Support of FW-CO, Inc.'s Response to TopKey Construction's Motion to Dismiss at ¶ 15 ("Lewis Decl.") & Exhibits 1 through 9 thereto. In addition to the allegations in the TAC, the following additional facts ("SOF") are relevant to the Motion:

1.      Fortis started doing business with Installation Services, LLC (which has changed names a few times and is now calling itself "TopKey Construction") as early as May of 2020. Lewis Decl. at ¶ 5 & Ex. 1.

2.      In June of 2020, for example, TopKey was discussing entering into a formal "strategic partnership" with Fortis and the parties were exchanging emails and having phone calls on the topic. *Id.*

3.      At the time, Fortis's then-employee, Defendant David Schupmann ("Schupmann") was the SVP of Sales & Marketing, and it was Schupmann who was communicating with TopKey regarding the potential arrangement. *Id.* Schupmann's

2

email signature prominently featured the company's address at the time, which was 50 South Steele St. Suite 375, Denver, CO 80209. *Id.* at ¶¶ 4-5 & Ex. 1.

4.     On June 28, 2022, TopKey's Director of Operations, Nancy Dyer, signed, on behalf of TopKey, a "Mutual Confidentiality and Non-Disclosure Agreement" with Fortis (the "NDA"). *Id.* at ¶ 8 & Ex. 2. The NDA provides that it would be governed by the "laws of the State of Colorado" and it was counter-signed on or around February 1, 2023 by Schupmann on behalf of Fortis, with the address again listed at 40 South Steele St. #375, Denver CO 80209. *Id.* ¶ 8 & Ex. 2. Emails about the NDA also contained Fortis's Denver address in the signature block. *Id.*

5.     Gary Scott Reynolds ("Reynolds"), who goes by "Scott," was hired by TopKey in July 2022. He worked for TopKey through November 18, 2024 as a Project Manager. *See* Declaration of Gary Scott Reynolds ("Reynolds Decl.") at ¶ 4 [ECF 188].

6.     At TopKey, Reynolds worked closely with TopKey's President, Daniel Schardt, and was intimately involved in TopKey's business interactions with Fortis—to the point where people referred to him around the office as "Mr. Fortis". *Id.* at ¶¶ 5, 16.

7.     Fortis was a major source of business for TopKey, and Reynolds was aware that Fortis was based in Colorado, as was everyone else he worked with at TopKey. *Id.* ¶¶ 11-14, 22.

8.     When Reynolds started in August of 2022, TopKey had already been working with Fortis for some time. Fortis was a key partner and a major source of business for TopKey. *Id.* ¶¶ 9, 17. Schardt referred to Fortis as TopKey's "partner" in both internal and external communications, and Fortis did the same. *Id.* ¶¶ 17, 48, 50.

3

9.      Fortis's location in Colorado was "unmissable" and appeared at the bottom of almost every email that a Fortis employee sent, as well as in many other documents. *Id.* ¶¶ 22, 14.

10.     Reynolds worked on the Park Shirlington project extensively, and in close cooperation with and under the supervision of Schardt. *Id.* ¶¶ 5, 42-47, 51-57.

11.     It was Reynolds who created TopKey's original proposal to Fortis for the roofing work, in September 2022. *Id.* at ¶ 45.

12.     Reynolds signed Schardt's name on the Park Shirlington contract with Fortis at Schardt's direction. *Id.* at ¶¶ 54, 56-57.

13.     The Park Shirlington contract was signed by Reynolds, at Schardt's direction and in his name, on June 21, 2023. *Id.* ¶¶ 56-58 & Ex. N. The Park Shirlington Contract clearly indicates on the signature page that Fortis was located in Denver, Colorado, and it also called for dispute resolution to take place in "Denver County, Colorado." Ex. N at p.6.

14.     Schulz and Schardt would direct Reynolds to increase his proposals for roofing work for Fortis artificially, and the increase was called a "markup" or "referral fee"—but it was really a kickback to Schulz and Schupmann that TopKey would pay directly to their company, Trident. *Id.* ¶¶ 31-32, 35-38. This happened frequently and Schardt absolutely knew about it. *Id.* ¶ 34.

15.     Park Shirlington was one of the larger and more complicated of these deals. *Id.* ¶¶ 42-47, 51-62.

16.     The kickback amount for Park Shirlington was substantial—it was over $100,000, and this ultimately led to some back and forth and pushback from Schardt towards Schulz and Schupmann regarding the amount, and Reynolds was included on all of those emails. *Id.* at ¶¶ 59-62 & Exs.O, P, Q.

17.     Schardt, and therefore TopKey, knew about the Park Shirlington contract. Schardt even communicated with Fortis's President, Richard Lewis about it, explicitly affirming the contract and threatening Lewis with contractual liability under it. Specifically, on September 6, 2023, Schardt emailed Lewis that he had "not accepted [Lewis's] note to terminate the contract, so you are still liable." *See* Attachment, Declaration of Richard Lewis ¶ 12, Exhibit 6.

18.     Lewis is a Colorado resident and was located in Colorado at all relevant times, including when exchanging emails with Schardt—indeed, Lewis's email signature clearly shows his Colorado address and Colorado phone number. *See id.* ¶¶ 3-4, 12 & Ex. 6.

19.     In May of 2024, TopKey and Trident discussed entering into a formal "referral agreement," but could not agree on formal terms. *Id.* ¶ 13, Exhibit 7. Documents produced in this case show that TopKey edited the draft agreement to add an indemnification clause that was very specific: in Section 10, the "Indemnification" section, TopKey added a provision that explicitly acknowledged that Trident was "owned and operated by David Schupmann and Charles Schulz . . . who are both current or prior employees of Fortis Roof Performance & Financial Certainty, Guaranteed, located at 50 South Street, Suite 375, Denver, Colorado, 80209." *Id.* ¶ 13, Ex. 7.

20.     In other words, TopKey, with full knowledge of wrongdoing, full knowledge of who their conduct was injuring, and full knowledge of where Fortis resided (Colorado), intentionally sought protection from the liability inherent in the arrangement and the significant risk that Fortis might discover what was going on and assert claims against TopKey—which of course, is exactly what has happened.  *Id.*

21.     Unsurprisingly, those edits were "a non-starter" for Schulz, Schupmann, and Trident. *Id.* ¶ 14, Exhibits 8, 9. Schulz was clear—he and Schupmann were willing to proceed with the arrangement, but "it won't be under this language." *Id.*

22.     Schardt was obsequious, backing off immediately and imploring Schulz that "I'm sure we can make this work," and assuring Schulz "I have ever [sic] intent to make this work, lets find a way!" *Id.*

23.     TopKey and Trident did find a way: they simply kept the kickback arrangement intact without a formal agreement. *See, e.g.*, Reynolds Decl. ¶¶ 60-62.

24.     Further factual details and evidentiary support regarding the ample basis for personal jurisdiction against TopKey are found in the Declaration of Gary Scott Reynolds [ECF 188] and the exhibits attached thereto, which facts are incorporated as if fully set forth herein, as well as the Declaration of Richard Lewis in support of this Response and the exhibits attached thereto, which is attached to this Response and also incorporated as if fully set forth herein.

## ARGUMENT

### I.    This Court Has Personal Jurisdiction Over TopKey.

A. <u>Legal Standard.</u>

It is the plaintiff's burden, when challenged under Fed. R. Civ. P. 12(b)(2), to establish personal jurisdiction. *See, e.g.*, *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984). However, this burden is "light" and requires only a prima facie showing that jurisdiction exists. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). To defeat a motion challenging the Court's exercise of personal jurisdiction, a plaintiff meets its prima facie burden if it is able to point to facts in the Complaint, affidavits, or other written material that, taken as true, support the exercise of jurisdiction over the defendant. *Warad W., LLC v. Sorin CRM USA Inc.*, 119 F. Supp. 3d 1294 (D. Colo. 2015); *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). In evaluating personal jurisdiction, the Court takes the allegations in the Complaint "as true to the extent they are uncontroverted by the defendant's affidavits." *Wenz*, 55 F.3d at 1505. However, if the parties present "conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.*

Because Colorado's long-arm statute permits the exercise of jurisdiction to the full extent of the United States Constitution, the personal jurisdiction inquiry under Colorado law "collapses into the single due process inquiry." *Intercon, Inc. v. Bell Atl. Internet Sols.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citation omitted); *Hood v. Am. Auto Care, LLC*, 21

F.4th 1216, 1220 (10th Cir. 2021) ((holding that Colorado's long-arm statute means that the "statutory and constitutional requirements merge and we must assess only whether Colorado jurisdiction over this claim would be consistent with due process."). Personal jurisdiction comports with due process where a defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).

After the Supreme Court's seminal decision in *International Shoe,* it has recognized "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal*., 582 U.S. 255, 262 (2017). To exercise specific jurisdiction over a defendant, "the suit must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct*., 592 U.S. 351, 359 (2021). "In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (cleaned up) (citation omitted).

The contacts needed to establish specific jurisdiction "often go by the name 'purposeful availment.'" *Ford Motor Co.* 592 U.S. at 359 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The question is whether the defendant took "some act" by which it "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Id.* (citation omitted). The contacts "must be the defendant's own choice

and not 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). "They must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

In the "tort context," courts typically ask "whether the nonresident defendant 'purposefully directed' its activities at the forum state." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (Gorsuch, C.J.). When analyzing personal jurisdiction in the tort context, the 10th Circuit has followed the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783 (1984), holding that, "[d]istill[ed] to its essence," *Calder* stands for the proposition that purposeful direction exists when the nonresident defendant is shown to have taken (a) "an intentional action," that (b) is "expressly aimed at the forum state," with (c) "knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov*, 514 F.3d at 1072 (citing *Calder*, 465 U.S. at 789).

B.  TopKey Established Minimum Contacts with Colorado.

On a motion to dismiss for lack of personal jurisdiction, all allegations in the complaint are "taken as true to the extent they are uncontroverted by the defendant's affidavits." *Wenz*, 55 F.3d at 1505. "[A]ny factual disputes found in the parties' affidavits must be resolved in plaintiffs' favor." *Dudnikov*, 514 F.3d at 1070. Here, the well pleaded facts alleged in the TAC, paired with the declarations of Reynolds and Lewis and the documentary evidence, establish that TopKey had minimum contacts with Colorado in two independent ways: **First**, because it entered into an ongoing business relationship

with Fortis and signed contracts with Fortis, a resident of Colorado, and **second**, because it knowingly engaged in intentional actions, expressly aimed at Colorado, with knowledge that the injury wrought by those actions would be felt entirely by Fortis in Colorado.

> 1. *TopKey Established Minimum Contacts When It Communicated with Fortis's Owner in Colorado, Entered Contracts With Fortis, and Carried on a Years-Long Business Relationship With Fortis.*

"Purposeful direction (sometimes referred to as purposeful availment) requires that a defendant have deliberately engaged in significant activities within the forum State or deliberately directed its activities at the forum State, so that it has manifestly availed itself of the privilege of conducting business there." *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1308 (10th Cir. 2024) (cleaned up) (citation omitted). There are "several frameworks for testing whether a defendant has purposefully directed its activities at the forum state." *Id.* The "typical purposeful direction analysis looks to the out-of-state defendant's 'continuing relationships and obligations with citizens of the forum state'" such as entering a "contractual relationship that envision[s] continuing and wide reaching contacts' in the forum state." *Old Republic Ins. Co.*, 877 F.3d at 905 (cleaned up) (citation omitted).

The uncontradicted factual allegations in the TAC must be accepted as true, and those facts alone are sufficient to establish personal jurisdiction where they show that the connection between TopKey and Colorado was purposeful, knowing, and deliberate, not "indirect" or "remote" in the least. *Contra* Motion at 9. Fortis's 55-page Third Amended Complaint contains myriad allegations as to TopKey's intentional actions and resulting injury inflicted on Fortis—allegations that go well beyond plausibility. TopKey's feeble

attempt, through Schardt, to disclaim a relationship with Fortis is unavailing, lacks credibility, and in any event, is contradicted by the evidence in the Lewis and Reynolds declarations—and factual disputes in affidavits must be resolved in favor of Fortis.

Here, the evidence adduced and the factual allegations establish resoundingly that TopKey purposefully directed its conduct towards Colorado by entering into extensive business dealings with Fortis, who TopKey knew was in Colorado, and with whom TopKey entered into at least two formal contractual arrangements, both of which mentioned Colorado and called for Colorado venue. *See* Lewis Decl. at ¶¶ 8, 14-15 & Ex. 2; Reynolds Decl. at ¶ 56-58 & Ex. N.

Parties who reach beyond one state to create continuing relationships and obligations with citizens of another are subject to suit there for the consequences of their activities. *Burger King Corp.*, 471 U.S. at 473. Relatedly, where defendants negotiate, execute, and perform an ongoing relationship with a forum resident and the claims arise from that relationship, purposeful availment and a nexus for exercising jurisdiction are established. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1076–79 (10th Cir. 2004). TopKey's wrongful conduct unquestionably arose out of its business relationship with Fortis, because it exploited that relationship in order to benefit itself through the unlawful quid-pro-quo arrangement it developed with Fortis's disloyal employees, Schulz and Schupmann.

Tenth Circuit case *Pro Axess, Inc. v. Orlux Distribution, Inc.*, is instructive on this issue. 428 F.3d 1270, 1278-79 (10th Cir. 2005). There, the court found a sufficient nexus between a defendant's contacts with Utah and the plaintiff's injuries, such that the latter

11

arose out of or related to those activities. *See id.* While the moving defendant claimed the plaintiff's presence in Utah was a mere "coincidence" inadequate to allow Utah to exercise jurisdiction over them, the court disagreed, finding plaintiff's claims "arose from [defendant]'s solicitation of [plaintiff], development of a business agreement with [plaintiff], and subsequent communications with [plaintiff]." *Id.* at 1279. As those same interactions constituted the defendant's contacts with Utah, the Tenth Circuit determined the plaintiff's claims arose out of the defendant's contacts with Utah. *Id.*

*Benton* is similarly instructive. 375 F.3d at 1076–79. In that case, the parties entered into a "Memorandum of Understanding" that proposed the terms of several transactions and a joint venture to pursue trading activities. *Id.* Although the transactions themselves would occur in places other than Colorado, the business end of the transactions—"the brokering of the deals, the coordination of the parties, the exchange of money and information between the parties, and the decision-making behind the joint venture"—took place partially in the defendant's forum state and partially in Colorado, where the plaintiff operated. *Id.* "By engaging in a business relationship with [plaintiff], who operates his business from Colorado, [the defendant] "purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (cleaned up).

Here, TopKey purposefully availed itself of a business relationship with Fortis, and thus personal jurisdiction is appropriate.

12

2. *TopKey Established Minimum Contacts with Colorado Under the* Calder *Effects Test.*

Under the *Calder v. Jones,* 465 U.S. 783 (1984), "effects test," TopKey also had minimum contacts with Colorado because it (1) intentionally acted and (2) expressly aimed its conduct at Colorado, (3) knowing the brunt of that conduct would be felt by Fortis, a Colorado resident. *Dudnikov*, 514 F.3d at 1072 (citing *Calder*, 465 U.S. at 789).

First, TopKey intentionally acted. This is not a case involving accidental, attenuated, or merely incidental contact with the forum. TopKey had been doing business with Fortis since at least May 2020, and by June 2020 was discussing a formal strategic partnership with Fortis through Fortis's then-employee David Schupmann. TopKey then entered into a Mutual Confidentiality and Non-Disclosure Agreement with Fortis, which TopKey's Director of Operations signed on TopKey's behalf and which selected Colorado law. TopKey also pursued and performed Fortis-related work through Reynolds, who was so closely involved in TopKey's Fortis business that others referred to him as "Mr. Fortis." Reynolds worked extensively on the Park Shirlington project, prepared TopKey's roofing proposal to Fortis, and signed Schardt's name to the Park Shirlington contract at Schardt's direction. The alleged kickback arrangement likewise was not passive or inadvertent. Schulz and Schardt directed Reynolds to inflate proposals for Fortis work through a supposed "markup" or "referral fee," which was in reality a kickback to Schulz and Schupmann through Trident. That conduct occurred frequently, Schardt knew about it, and Park Shirlington was one of the larger and more complicated examples, involving a kickback exceeding $100,000.

Second, TopKey expressly aimed its conduct at Colorado. TopKey was not dealing with an unknown or out-of-state abstraction; it was dealing with Fortis, a company whose Colorado location was obvious from the outset and repeatedly confirmed in the parties' documents and communications. Schupmann's Fortis email signature prominently displayed Fortis's Denver address during the parties' early strategic-partnership communications. The NDA identified Fortis with a Denver address and selected Colorado law. Fortis's Denver address appeared in email signature blocks and in many other documents, and Reynolds confirmed that Fortis's Colorado location was "unmissable" and known to everyone he worked with at TopKey. The Park Shirlington contract likewise identified Fortis as located in Denver, Colorado, and required dispute resolution in Denver County, Colorado. TopKey therefore deliberately entered, maintained, and exploited a course of business with a Colorado company, using Fortis-related contracts and proposals as the mechanism for the alleged inflated pricing and kickback scheme.

The express aiming is particularly clear because the alleged misconduct targeted Fortis's business relationship and Fortis's money. TopKey's inflated proposals were submitted for Fortis work, and the alleged "markup" or "referral fee" was built into pricing charged in connection with Fortis projects. The Park Shirlington contract was a Fortis contract. When Fortis attempted to terminate that contract, Schardt did not disclaim it or treat it as unauthorized; he affirmatively asserted it against Fortis, telling Fortis's Colorado-based President, Richard Lewis, that Schardt had "not accepted" Lewis's termination notice and that Fortis was "still liable." TopKey thus expressly invoked the

14

Fortis contract against Fortis, with knowledge that Fortis was located in Colorado and that Lewis was acting from Colorado.

Third, TopKey knew the brunt of the harm would be felt by Fortis in Colorado. The record shows TopKey's knowledge not only of Fortis's identity, but of Fortis's Colorado residence and the risks created by the alleged arrangement. Reynolds knew Fortis was based in Colorado, and he testified that everyone else at TopKey knew the same. Lewis was a Colorado resident located in Colorado at all relevant times, including when communicating with Schardt, and his email signature showed his Colorado address and phone number. TopKey's own proposed edits to the draft referral agreement with Trident confirm that TopKey understood exactly who was affected and where that company was located. In the proposed indemnification provision, TopKey specifically acknowledged that Trident was owned and operated by Schupmann and Schulz, both of whom were employees of Fortis. That proposed indemnity language demonstrates that TopKey knew the arrangement created liability risk connected to Fortis, knew Fortis was the party exposed to injury, and knew Fortis was located in Colorado. Taken together, these facts show far more than foreseeable injury in the forum and the Motion should be denied.

C. Exercising Jurisdiction Over TopKey in Colorado is Reasonable.

Because Plaintiff's injuries arise from TopKey's minimum contacts in Colorado, the burden shifts to TopKey to make a "compelling case" that exercising jurisdiction over it will actually offend concepts of fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 477-78. Courts engage in a five-factor reasonableness test to assess whether the exercise of jurisdiction offends due process, even when the plaintiff has established

the defendant's minimum contacts. *Old Republic Ins. Co.*, 877 F.3d 904-06. The factors are: "'(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.'" *Id.* at 909. "The strength of these factors sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1095 (10th Cir. 1998). Each of these factors favors a finding of personal jurisdiction in this case.

On the first factor, the burden on TopKey of litigating in Colorado does not rise to the level of a constitutional concern. "As in any case in which the parties reside in different fora, one side must bear the inconvenience of litigating 'on the road.' While admittedly a burden, defendants have not indicated that their defense of this case would be hindered by the territorial limits on the Colorado district court's power to subpoena relevant witnesses, or indeed hampered in any other significant way." *Dudnikov*, 514 F.3d at 1081. TopKey has Colorado counsel and has already successfully appeared in court, filed documents, and engaged in communications regarding the case. Given modern travel and telecommunications, it is not unduly burdensome to require [TopKey's] representatives to travel or call." *Watson v. Dillon Companies, Inc.*, 615 F. Supp. 2d 1221, 1228 (D. Colo. 2009); *see also, e.g.*, *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1061 (10th Cir. 2008) (holding that it was not unduly

16

burdensome to require an English company to litigate in Colorado thanks to "modern transportation and communications" and where the Company's president had previously demonstrated his "ability to journey to the United States.")

On the second factor, Fortis is a Colorado resident and has an interest in litigating here. "States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005) (quotation omitted). Federal courts nationwide find this factor weighs in favor of exercising jurisdiction where the forum state wishes to protect its citizens from misconduct. *See, e.g., Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 814 (5th Cir. 2006) (weighing the forum state's interest in protecting its citizens from a tort as a factor in favor of finding personal jurisdiction). Colorado has a strong interest in protecting Colorado businesses from precisely the conduct alleged here—injury at the hands of unscrupulous out-of-state actors who interfere with the contractual relationships of residents, engage in unfair competition, harm local business, damage the local economy, and who aid and abet breach of fiduciary duties to Coloradans.

As for the third factor: Fortis's interest in convenient and effective relief at home is obvious: Fortis and its owner reside in the state and filed this case in Colorado. Moreover, this case has been ongoing for more than a year against multiple defendants in Colorado. It will absolutely be inconvenient and inefficient if Fortis is required to proceed in a separate forum, piecemeal, against TopKey alone.

17

Courts in this district have recognized that Plaintiffs have a "strong interest in having all the defendants in a single lawsuit rather than pursuing piece meal litigation," particularly where "other defendants do not dispute jurisdiction." *Watson*, 615 F. Supp. 2d at 1228. Here, as in *Watson*, there is personal jurisdiction against all of the other Defendants, and the case should proceed here, in a single lawsuit. *Id.* TopKey argues that Fortis can obtain "convenient and effective relief" in Maryland, but Fortis respectfully disagrees. In any event, the fact that Fortis *could* proceed in Maryland against TopKey only does not cause this factor to favor TopKey. In reality, Fortis would be unduly burdened if it were required to separately pursue its claims against TopKey in Maryland, and Maryland has little connection to the events in this case other than the fact that it is where TopKey maintains offices.

The fourth and fifth factors are related: they are the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the "shared interest of the several states" in furthering social policies. *Pro Axess, Inc*., 428 F.3d at 1274. "Key" considerations on the fourth factor are "the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI Holdings, Inc.,* 149 F.3d at 1097. Here, to grant TopKey's motion would *require* piecemeal litigation.

In this case, "[s]ince all of the defendants come from different states, no other single state has a greater interest in resolving this matter than Colorado." *Watson*, 615 F. Supp. 2d at 1228. As in *Watson*, the state with the greatest connection to and interest

in this matter is Colorado. Moreover, the judicial system's interest in avoiding piecemeal litigation and waste of resources is strong. This case has been pending in this court since 2025, and it should stay here. While a number of the witnesses certainly reside outside of Colorado, at best they reside in a hodge-podge of different states. In this age of remote work, it is by pure chance that Schulz and Schupmann do not reside in Colorado—but they worked for a Colorado company, and the litigation is best suited to proceed here.

As to the final factor—the states' shared policy interest, Maryland's does not outweigh Colorado's interest. Colorado has a strong interest in protecting its citizens from torts. It would be a waste of time and resources to require the claims against TopKey to be dismissed and refiled in a new forum, separate from all of the others. Taken together, each of these considerations favors Fortis. Accordingly, the Court should conclude that the exercise of personal jurisdiction over TopKey comports with traditional notions of fair play and substantial justice and deny the Motion.

## CONCLUSION

For the foregoing reasons, Fortis requests that the Court deny TopKey's Motion to Dismiss, permit the case to proceed, and grant such other and further relief as the Court may deem just and proper.

DATED this 14th day of July, 2026.

Respectfully submitted,

SENN FORTIS, LLC

*/s/ Lenora B. Plimpton*
Christine K. Lamb, Atty. Reg. #30326

Lenora B. Plimpton, Atty. Reg. #48194
Megan M. Ratcliffe, Atty. Reg. #56489
Senn Fortis LLC
1700 Lincoln Street, Suite 2100
Denver, CO 80203
Telephone: (303) 298-1122
clamb@sennfortis.com
lplimpton@sennfortis.com
mratcliffe@sennfortis.com
*Attorneys for Plaintiff/Counter-Defendants*

## CERTIFICATION REGARDING THE USE OF GENERATIVE ARTIFICIAL INTELLIGENCE

Pursuant to Judge Nina Wang's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, undersigned counsel hereby certifies as follows:

1)      The individuals who contributed to the drafting of this filing used tools provided by Harvey, which is a Generative Artificial Intelligence ("AI") platform, to prepare this filing.

2)      A small amount of the language in this filing was drafted by or generated by AI, and no legal citations in this filing were drafted, written, or generated by AI. I hereby certify that I personally reviewed the generated language for accuracy and that I did not use any AI-generated legal citations.

*/s/ Lenora B. Plimpton*
Lenora B. Plimpton, Atty. Reg. #48194

21

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2026, I served the foregoing **PLAINTIFF'S RESPONSE TO TOPKEY CONSTRUCTION'S MOTION TO DISMISS THIRD AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kellie Nelson Fetter
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Telephone: (303) 299-8354
Facsimile: (303) 298-0940
kfetter@taftlaw.com
*Attorney for Defendant David Schupmann*

Todd Rowden
Taft Stettinius & Hollister, LLP
111 East Wacker Suite 2600
Chicago, IL 60601
TRowden@Taftlaw.com
Phone: 312.836.4060
Fax: (312) 527-4011
*Attorney for Defendants David Schupmann and Roofing USA, LLC*

Gary J. Benson
Denesh Chukkapalli
Dworkin, Chambers, Williams, York,
Benson & Evans, P.C.
3900 East Mexico Avenue
Suite 1300 & Suite 820

Denver, CO 80210
303-584-0990
Fax: 303-584-0995
Email: gbenson@dnvrlaw.com
dchukkapalli@dnvrlaw.com
*Attorneys for Defendant Charles Schulz*

Gabriel D. Pinilla (CO Bar # 54504)
Uriel Martinez (CO Bar # 57394)
ADAMS & REESE, LLP
1001 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 970-2156
Gabriel.Pinilla@arlaw.com
Uriel.Martinez@arlaw.com
Alisyn.Bukowski@arlaw.com
*Attorneys for Defendant Installation Services dba TopKey Construction*

*Via U.S. Mail*:
Trident Solutions of Sugar Grove
c/o David Schupmann
0S440 Crego Place
Geneva, IL 60134

/s/ Lenora B. Plimpton
Lenora B. Plimpton
SENN FORTIS LLC